Filing # 68337188 E-Filed 02/22/2018 03:07:18 PM

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO:

PANDORA A/S,
a Danish corporation

and

Pandora Jewelry LLC,
a Maryland limited liability company,

     Petitioners,

v.

B&B JEWELRY, INC.
a Florida corporation

     Respondent.

_____/

**PETITION TO CONFIRM FOREIGN
ARBITRATION AWARD**

Petitioners Pandora A/S and Pandora Jewelry, LLC (together "Pandora" or "Petitioners"),

by and through their undersigned attorneys, allege as follows:

## Nature of the Action

1.     This is a proceeding pursuant to Section 207 of the Federal Arbitration Act, 9

U.S.C. § 207, to confirm a foreign arbitral award in accordance with the Convention on the

Recognition and Enforcement of Foreign Arbitral Final Awards of June 10, 1958, 21 U.S.T.

2517 (entered into force December 29, 1970) (the "Convention") and to have judgment entered

thereon.

2.     On January 5, 2018, a sole arbitrator appointed by the Danish Institute of

Arbitration ("DIA") entered a final arbitral award in favor of Petitioners and against Respondent,

1

B&B Jewelry Inc. ("B&B"). A true and authentic copy of the sole arbitrator's Final Award (as corrected by order dated December 27, 2017) (the "Final Award") duly certified by the DIA is attached as **Exhibit 1** to the Affidavit of Rene Offersen, Pandora's Danish counsel in the underlying arbitration proceedings.[1]

3.      The Final Award was rendered pursuant to the arbitration provisions of two written contracts entered into between Pandora A/S and B&B: (1) a Master Distribution Agreement commencing August 1, 2012 (the "MDA"); and (2) a Master Franchise Agreement commencing August 1, 2012 (the "MFA") (collectively the "2012 Agreements"). True and authentic copies of the MDA and MFA are attached to Mr. Offersen's Affidavit as **Exhibits 2 and 3** respectively.

4.      Petitioners now seek confirmation and enforcement of the Final Award and the entry of judgment based on that Final Award.

**Parties**

5.      Petitioner Pandora A/S (f/k/a Pandora Holdings A/S) is a Danish corporation with its principal place of business located in Copenhagen, Denmark. Pandora A/S designs, manufacturers, markets and distributes hand-finished, high quality jewelry. PANDORA® jewelry is sold in more than 100 countries on six continents through approximately 9,300 points of sale. **Ex. 1 ¶ 3.**

6.      Petitioner, Pandora Jewelry LLC ("Pandora Americas") is a limited liability company organized and existing under the laws of Maryland with its principal place of business located in Baltimore, Maryland. **Ex. 1 ¶ 4.**

---

[1] The Affidavit of Rene Offersen is attached hereto as **Exhibit A**. Hereinafter, the documents attached to and authenticated by Mr. Offersen's Affidavit shall be referenced by their numerical designations in the Affidavit.

7.     Respondent B&B is a corporation organized and existing under the laws of Florida with its principal place of business located in Miami, Florida. **Ex. 1** ¶ 5.

## Jurisdiction and Venue

8.     This Court has subject matter jurisdiction pursuant to Fla. Stat. § 26.012 and 9 U.S.C. § 207. *See Benefit Assoc. Int.'l v. Mount Sinai Comprehensive Cancer Ctr.*, 816 So. 2d 164, 166 (Fla. 3rd DCA 2002) ("The Federal Arbitration Act, under which the Convention is implemented, governs in the enforcement, validity and interpretation of arbitration provisions in commercial contracts in *state* or federal court") (emphasis added) (citing *Allied Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 269-73 (1995)); *McDermott Int.'l Inc. v. Lloyds Underwriters of London*, 944 F.2d 1199, 1208 (5th Cir. 1991)(recognizing concurrent jurisdiction over Convention cases in federal and state courts).

9.     The court has personal jurisdiction over Respondent B&B pursuant to Fla. Stat. § 48.193(a)(1), as B&B is a resident of and conducts, engages in and carries on a business in the state of Florida.

10.     Venue in this Court is proper under Fla. Stat. § 47.051, as Respondent B&B, a domestic corporation, maintains its principal office for the transaction of its customary business in this judicial district.

## Factual Background

11.     On August 1, 2012, B&B entered into the 2012 Agreements with Pandora A/S, pursuant to which B&B was granted exclusive distribution and franchise rights for the sale of PANDORA® jewelry in certain South American countries. **Ex. 1** ¶¶ 69-71.

12.     The 2012 Agreements are "governed in all respects in accordance with Danish law and shall be construed and take effect as an agreement made in Denmark." **Ex. 1** ¶12 (citing MDA § 28.1; MFA § 32.1).

13.     With respect to dispute resolution, the Agreements provide as follows:

> PANDORA shall have the right to enforce *any dispute or claim arising out of or in connection with this agreement* in accordance with the Rules of Arbitration Procedure of the Danish Institute of Arbitration. The venue of arbitration shall be Copenhagen. The language of the proceeding shall be English.

**Ex. 1** ¶ 7 (citing MDA § 28.2; MFA § 32.2) (emphasis added).

### A.     The Arbitration filed by Pandora

14.     In 2016, a dispute arose between the parties as to when the 2012 Agreements expired.

15.     B&B alleged that the 2012 Agreements had expired at the end of their initial 3-year term, July 31, 2015 (the "Initial Term"), and that its continuing franchise and distribution activities after that date were governed by a separate verbal agreement between B&B and Pandora Americas. **Ex. 1** ¶¶ 2; 142; 147.

16.     Petitioners maintained that the 2012 Agreements were extended by course of performance beyond their Initial Term and into a two-year renewal term ending on July 31, 2017 (the "Renewal Term"), and, as such, the 2012 Agreements continued to govern B&B's franchise and distribution activities in South America during the Renewal Term. **Ex. 1** ¶¶ 2; 146.

17.     To resolve this dispute, on January 17, 2017, Petitioners filed a Statement of Claim in the DIA pursuant to the parties' arbitration agreement seeking a declaratory judgment under Danish law that: (i) the 2012 Agreements were extended by course of performance beyond their Initial Term into the Renewal Term and would expire on July 31, 2017; (ii) the 2012

4

Agreements between B&B and Pandora A/S governed B&B's franchise and distribution activities in South America during the Renewal Term; and (iii) the 2012 Agreements had not been assigned to Pandora Americas such that, at all relevant times, the contracting party under the 2012 Agreements remained Pandora A/S, not Pandora Americas. **Ex. 1** ¶ 67.

18.     Although Pandora A/S was the primary claimant in the arbitral proceedings, Pandora Americas also participated as a Claimant for the sole purpose of asserting an alternative claim that if found to have been assigned rights under the 2012 Agreements by Pandora A/S, the 2012 Agreements still continued by course of performance. **Ex. 1** ¶ 67.

19.     In connection with their claims for declaratory relief, Petitioners further sought to recover their legal fees and costs incurred in connection with or resulting from the arbitration, plus default interest in accordance with section 5 of the Danish Interest Act. **Ex. 1** ¶¶ 67.1.5; 67.2.4.

**B.     The Sole Arbitrator's Exercise of Jurisdiction over the Dispute.**

20.     In response to the Statement of Claim, by letter from its Danish counsel dated February 1, 2017, B&B objected to arbitral jurisdiction over the dispute and provided comments regarding Pandora's request for the appointment of sole arbitrator for the matter in accordance with the DIA Rules. **Ex. 1** ¶ 16.

21.     By letter dated February 7, 2017, the DIA notified the parties of its intention to appoint James Hope as the sole arbitrator of the dispute (the "Sole Arbitrator"), which appointment was confirmed by the DIA on March 15, 2017. **Ex. 1** ¶ 21.   B&B confirmed in writing to the DIA that it did not object to the appointment of Mr. Hope as sole arbitrator.

22.     Following the appointment of the Sole Arbitrator, the parties, by and through their respective counsel, participated in a series of procedural conferences and submitted written briefs relating to B&B's objections to jurisdiction. **Ex. 1** ¶¶ 20-32.

23.     On June 23, 2017, the Sole Arbitrator issued a Partial Award of Jurisdiction as certified by the DIA (the "Partial Award") – a true and authentic copy of which is attached to Mr. Offersen's Affidavit as **Exhibit 4.**   In his Partial Award (which is referenced in and relied upon his Final Award), the Sole Arbitrator found that contrary to B&B's arguments, he had jurisdiction over the claims asserted by Pandora in the arbitration. **Ex. 1** ¶¶ 33; 130-35 (citing Partial Award (**Ex. 4**)).

24.     After issuing his jurisdictional ruling, and as the result of additional conferences attended and written submissions made by counsel for both parties, the Sole Arbitrator issued a series of procedural orders setting forth a timetable for the further arbitration of the merits of Pandora's claims. **Ex. 1** ¶¶ 34-52.

25.     Pursuant to those orders, on August 30, 2017, B&B filed its Statement of Defense reiterating its objections to jurisdiction and asserting a substantive defense to the merits of the case. **Ex. 1** ¶¶ 38; 133 (a).

26.     Throughout the pre-hearing procedural phase of the arbitration, from June 23 through at least October 24, 2017, B&B actively participated in the arbitration. **Ex. 1** ¶¶ 133-34. Specifically, the Sole Arbitrator found that:

> B&B's participation in arbitration has gone considerably beyond objecting to jurisdiction. B&B has presented its case on the merits, at least in part, and it has also participated in the proceedings on the merits following the issuance of the Partial Award on Jurisdiction. In fact, up until at least October 24, 2017, B&B gave the impression that it was intending to participate in the main hearing.

6

**Ex. 1 ¶ 134.** Based on these findings, the Sole Arbitrator concluded that, "B&B has, in any event, waived its right to object to jurisdiction of the DIA and the Sole Arbitrator by participating in the arbitration on the merits." **Ex. 1 ¶ 135.**

### C.     The Main Hearing

27.     A final hearing on the merits of the arbitration (the "Main Hearing") was held on November 29, 2017.  With the prior consent of the parties, the Main Hearing was held in Baltimore, Maryland. **Ex. 1 ¶¶ 36(d); 56.**

28.     Notwithstanding the Sole Arbitrator's finding of jurisdiction and B&B's participation in the merits of the proceedings, B&B chose not to appear at the Main Hearing. **Ex. 1 ¶ 57.**

29.     The Sole Arbitrator gave B&B a full and fair opportunity to participate in the Main Hearing. **Ex. 1 ¶¶ 125-29.**   In B&B's absence, the Sole Arbitrator conducted the Main Hearing in full compliance with the applicable requirements of Danish law and the DIA Rules. **Ex. 1 ¶¶ 112-40.**  Specifically, the Sole Arbitrator found that:

-     None of the parties lacked legal capacity to arbitrate. **Ex. 1 ¶ 118.**

-     The agreement to arbitrate in the 2012 Agreements was valid and adhered to. **Ex. 1 ¶¶ 119-21.**

-     The party that failed to appear (*i.e.*, B&B) was given proper notice of the appointment of the Sole Arbitrator and of the arbitral proceedings. **Ex. 1 ¶¶ 122-24.**

-     All mandatory rules of the Danish Arbitration Act were complied with, including that the party failing to appear was given ample opportunity to present its case. **Ex. 1 ¶¶ 125-29.**

-     The arbitral tribunal had jurisdiction to hear the dispute at hand. **Ex. 1 ¶¶ 130-35.**

-     The Sole Arbitrator was not disqualified. **Ex. 1 ¶ 138-39.**

-       The award is not contrary to public policy. **Ex. 1** ¶ 140.

30.     At the Main Hearing, Pandora presented an opening statement, the sworn testimony of two witnesses and a closing statement. **Ex. 1** ¶ 58.

**D.     The Final Award**

31.     Based on the evidence presented at the Main Hearing, the Sole Arbitrator issued his Final Award.

32.     The Sole Arbitrator observed that: "There is no doubt that the parties continued to do business after the end of the Initial Term on July 31, 2015." **Ex. 1** ¶ 141. "The principal question to be determined is on what basis, and pursuant to what contractual arrangement, the parties continued to do business." **Ex. 1** ¶ 143.

33.     In resolving this question, the Sole Arbitrator found that, pursuant to governing Danish law, the 2012 Agreements were extended by course of performance beyond their Initial Term and into the Renewal Term. **Ex. 1** ¶¶ 148-77.

34.     Even in B&B's absence at the Main Hearing, the Sole Arbitrator carefully considered the evidence submitted by B&B in the form of a pre-hearing Affidavit from B&B's principal Rafael Bild.  In weighing that Affidavit against the evidence presented by Pandora at the Main Hearing, the Sole Arbitrator found as "not credible" B&B's claim that its franchise and distribution rights were governed by a separate verbal agreement with Pandora Americas after the Initial Term.  **Ex. 1** ¶¶ 181-91.

35.     The Sole Arbitrator further found that the governing 2012 Agreements were not assigned to Pandora Americas and that Pandora A/S remained the contracting party under the 2012 Agreements during the Renewal Term. **Ex. 1** ¶¶ 200-04.

36.     Based on these findings, the Sole Arbitrator issued its Final Award in favor of Pandora.

37.     The Final Award declares that: (i) the 2012 Agreements expired on July 31, 2017; and (ii) Pandora A/S did not assign the 2012 Agreements to Pandora Americas. **Ex. 1** ¶¶ 218.1; 218.4.

38.     The Final Award further recognizes that pursuant to a prior Stipulation between the parties, B&B's contractual obligations upon expiration of the 2012 Agreements had been temporarily suspended pending resolution of a motion for temporary injunction filed by B&B in related litigation pending in this Court, *B&B Jewelry, Inc. v. Pandora Jewelry, LLC, et al.,* Case No. 2016-032176 CA 01 (the "Florida Suit"). **Ex. 1** ¶ 218.2. The Final Award provides that upon the time permitted by that Stipulation (*i.e.,* a denial of B&B's motion for temporary injunction in the Florida Suit), B&B is required to discontinue its franchise and distribution operations in compliance with the termination provisions of the 2012 Agreements. **Ex. 1** ¶ 218.3.

39.     By Order dated December 19, 2017 (a true and authentic copy of which is attached to hereto as **Exhibit B**), this Court denied B&B's Motion for Temporary Injunction in the Florida Suit, thereby triggering B&B's obligation under the Final Award to comply with the termination provisions of the 2012 Agreements.

40.     Consistent with the DIA Rules and the Danish Arbitration Act, the Sole Arbitrator awarded Pandora its costs incurred in connection with the arbitration including:

-   Pandora's attorneys' fees and expenses:
    -   o   Danish Counsel                     DKK 2,049,097.11
    -   o   U.S. Counsel                        USD 188,881.00

-   Fees and costs paid to Sole Arbitrator & the DIA:     DKK 699,700.00

**Ex. 1** ¶¶ 205-17; 218.5-218.6.  The Final Award further awards default interest on this amount in accordance with Danish Interest Act as applicable.

41.     By letter dated December 21, 2017 (a true and authentic copy of which is attached to Mr. Offersen's Affidavit as **Exhibit 5**), Pandora demanded that B&B pay the above costs and fees as required by the Final Award.  As of the date of this Petition, B&B has neither responded to Pandora's demand, nor complied with the DIA's award and orders regarding payment of fees and costs.

**COUNT I**
**(Confirmation of Final Award Pursuant to 9 U.S.C. § 207)**

42.     Petitioners re-allege and incorporate herein by reference the allegations set forth in paragraphs 1 through 41 above.

43.     The United States and Denmark are both signatories to the Convention. *See* List of Contracting States http://www.newyorkconvention.org/list+of+contracting+states.

44.     The Convention has been implemented in the United States by Chapter Two of the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 201 *et seq.*

45.     The Final Award is governed by the Convention because it was rendered pursuant to an agreement to arbitrate between citizens of contracting states to the Convention that satisfies the requirements of 9 U.S.C. § 202.   Specifically, the 2012 Agreements are (1) in writing, (2) provide for arbitration in Denmark, and (3) arise out of a legal, commercial relationship.  *See* **Ex. 2** § 28.2; **Ex. 3** § 32.2.  Further, Pandora A/S, a party to the 2012 Agreements, is not an American citizen, and the parties' relationship envisages both performance and enforcement abroad, and has a reasonable relation with foreign states.

46.     The Final Award includes declaratory relief and a monetary award of costs (including reasonable attorneys' fees) under governing Danish law and the DIA Rules.

10

47.     Section 207 of the FAA provides that this "court *shall* confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the Convention." 9 U.S.C. § 207 (emphasis added).

48.     None of the grounds available for refusal or deferral of recognition and enforcement of an award specified in the Convention apply to the Final Award in this case.

49.     The reasons for and legal authorities supporting this Petition are set forth in the supporting Memorandum of Law, which is incorporated herein by reference.

**WHEREFORE,** Petitioners respectfully request that the Final Award be confirmed pursuant 9 U.S.C. § 207, and judgment entered for the relief set forth therein. The monetary portion of Final Award comprised of costs of arbitration, reasonable attorneys' fees and pre-judgment default interest under the Danish Arbitration Act should be converted to United States dollars at the time of confirmation and entry of judgment.

Dated: February 22, 2018           Respectfully submitted,

By: /s/ Manuel A. Garcia Linares
      Manuel A. Garcia-Linares, Esq.
      Florida Bar No. 985252
      mlinares@richmangreer.com
      brodriguez@richmangreer.com
      Georgia A. Thompson, Esq.
      Florida Bar No. 100181
      gthompson@richmangreer.com

      **Richman Greer, P.A**
      396 Alhambra Circle
      North Tower – 14th Floor
      Miami, FL 33134
      Telephone: (305) 373-4000
      Facsimile: (305) 373-4099

      *and*

      John E. McCann, Jr., Esq., *(pro hac vice)*
      *jmccann@MilesStockbridge.com*
      Michael Blumenfeld, Esq., *(pro hac vice)*
      *mblumenfeld@MilesStockbridge.com*
      Alexandra P. Moylan, Esq. *(pro hac vice)*
      *amoylan@milesstockbridge.com*
      **Miles & Stockbridge P.C.**
      100 Light Street
      Baltimore, Maryland 21202
      Tel: 410.727.6464
      Fax: 410.773.9101

      *Counsel for Petitioners*
      *Pandora A/S and Pandora Jewelry LLC*

# EXHIBIT A

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO:_____

PANDORA A/S, *et. al.*

    Petitioners,

v.

B&B JEWELRY, INC.

    Respondent.

_____/

## DECLARATION OF RENÉ OFFERSEN

I, René Offersen, hereby declare as follows:

1.    I am over the age of eighteen (18), am competent to testify to and have personal knowledge of the matters set forth in this Affidavit.

2.    I am a partner at DLA Piper Denmark Law Firm P/S, where I focus in the area of dispute resolution, including litigation and arbitration. I earned my Master of Law degree from the University of Aarhus in 1990. After becoming an attorney in 1993, I was admitted to the High Court of Denmark in 1993 and the Supreme Court in 1998.

3.    I served as counsel to Pandora A/S and its subsidiary, Pandora Jewelry, LLC, in an arbitration proceeding in the Danish Institute of Arbitration ("DIA") captioned *Pandora A/S v. B&B Jewelry Inc.*, DIA No. E-2588 (the "DIA Arbitration Proceeding").

4.    Attached hereto is as Exhibit 1 is true and authentic copy of the Sole Arbitrator's Final Award (as corrected by order dated December 27, 2017) (the "Final Award") as duly certified by the DIA is attached hereto as **Exhibit 1.**

5.      A true and authentic copy of a Master Distribution Agreement by and between Pandora Holding A/S (n/k/a Pandora A/S) and B&B Jewelry, Inc. ("B&B") (the "MDA"), as introduced into evidence during the Arbitration Proceeding is attached hereto as **Exhibit 2.**

6.      A true and authentic copy of a Master Franchise Agreement by and between Pandora A/S and B&B (the "MFA"), as introduced into evidence during the Arbitration Proceeding is attached hereto as **Exhibit 3.**

7.      A true and authentic copy of the Sole Arbitrator's Partial Award of Jurisdiction dated July 23, 2017 as certified by the DIA (the "Partial Award") is attached hereto **Exhibit 4.**

8.      A true and authentic copy of letter sent by me to counsel for B&B, Daniel K. Bandklayder, Jens Folker Bruun and Lars Lüthjohan Jensen, dated December 21, 2017 is attached hereto as **Exhibit 5.**

**UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.**

Date: February 21, 2018                                          _____

René Offersen

4828-0199-5869, v. 3

# EXHIBIT 1

# THE DANISH INSTITUTE OF ARBITRATION

**FINAL AWARD**

**(CORRECTED VERSION, PURSUANT TO THE SOLE ARBITRATOR'S DECISION DATED DECEMBER 27, 2017)**

**In arbitration case number: E-2588**

| **PANDORA A/S** | & | **PANDORA JEWELRY, LLC** |
|---|---|---|
| Havneholmen 17-19 | | 250 W. Pratt Street |
| 1561 Copenhagen V | | Baltimore, MD 21201 |
| Denmark | | U.S.A. |

"Claimants"

Represented by:

René Offersen, DLA Piper Denmark Advokatpartnerselskab, Copenhagen, Denmark, and

John E. McCann, Michael E. Blumenfeld and Alexandra P. Moylan, Miles & Stockbridge, P.C., Baltimore, Maryland, U.S.A.

**v.**

**B&B JEWELRY, INC.**

36 N.E. 1 St. #213

Miami, FL 33132

U.S.A.

"Respondent"

Represented by:

Daniel K. Bandklayder, Daniel K. Bandklayder, P.A., Miami, Florida, U.S.A.

Brandon J. Hechtman, Wicker Smith, Miami, Florida, U.S.A.

Jens Folker Bruun and Lars Lüthjohan Jensen, Mazanti-Andersen Korsø Jensen Advokatpartnerselskab, Copenhagen, Denmark

PLACE OF ARBITRATION: Copenhagen, DENMARK

Date: 5 January 2018

# THE DANISH
# INSTITUTE OF ARBITRATION

## TABLE OF CONTENTS

I.      Introduction ..................................................................................................... 2

II.     The parties ....................................................................................................... 2

III.    The arbitration agreements, and applicable laws ........................................... 3

IV.     The arbitration proceedings ............................................................................ 4

V.      The parties' respective claims in the arbitration ........................................... 13

VI.     The 2012 Agreements ..................................................................................... 16

VII.    Chronology of relevant facts and circumstances .......................................... 19

VIII.   The Sole Arbitrator's analysis ....................................................................... 23

        (A)     Procedural issues ............................................................................... 23

        (B)     Substantive issues ............................................................................. 32

IX.     Costs ............................................................................................................... 49

X.      Award ............................................................................................................. 53

# THE DANISH
# INSTITUTE OF ARBITRATION

### I.    Introduction

1.    This is an arbitration between Pandora A/S, previously Pandora Holdings A/S, (**"Pandora A/S"**) and Pandora Jewelry, LLC (**"Pandora Americas"**) acting together as claimants (together, **"Pandora"**), and B&B Jewelry, Inc. (**"B&B"**) as respondent.[1]

2.    This arbitration concerns the status of the business relationship between Pandora and B&B. In short, Pandora claims that their business relationship has essentially come to an end as from July 31, 2017, subject only to a stipulation that has been entered into between Pandora Americas and B&B pending a ruling from a U.S. court. B&B, on the other hand, claims that their business relationship is the subject of a continuing verbal agreement.

### II.    The parties

Pandora A/S

3.    Pandora A/S is a Danish listed company, founded in 1982, which designs, manufactures, markets and distributes hand-finished, high-quality jewelry.[2] Pandora's jewelry is sold in more than 100 countries on six continents through approximately 9,300 points of sale, including around 1,800 concept stores. Pandora A/S has its headquarters in Copenhagen, Denmark. Pandora A/S and its affiliates employ more than 16,700 people worldwide.

Pandora Americas

4.    Pandora Americas is a wholly-owned subsidiary of Pandora A/S, which has its headquarters in Baltimore, Maryland, U.S.A. Pandora Americas currently overseas the distribution and sale of Pandora jewelry in North America and South America.

B&B

5.    B&B is a Florida corporation, which carries on business as a distributor and franchisor of jewelry products. This arbitration concerns B&B's status as franchisor and distributor of Pandora jewelry products for various countries in South America.

---

[1]    In this Final Award, references to "the parties" and to "both parties" are references to Pandora (*i.e.* Pandora A/S and Pandora Americas) and B&B, respectively.

[2]    For the sake of consistency, the Sole Arbitrator will use the U.S. spelling of "jewelry" and the U.S. format for dates, but the rest of this Final Award is written in British English.

# THE DANISH
# INSTITUTE OF ARBITRATION

**III.**     **The arbitration agreements, and applicable laws**

The arbitration agreements

6.     This arbitration was commenced pursuant to the arbitration agreements contained in Clause 28.2 of the Master Distribution Agreement ("**MDA**") and Clause 32.2 of the Master Franchise Agreement ("**MFA**").

7.     These clauses, which are in exactly the same terms, provide:

> "*PANDORA shall have the right to enforce any dispute or claim arising out of or in connection with this agreement in accordance with the Rules of Arbitration Procedure of the Danish Institute of Arbitration. The venue of arbitration shall be in Copenhagen. The language of the proceeding shall be English.*"

8.     Although the claims are brought under two separate arbitration agreements, no objection has been made to the claims being heard together in the same arbitration.

The applicable procedural rules and procedural law

9.     Accordingly, the parties have agreed that the arbitration shall be conducted pursuant to the Rules of Arbitration Procedure of the Danish Institute of Arbitration (the "**DIA**", and the "**DIA Rules**"), the current edition of which has been in force as from 1 May 2013.

10.     The agreed seat of arbitration is Copenhagen, Denmark. Section 1(1) of the Danish Arbitration Act 2005 (Act no. 553 of 24 June 2005 on Arbitration) (the "**Danish Arbitration Act**") provides:

> Original Danish text: "*Loven gælder for voldgift, herunder international voldgift, der finder sted her i landet.*"

> English translation on the DIA's website: "*This Act applies to arbitration, including international arbitration, if the place of arbitration is in this country.*"

11.     The Danish Arbitration Act is accordingly applicable.

# THE DANISH
## INSTITUTE OF ARBITRATION

<u>The applicable substantive law</u>

12.   Both the MDA and the MFA are *"governed in all respects in accordance with Danish law"* (MDA, clause 28.1; MFA, clause 32.1).

13.   Thus, the applicable substantive law of the MDA and the MFA is Danish law. Accordingly, subject to certain issues discussed at paragraphs 148-155 below. Danish substantive law is to be applied to the merits in this arbitration.

**IV.   The arbitration proceedings**

14.   The proceedings started on January 17, 2017, when Pandora filed its Statement of Claim pursuant to Article 4(1) of the DIA Rules.

15.   By letter dated January 18, 2017, the DIA acknowledged receipt of the Statement of Claim and the registration fee, and *inter alia*:

    (a)   requested B&B to file a Statement of Defence no later than March 1, 2017;

    (b)   stated that it followed from Article 10(1) of the DIA Rules that, unless otherwise agreed, the dispute should be decided by a sole arbitrator;

    (c)   stated that the Chairman's Committee of the DIA would appoint the sole arbitrator, unless the parties jointly appointed a sole arbitrator no later than February 1, 2017;

    (d)   noted that Pandora had requested that the sole arbitrator should have a civil law background since the agreements were governed by Danish law;

    (e)   requested B&B to submit its comments on the background of the sole arbitrator no later than February 1, 2017;

    (f)   advised the parties that the provisional deposit amount for estimated expenses in the arbitration had been fixed at DKK 540,000; and

    (g)   requested each party to pay its share of the provisional deposit amount no later than February 7, 2017.

16.   By letter dated February 1, 2017, Mr. Lars Lüthjohan Jensen, Danish counsel for B&B, replied to the DIA and stated, *inter alia*, as follows:

4

# THE DANISH
# INSTITUTE OF ARBITRATION

(a)     On December 16, 2016, B&B had submitted a complaint to the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida U.S.A. against Pandora Americas (the "**Complaint**"), which had since been amended and removed to the United States District Court, Southern District of Florida.

(b)     B&B's position was that the DIA was compelled to dismiss the claim submitted to it by Pandora on grounds of lack of jurisdiction.

(c)     B&B would, for the time being, submit comments only in relation to the appointment of the sole arbitrator and in relation to the question of estimated expenses.

(d)     Regarding the appointment of the sole arbitrator, B&B submitted that the sole arbitrator should not be a citizen of Denmark or of the U.S.A., and that B&B preferred and requested that the sole arbitrator should have a common law background, but that B&B was willing to accept that the sole arbitrator be a person qualified within both a common law and a civil law legal system.

(e)     Regarding the question of estimated expenses, B&B submitted that such expenses should be assessed on the basis of proceedings solely on the question of whether or not the arbitration could proceed. Accordingly, B&B asked for the arbitration to be stayed, alternatively for the arbitration to be limited in the first instance to the issue of whether there was a valid and enforceable arbitration agreement.

17.     By letter dated February 2, 2017, the DIA asked Advokat and Solicitor-Advocate James Hope whether he would be willing and able to serve as Sole Arbitrator in respect of this arbitration. Mr. Hope is a British Citizen, and he is not a citizen of Denmark or of the U.S.A. He is also qualified as a lawyer in both Sweden and England, and he is thus a person qualified within both a common law and a civil law legal system.

18.     By email dated February 6, 2017, Mr. Hope confirmed to the DIA that, having carried out the necessary conflict check, he would be willing and able to accept appointment as Sole Arbitrator.

19.     By letter dated February 7, 2017, the DIA informed the parties that it proposed to appoint Mr. Hope to serve as Sole Arbitrator in respect of this arbitration.

5

# THE DANISH
# INSTITUTE OF ARBITRATION

20. On March 15, 2017, the Chairman's Committee of the DIA confirmed the appointment, and consequently the DIA informed the parties that Mr. Hope had been appointed to serve as Sole Arbitrator in respect of this arbitration.

21. Later on March 15, 2017, the Sole Arbitrator sent an initial email to the parties, in which he invited the parties to attend an initial procedural telephone conference.

22. An initial procedural telephone conference was duly held on March 23, 2017. Both parties were represented by counsel at this procedural telephone conference. Pursuant to Article 7 of the DIA Rules, the first issue that needed to be addressed was the date for submission of the Statement of Defence. B&B asked to be given until April 21, 2017, whereas Pandora submitted that the Statement of Defence should be submitted as soon as possible, and in any event before April 16, 2017.

23. On March 23, 2017, the Sole Arbitrator circulated minutes of the initial procedural telephone conference. By Procedural Order No. 1, dated March 23, 2017, the Sole Arbitrator ruled that the Statement of Defence should be submitted by April 3, 2017, at the latest.

24. By email dated March 27, 2017, B&B noted that, during the initial procedural telephone conference, B&B's counsel had reiterated B&B's position that the DIA was without jurisdiction, as set forth in B&B's earlier correspondence to the DIA. B&B also forwarded a copy of an Order of the U.S District Court for the Southern District of Florida, dated March 23, 2017.

25. By email dated March 27, 2017, the Sole Arbitrator acknowledged receipt of B&B's email and invited the parties to set out their respective positions regarding jurisdiction. The parties did so accordingly by emails dated March 29 and March 30, 2017.

26. By email dated April 2, 2017, the Sole Arbitrator circulated a revised version of the minutes of the initial procedural telephone conference, noting B&B's objection to jurisdiction, and asked the parties to attempt to agree upon a timetable for the exchange of pleadings on the issue of jurisdiction. By email dated April 6, 2017, since the parties had not reached agreement, the Sole Arbitrator proposed a timetable for the exchange of pleadings on the issue of jurisdiction.

27. By Procedural Order No. 2, dated April 11, 2017, the Sole Arbitrator fixed a timetable for the exchange of pleadings on the issue of jurisdiction.

6

# THE DANISH
## INSTITUTE OF ARBITRATION

28.     On April 14, 2017, B&B filed its first submission on jurisdiction.

29.     On April 28, 2017 – but received by the Sole Arbitrator on May 2, 2017 – Pandora filed its first submission on jurisdiction.

30.     By Procedural Order No. 3, dated 3 May 2017, and by agreement between the parties, the Sole Arbitrator varied the timetable as set out in Procedural Order No. 2.

31.     On May 15, 2017, B&B filed its second submission on jurisdiction.

32.     On June 1, 2017, Pandora filed its second submission on jurisdiction.

33.     On June 23, 2017, following scrutiny by the DIA, the DIA issued the Sole Arbitrator's Partial Award on Jurisdiction.[3] In that Partial Award, the Sole Arbitrator found that the DIA and the Sole Arbitrator had jurisdiction to hear and determine the claims made by Pandora A/S and Pandora Americas in this arbitration. (To the knowledge of the Sole Arbitrator, B&B did not make any request for the Danish courts to decide the issue of jurisdiction, pursuant to section 16(3) of the Danish Arbitration Act.)

34.     By email dated June 29, 2017, the Sole Arbitrator asked the parties to give their views on the further timetable in the arbitration. In particular, the Sole Arbitrator asked the parties to comment on:

    (a)     an appropriate deadline for the Respondent's submission of its Statement of Defence;

    (b)     possible dates for the preparatory meeting as per Article 19 of the DIA Rules (which should ordinarily take place after the Respondent's submission of its Statement of Defence); and

    (c)     an appropriate further timetable for the arbitration going forward, including possible dates for any main hearing.

35.     Both parties provided their comments by emails dated July 10, 2017. On that date, B&B asked for a stay of the arbitration pending an expected ruling by the Florida court.

---

[3]     The Partial Award on Jurisdiction was wrongly dated July 23, 2017, but was sent to the parties on June 23, 2017.

# THE DANISH
# INSTITUTE OF ARBITRATION

36. By Procedural Order No. 4, dated July 18, 2017, after receiving further emails from both parties, the Sole Arbitrator ruled on the further timetable in the arbitration. In particular:

   (a) The Sole Arbitrator refused B&B's request for a stay of the arbitration. As with the Statement of Defence, B&B's reason for delay was its expectation of an impending ruling by the U.S. courts, namely a ruling by the Florida court which was anticipated before the end of September 2017. However, the Sole Arbitrator decided that the possibility of a ruling by the Florida court could not override the need to proceed with the arbitration, particularly in light of the obligation under Article 18(1) of the DIA Rules to "*ensure that the arbitration is conducted within reasonable time and in an efficient and cost-conscious manner*".

   (b) Nevertheless, at B&B's request, the Sole Arbitrator delayed Pandora's proposed timetable by 15 days in order to allow for a court hearing that was anticipated to take place before the Florida court during August 2017.

   (c) The Sole Arbitrator ruled that five days should be set aside for the main hearing, although he expressly stated that it was to be hoped that the main hearing could be resolved within a shorter amount of time.

   (d) Since both parties were in agreement on this issue, the Sole Arbitrator ruled that the main hearing would be held in Baltimore, Maryland, U.S.A, at the offices of Pandora's U.S. counsel, Miles & Stockbridge, P.C. At B&B's request, the Sole Arbitrator also confirmed that B&B could continue to be represented by its Florida counsel at the main hearing.

37. By Procedural Order No. 5, dated August 25, 2017, and by agreement of the parties, the Sole Arbitrator varied the procedural timetable in order to postpone the date of the proposed preliminary hearing.

38. On August 30, 2017, B&B submitted its Statement of Defence. In its Statement of Defence:

   (a) B&B maintained its objections to the jurisdiction of the DIA and of the Sole Arbitrator;

   (b) B&B put forward its argument in defence (as set out further below);

8

## THE DANISH
## INSTITUTE OF ARBITRATION

(c)   B&B confirmed that it did not seek affirmative relief from the Sole Arbitrator at that point;

(d)   B&B requested that, if appropriate, the Sole Arbitrator assess the expenses of this arbitration, including B&B's attorney's fees and expenses, against Pandora;

(e)   B&B reserved the right to request documents and information from Pandora A/S and from Pandora Americas;

(f)   B&B reserved the right to identify witnesses in the arbitration, including but not limited to Rafael Bild, Manolo Barral, Tobias Toft, Franck Saragossi, Matthew Scott and Tracey Griffin;

(g)   B&B reserved the right to arbitrate its claims, in the event that the Florida State Court ordered it to do so.

39.   On September 22, 2017, the preliminary hearing took place by telephone conference pursuant to Article 18(5) of the DIA Rules. Both parties were represented at the preliminary hearing. The Sole Arbitrator went through the list of points set out at Article 18(5) of the DIA Rules. At B&B's request, the Sole Arbitrator ruled that each witness would need to give advance notice of his or her testimony, in the form of a witness summary, setting out both the subject matter of the witness's testimony and a summary of what the witness would say about that subject matter. The Sole Arbitrator further ruled that full direct examination, cross-examination and re-examination would be allowed in respect of each witness.

40.   Later on September 22, 2017, the Sole Arbitrator circulated minutes of the preliminary hearing.

41.   On September 25, 2017, Pandora submitted its Statement of Reply.

42.   By Procedural Order No. 6, dated October 4, 2017, the Sole Arbitrator confirmed the minutes of the preliminary hearing, having not received any comments from either party, and confirmed his ruling in respect witness summaries as set out above.

43.   Later on October 4, 2017, B&B made an application to the Sole Arbitrator, requesting that all existing deadlines in the arbitration be rescheduled for dates after the next hearing before the Florida court, on November 14, 2017.

9

# THE DANISH
# INSTITUTE OF ARBITRATION

44.     On October 10, 2017, B&B applied for Pandora's Reply to be stricken from the record.

45.     By Procedural Order No. 7, dated October 15, 2017, after receiving further emails from both parties, the Sole Arbitrator ruled on B&B's requests (a) for a further postponement or stay of the procedural timetable, and (b) for Pandora's Reply to be stricken from the record:

    (a)     B&B argued that the question of a stay should be re-visited, since the Florida court, contrary to previous expectations that the hearing would be held in August or September, had scheduled its hearing to be held on November 14, 2017. The Sole Arbitrator agreed that the question of a stay could be revisited, but having revisited the question the Sole Arbitrator denied the request for a stay. In particular, the Sole Arbitrator did not agree that it would be more efficient and cost-conscious to delay the arbitration in case the Florida court should rule that B&B should be required to arbitrate its claims.

    (b)     B&B argued that Pandora had no right to submit a reply in these circumstances, since B&B had not submitted a counterclaim. However, the Sole Arbitrator did not accept B&B's arguments in this respect, particular since B&B had previously agreed to the various steps in the procedural timetable and had failed to raise the issue at the preliminary hearing held on September 22, 2017.

46.     By emails dated October 17, 2017, as confirmed by the Sole Arbitrator later that day, the parties agreed to a one-week extension, respectively, for submission of witness summaries and supplementary witness summaries.

47.     On October 24, 2017, Pandora submitted witness summaries in respect of Matthew Scott, Esquire, Franck Saragossi, and Debra J. Markwitz, Esquire.

48.     Also on October 24, 2017, B&B submitted an affidavit sworn by Rafael Bild, which had previously been filed before the U.S. District Court.

49.     By email dated October 24, 2017, B&B requested the Sole Arbitrator to reconsider his Partial Award on Jurisdiction, and indicated that it would limit its participation in the arbitration to maintaining its challenge to the jurisdiction of the DIA.

50.     By Procedural Order No. 8, dated October 27, 2017, the Sole Arbitrator refused B&B's request to reconsider the Partial Award on Jurisdiction. In particular, the Sole Arbitrator ruled

10

# THE DANISH
# INSTITUTE OF ARBITRATION

that he did not have jurisdiction to re-consider the Partial Award on Jurisdiction, and that it was therefore not open to him to do so.

51.   By Procedural Order No. 9, dated November 7, 2017, the Sole Arbitrator gave directions in preparation for the main hearing. In particular, the Sole Arbitrator confirmed the proposed timetable for the main hearing as proposed by Pandora, following B&B's indication that it would limit its participation in the arbitration to maintaining its challenge to the jurisdiction of the DIA. Nevertheless, the Sole Arbitrator stated that he had a duty to ensure that, despite B&B's indication that it might not participate in the main hearing, B&B would continue to be given an opportunity to defend itself against the claims that had been made against it in the arbitration. For that reason, the Sole Arbitrator:

(a)   continued to give B&B the opportunity to submit Supplementary Witness Summaries;

(b)   delayed the date for submission of the parties' case summaries, in order to allow further time for B&B to consider its position after November 14, 2017, when the hearing in the Florida court was expected to take place;

(c)   gave both parties the opportunity to attend a further preparatory hearing on November 21, 2017;

(d)   left open the possibility for B&B to present an opening speech, cross-examine the witnesses presented by Pandora, present a closing speech, and make remarks on costs;

(e)   asked both parties to ensure that the hearing could continue up until 7.00 pm on each hearing day, if necessary, in order to allow B&B the opportunity to participate as indicated above;

(f)   asked Pandora to arrange for an audio recording to be made of the hearing; and

(g)   gave each party the opportunity to apply to the Sole Arbitrator, giving reasons, if it considered that it was necessary to vary the terms of Procedural Order No. 9.

52.   On November 17, 2017, Pandora filed its Case Summary. No Case Summary has been filed on behalf of B&B.

11

# THE DANISH
# INSTITUTE OF ARBITRATION

53.   By email dated November 24, 2017, B&B's counsel Mr. Bandklayder stated:

> "*Based upon the USDC's Order, for the reasons previously expressed B&B will not appear at the Main Hearing next week.*".

54.   By Procedural Order No. 10, dated November 27, 2017, the Sole Arbitrator ruled that, notwithstanding B&B's notification in its email dated November 24, 2017, and in accordance with Article 18(8) of the DIA Rules, the main hearing would nevertheless proceed as planned, the Sole Arbitrator would continue the proceedings, and the Sole Arbitrator would proceed to make an arbitral award on the basis of the evidence presented at the main hearing.

55.   By email dated November 27, 2017, B&B's counsel, Mr. Bandklayder, acknowledged receipt of Procedural Order No. 10.

56.   In accordance with Procedural Order No. 9, the main hearing took place on Wednesday November 29, 2017, at the offices of Miles & Stockbridge P.C., 100 Light Street, Baltimore, MD 21202, U.S.A.

57.   Pandora appeared and was represented by counsel at the main hearing.   However, as previously indicated in Mr. Bandklayder's email dated November 24, 2017, B&B did not appear at the main hearing.

58.   At the main hearing:

- Pandora presented an opening statement;

- Mr. Matthew Scott gave oral evidence on behalf of Pandora;

- Mr. Franck Saragossi gave oral evidence on behalf of Pandora; and

- Pandora presented a closing statement.

59.   Pandora elected not to call Ms. Debra J. Markwitz to give evidence.

60.   At the Sole Arbitrator's suggestion, Pandora chose to present its closing statement that same day, rather than on the next day as originally scheduled.   Accordingly, it turned out not to be necessary to continue the hearing for more than one day.

# THE DANISH
# INSTITUTE OF ARBITRATION

61.     The proceedings during the main hearing were recorded and transcribed by a court reporter.[4]

62.     In the evening of November 29, 2017, the Sole Arbitrator issued Procedural Order No. 11, in
        which the Sole Arbitrator recorded that the main hearing had taken place and gave directions
        for the remaining steps in the arbitration.

63.     On November 30, 2017, Pandora submitted by email a revised Proposed Order for Requested
        Relief.

64.     On December 6, 2017, Pandora submitted a claim for costs pursuant to the Sole Arbitrator's
        direction in Procedural Order No. 11.

65.     On December 7, 2017, Pandora circulated to the Sole Arbitrator the transcript of the main
        hearing.  For the record, the Sole Arbitrator then informed both parties by email that he had
        received the transcript, copies of which could be ordered from the court reporter.

66.     Later on December 7, 2017, by Procedural Order No. 12, the Sole Arbitrator closed the
        proceedings pursuant to Article 23(1) of the DIA Rules.

## V.      The parties' respective claims in the arbitration

67.     Pandora makes the following requests for relief, as stated in Pandora's Revised Proposed
        Order for Requested Relief, dated November 30, 2017:

        "*Primary Claim*

        *Pandora [i.e.* Pandora A/S] *respectfully requests that the Sole Arbitrator:*

        *1.1     declare that on July 31, 2017, the Master Distribution Agreement and the Master
                 Franchise Agreement expired in accordance with Clause 18.3 of the Master
                 Distribution Agreement and Clause 22.3 of the Master Franchise Agreement;*

        *1.2     declare that the contractual obligations upon termination as stated in Clause 19 of the
                 Master Distribution Agreement and Clause 23 of the Master Franchise Agreement
                 applied with effect from July 31, 2017, but have been temporarily suspended until a*

---

[4]      The court reporter was Susan Kambouris, Gore Brothers, 36 S. Charles Street, Suite 2002, Baltimore, MD 21201,
         U.S.A. Email: reporter@gorebrothers.com.  Tel: 00 1 (410) 837 3027.

13

# THE DANISH
# INSTITUTE OF ARBITRATION

*ruling by the Miami court on B&B's motion for temporary injunction under the conditions set forth in the Stipulation marked as Exhibit 35;*

1.3    *order that at the time permitted by the Stipulation (i.e., upon a ruling by the Miami court on the referenced injunction motion) and unless otherwise ordered by the Miami court, B&B Jewelry shall do the following:*

    1.3.1    *B&B Jewelry must discontinue any use of Pandora's intellectual property and confidential information including without limitation the intellectual property and confidential information in the Pandora name, products, brand, trademarks, guide and system;*

    1.3.2    *All Sub-Franchise Agreements and pending orders shall be assigned directly to Pandora or such third party as designated by Pandora;*

    1.3.3    *B&B Jewelry must refrain from doing business under any name or in any matter that might give the impression that B&B Jewelry is or was a franchisee or distributor of Pandora or otherwise affiliated or associated with Pandora;*

1.4    *declare that Pandora did not assign the Agreements to Pandora Americas and that Pandora remains the contracting party under the Agreements;*

1.5    *order B&B Jewelry to reimburse the legal fees and costs incurred by Pandora in connection with or resulting from this dispute with default interest in accordance with section 5 of the Danish Interest Act, cf. section 8a from the date of enforcement; and*

1.6    *order B&B Jewelry to pay the fees and costs of the Arbitral Tribunal and any other costs of the arbitration, such as the registration fee and other expenses to the Danish Institute of Arbitration, with default interest in accordance with the Danish Interest Act as applicable.*

<u>*Alternative Claim*</u>

*Pandora Americas respectfully requests that the Tribunal:*

14

# THE DANISH
# INSTITUTE OF ARBITRATION

2.1   declare that on July 31, 2017, the Master Distribution Agreement and the Master Franchise Agreement expired in accordance with Clause 18.3 of the Master Distribution Agreement and Clause 22.3 of the Master Franchise Agreement;

2.2   declare that the contractual obligations upon termination as stated in Clause 19 of the Master Distribution Agreement and Clause 23 of the Master Franchise Agreement applied with effect from July 31, 2017, but have been temporarily suspended until a ruling by the Miami court on B&B's motion for temporary injunction under the conditions set forth in the Stipulation marked as Exhibit 35;

2.3   order that at the time permitted by the Stipulation (i.e., upon a ruling by the Miami court on the referenced injunction motion) and unless otherwise ordered by the Miami court, B&B Jewelry shall do the following:

2.3.1   B&B Jewelry must discontinue any use of Pandora's intellectual property and confidential information including without limitation the intellectual property and confidential information in the Pandora name, products, brand, trademarks, guide and system;

2.3.2   All Sub-Franchise Agreements and pending orders shall be assigned directly to Pandora or such third party as designated by Pandora;

2.3.3   B&B Jewelry must refrain from doing business under any name or in any matter that might give the impression that B&B Jewelry is or was a franchisee or distributor of Pandora or otherwise affiliated or associated with Pandora;

2.4   order B&B Jewelry to reimburse the legal fees and costs incurred by Pandora Americas in connection with or resulting from this dispute with default interest in accordance with section 5 of the Danish Interest Act, cf. section 8a from the date of enforcement; and

2.5   order B&B Jewelry to pay the fees and costs of the Arbitral Tribunal and any other costs of the arbitration, such as the registration fee and other expenses to the Danish Institute of Arbitration, with default interest in accordance with the Danish Interest Act as applicable."

15

# THE DANISH
# INSTITUTE OF ARBITRATION

68.   B&B makes the following requests for relief, as set out in its Statement of Defence:

1.1   *"B&B respectfully requests the Tribunal to deny Pandora's claims."*

1.2   *"B&B requests that, if appropriate, the Arbitrator assess the expenses of this arbitration, including B&B's attorney's fees and expenses, against Pandora."*

## VI.   The 2012 Agreements

The 2012 Agreements

69.   The parties entered into the MDA and the MFA – which have been referred to in this arbitration as the **"2012 Agreements"** – on August 1, 2012.  (As at that date, Pandora A/S was named Pandora Holdings A/S, but has subsequently changed its name.)

70.   As noted above, the MDA and MFA both contain the arbitration clauses pursuant to which Pandora commenced this arbitration.

71.   The MDA and the MFA were signed by Pandora's CEO, Mr. Björn Gulden, and by B&B's President, Mr. Rafael Bild, respectively.

*The MDA*

72.   By clauses 1.2 and 4.1 of the MDA, Pandora appointed B&B as its exclusive distributor to distribute Pandora's Products in its own name and for its own account to Multi-brand Retailers authorised by B&B within the Territory (all such terms are defined in clause 2.1 of the MDA). Four different retail formats for Multi-brand Retailers are specified in clause 7 of the MDA: Pandora Shop-in-Shop, Gold Partners, Silver Partners, and White Partners.

73.   The MDA also contains several additional obligations upon B&B as Distributor, including a minimum aggregate purchase and development obligation (clause 6), a requirement to follow Pandora's guidelines (clause 8), an obligation to attend training and to provide training to Multi-brand Retailers (clause 9), obligations regarding personnel (clause 10), an obligation to carry out sale representative and merchandiser visits (clause 11), an obligation to participate in marketing and promotion activities (clause 12), an obligation to participate in retailer satisfaction and customer satisfaction surveys (clause 13), reporting obligations (clause 14), a non-competition obligation (clause 15), obligations regarding intellectual property (clause 16),

16

# THE DANISH
# INSTITUTE OF ARBITRATION

a confidentiality obligation (clause 17), an insurance obligation (clause 21), and an obligation to comply with all applicable laws and regulations for the conduct of its business (clause 26).

*The MFA*

74.   By clauses 1.3 and 4.1 of the MFA, Pandora granted B&B, as Franchisee, the right within the Territory to use the Trademarks and the System in connection with the operation of Concept Stores and to grant sub franchise rights to Sub Franchisees by concluding Sub Franchise Agreements (all such terms are defined in clause 2.1 of the MFA).   It is useful to note the following particular definitions:

- A Concept Store is defined as "*a stand-alone retail store or a stand-alone and clearly defined space in a department store, which is dedicated to the sale of the Products and which is owned and operated by the Franchisee or a Sub Franchisee in accordance with the Guide*".

- The System is defined as "*the system developed by PANDORA for the establishment, management and operation of Concept Stores and distribution of Products. The System is described in the Guide and includes service systems, quality standards, Products, Trademarks, requirements for use of Trademarks, Shop Fittings, POS Material, management, training, stock control, guidelines, shop visuals, management support processes, reporting requirements and all other support processes, documentation, electronic guides, manuals, marketing material, and all their derivative works and improvements supplied by PANDORA from time to time.*"

75.   By clause 4.3 of the MFA, Pandora agreed during the term of the MFA not to conclude any Sub Franchise Agreements, grant any third party the right to use the System, or itself use the System, in the Territory.

76.   The MFA also contains several additional obligations upon B&B as Franchisee, including a development obligation (clause 5), obligations regarding the approval of Sub Franchisees and Store Locations (clause 6), obligations regarding the purchase and distribution of Products (clause 7), a minimum aggregate purchase obligation (clause 8), an obligation to conduct all activities in strict accordance with Pandora's Guide and also to cause all Sub Franchisees to do so (clause 9),   an obligation to provide training to Sub Franchisees (clause 10), obligations to provide assistance and services to Sub Franchisees, including regular sales representative and

17

# THE DANISH
# INSTITUTE OF ARBITRATION

merchandiser visits (clause 11), obligations regarding personnel (clause 12), an obligation to participate in marketing and promotion activities (clause 13), an obligation to participate in retailer satisfaction and customer satisfaction surveys (clause 14), an obligation to pay sign-on fees (clause 15), reporting obligations (clause 16), a non-competition obligation (clause 19), obligations regarding intellectual property (clause 20), a confidentiality obligation (clause 21), an insurance obligation (clause 25), and an obligation to comply with all applicable laws and regulations for the conduct of its business (clause 30).

The Territory

77.     The Territory is defined in both the MDA and the MFA as Columbia and Venezuela, with the exception of travel retail areas such as airports, airplanes and cruise ships, military establishments and other duty free areas (clause 2.1 and Schedule 2.1(d) in both Agreements).

The Initial Term of the 2012 Agreements

78.     Both Agreements provide for an Initial Term of three years from the Commencement Date of August 1, 2012 (MDA, clause 18.1, Schedule 2.1(a); MFA, clause 22.1, Schedule 2.1(a)).

Provision for an additional term of the 2012 Agreements

79.     After the Initial Term of three years, both Agreements *"shall be extended for an additional two (2) years provided that agreement on extension has been reached between the Parties before the end of the second Contractual Year."* (MDA clause 18.2; MFA clause 22.2). The same clause in both Agreements also provides that *"[a]greements on extensions of this agreement, including any amendments or alterations hereto, shall be made in writing."*

80.     The next clause in both Agreements provides: *"If agreement on extension of this agreement has not been reached in accordance with Clause [18.2 of the MDA; 22.2 of the MFA] or if PANDORA decides not to extend the term, the agreement will automatically terminate upon expiry of the initial term or the applicable subsequent agreed extension, i.e. at the end of year 3, 5, 7, 9, 11 and so on."* (MDA clause 18.3; MFA clause 22.3).

81.     In addition, the following clause in both Agreements provides: *"Notwithstanding Clauses [18.1 and 18.2 of the MDA; 22.1 and 22.2 of the MFA] PANDORA shall at all times be entitled to terminate this agreement before expiry by giving six (6) months' written notice*

# THE DANISH
# INSTITUTE OF ARBITRATION

[t]hereof to the [Distributor under the MDA: Franchisee under the MFA]. ..." (MDA clause 18.4; MFA clause 22.4).

82. There are also provisions in both Agreements for termination in the event of breach of contract or similar circumstances.

83. Upon the expiration or termination of the 2012 Agreements:

    (a)    B&B is required to pay any and all amounts owing to Pandora under the Agreements, and all the rights granted to B&B as Distributor or Franchisee will automatically revert to Pandora (MDA clause 19.1(a); MFA clause 23.1(a));

    (b)    B&B is required to "*discontinue any use of the Intellectual Property and confidential information*" of Pandora (MDA clause 19.1(b); MFA clause 23.1(b));

    (c)    B&B is required to "*otherwise refrain from doing business under any name or in any manner that might give the impression that [B&B] is or was [a distributor under the MDA; a franchisee under the MFA] of PANDORA, or otherwise affiliated or associated with PANDORA.*" (MDA clause 19.1(c); MFA clause 23.1(d)); and

    (d)    In addition, under the MFA, "*all Sub Franchisee Agreements and pending orders shall be assigned directly to PANDORA or such third party as designated by PANDORA.*" (MFA clause 23.1(c)).

## VII.    Chronology of relevant facts and circumstances

Course of dealing

84. As noted above, the 2012 Agreements had an initial term of three years from the commencement date, ending on July 31, 2015. During the Initial Term, B&B authorised and made commercial agreements with a number of multi-brand retail stores and franchise stores in Columbia and Venezuela.

85. In addition, during this Initial Term, but without executing any formal written amendment to the 2012 Agreements, Pandora authorised B&B to explore multi-brand retailer and franchise opportunities in Peru, Bolivia and Ecuador. The parties' agreement in this regard is reflected in the email correspondence between the parties and the course of dealing over time.

# THE DANISH
# INSTITUTE OF ARBITRATION

86.   In July 2013, and pursuant to the MDA, B&B entered into two Master Purchase Authorization agreements with multi-brand retailers in Bolivia.

Pandora Americas

87.   In the autumn of 2013, Pandora Americas took over the practical management of the contractual relationship with B&B from Pandora.

88.   This is confirmed in an email of October 21, 2013, from B&B's Vice President of Sales/Marketing, Mr. Manolo Barral, to Mr. David Lamb of Pandora Americas, in which Mr. Manolo Barral stated: "*This week we will finalize the loose ends for the integration with the US HQ and i [sic] am very positive it will help all to grow in this area*".

B&B's email dated October 21, 2013

89.   Also in the same email, in response to a request by Mr. Lamb to give an update "*as to which countries you are handling the franchise requests*", Mr. Manolo Barral stated: "*So far the countries we open [sic] are Columbia, Venezuela, Peru and Bolivia*". In the same email, Mr. Manolo Barral further requested permission to explore opportunities in Ecuador – a request that Pandora granted.

90.   Over time, and during the Initial Term of the 2012 Agreements, B&B authorised and made commercial agreements with a number of multi-brand retail stores and franchise stores in Peru and Bolivia.

91.   In accordance with MFA, clause 4.1(b), B&B entered into sub-franchise agreements with concept stores in Peru using the form contract authorised by the MFA.

Continued performance under the 2012 Agreements after the initial term after July 31, 2015

92.   On July 31, 2015, the Initial Term of the 2012 Agreements expired.

93.   No written agreement regarding an additional term was entered into between the parties, as contemplated by the 2012 Agreements (MDA clause 18.2; MFA clause 22.2).

94.   Nevertheless, the parties continued to do business together.

# THE DANISH
# INSTITUTE OF ARBITRATION

95.     At the end of the Initial Term of the 2012 Agreements, B&B did not stop purchasing and distributing Pandora jewelry.

96.     B&B did not assign to Pandora or its designee, B&B's pending orders and sub-franchise agreements, as required under the 2012 Agreements (MDA, clause 19.1; MFA, clause 23.1).

97.     B&B did not stop using *"the Intellectual Property and confidential information in the PANDORA name, Products, brand, Trademarks and Systems"* as required under the 2012 Agreements (MDA, clause 19.1(b); MFA clause 23.1(b)).

Pandora Americas' email dated August 17, 2015

98.     After the expiration of the Initial Term, by email dated August 17, 2015, Pandora Americas proposed a new Master Franchise and Distribution Agreement between B&B and Pandora Americas (the "**MFDA**"), which, if executed, would have replaced the 2012 Agreements.

B&B's response regarding the MFDA

99.     B&B provided comments on the draft MFDA by emails dated October 5 and October 7, 2015.

100.    B&B's counsel, Mr. Bandklayder, circulated B&B's mark-up of the draft MFDA by email dated October 7, 2015.

101.    As reflected in the redline revision from its counsel, B&B did not agree with a number of the material terms proposed by Pandora Americas in the 2015 Draft MFDA, including: (i) a proposed two-year term for the proposed contract (B&B counter-proposed a three-year term); (ii) a proposed 2.5% fee on B&B's monthly net sales; (iii) a proposed payment by B&B of 5% franchise fee; (iv) the financial terms of a proposed buyout provision; and (v) a proposed non-compete provision.

102.    The parties did not reach agreement on the terms of the MFDA. Accordingly, the MFDA was never signed.

Meeting between the parties on May 19, 2016

103.    On May 19, 2016, at a meeting between the parties, Pandora informed B&B that Pandora wished to end the parties' relationship with effect from December 31, 2016.

21

# THE DANISH
## INSTITUTE OF ARBITRATION

104.   Although it would have been possible for Pandora to exercise its right to terminate the 2012 Agreements on six months' notice (MDA clause 18.4; MFA clause 22.4), Pandora proposed instead that the parties should work together toward winding up B&B's distribution operations and the orderly transition of its franchise stores to Pandora with effect from January 1, 2017, in exchange for reasonable compensation.

Negotiations after May 19, 2016

105.   Following the meeting on May 19, 2016, the parties engaged in a series of negotiations on the financial and other terms of a consensual termination of the 2012 Agreements with effect from December 31, 2016.

106.   Because these negotiations were taking longer than initially anticipated, by email of November 17, 2016, Pandora informed B&B that, in the absence of reaching an agreement on early consensual termination, B&B could continue to operate as a franchisee and distributor (including opening new stores) until expiration of the 2012 Agreements on July 31, 2017.

107.   The parties were unable to reach an agreement on the financial and other terms of a consensual termination of the 2012 Agreements with effect from December 31, 2016.

Legal proceedings filed by B&B in Florida

108.   On December 16, 2016, B&B filed the Complaint with the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, U.S.A.

109.   Nevertheless, despite B&B commencing legal proceedings in Florida, B&B continued to serve as Pandora's distributor and franchisee.

Motion for temporary injunction and stipulation

110.   On July 21, 2017, B&B moved for a temporary injunction in the Miami court seeking to enjoin Pandora Americas from terminating B&B's operations and to maintain what B&B contends is the *status quo*.

111.   On July 25, 2017, in light of the pending injunction request by B&B in the Miami court, the parties to the proceedings before the Miami court stipulated and agreed, with the consent of Pandora A/S, that, subject to certain conditions, Pandora Americas will continue to supply B&B, and B&B may continue to operate as a Pandora franchisee and distributor in the

22

# THE DANISH
# INSTITUTE OF ARBITRATION

Territory, until such time as the Miami court rules on the pending injunction motion (the **"Stipulation"**).

## VIII.   The Sole Arbitrator's analysis

## (A)   Procedural issues

<u>The Sole Arbitrator's obligation in light of B&B's decision not to appear at the main hearing</u>

112.   The Sole Arbitrator notes that particular procedural issues arise in circumstances where one party fails to take part in all or part of the arbitration proceedings.

113.   The Sole Arbitrator notes the following comments concerning the making of arbitral awards "by default", by Steffen Pihlblad, Secretary General of the DIA and Oliver Talevski, Danish High Court Judge, in an article published in the Danish Weekly Law Reports, U.2009B.269:

> Original Danish text: "*Ud over at tage stilling til de materielle spørgsmål i sagen bliver opgaven for voldgiftsretten således af afsige en kendelse, som dokumenterer, at:*
>
> - *ingen af parterne manglede retlig handleevne,*
>
> - *voldgiftsaftalen er gyldig og overholdt,*
>
> - *den udeblevne part fik behørig meddelelse om udpegningen af voldgiftsretten og om voldgiftssagens behandling,*
>
> - *alle præceptive regler i voldgiftsloven er overholdt, herunder at den udeblevne part fik fuld lejlighed til at fremføre sin sag,*
>
> - *voldgiftsretten er kompetent til at behandle den foreliggende tvist,*
>
> - *der ikke tages stilling til spørgsmål, som ikke kan undergives voldgift,*
>
> - *voldgiftsrettens medlemmer ikke har været inhabile, og*
>
> - *kendelsen ikke er i strid med "ordre public".*
>
> *Voldgiftsretten må i kendelsen redegøre for, hvordan voldgiftsretten har sikret sig, at de nævnte pinde har været iagttaget, således at voldgiftsrettens håndtering af sagen ikke kan give anledning til kritik, som kan føre til ugyldighed mv.*

23

THE DANISH
INSTITUTE OF ARBITRATION

*Ud over at sikre sig, at alle formalier har været overholdt, skal voldgiftsretten tillige overveje, om der faktisk kan gives medhold i den materielle del af den rejste påstand. Det sker i praksis ved, at der på sædvanlig måde indkaldes til og afholdes en egentlig mundtlig forhandling i sagen. Den fremmødte part forelægger sagen, fremlægger sine beviser og afhører sine vidner, og på den måde godtgør parten for berettigelsen af sit krav. Under en sådan mundtlig forhandling stilles væsentligt større krav til voldgiftsrettens evne til materiel procesledelse end under en almindelig voldgiftssag, hvor det sædvanligvis i højere grad er overladt til parterne at præsentere og procedere sagen. Voldgiftsretten må i udeblivelsessager således selv udfolde passende bestræbelser på at indentificere styrker og svagheder i den fremmødte parts sag og om fornødent stille opklarende spørgsmål til den fremmødte part, vinder mv. (...) Endelig skal voldgiftsretten i en udeblivelseskendelse tage stilling til spørgsmålene vedrørende sagsomkostninger.*"

Certified English translation: "*In addition to determining the substantive issues in the proceedings, the arbitral tribunal will thus be tasked with making an award which shows that:*

- *none of the parties lacked legal capacity;*

- *the arbitration agreement is valid and was adhered to;*

- *the party failing to appear was given proper notice of the appointment of the arbitral tribunal and of the arbitral proceedings;*

- *all mandatory rules stipulated in the Arbitration Act were complied with, including that the party failing to appear was given ample opportunity to present its case;*

- *the arbitral tribunal has jurisdiction to hear the dispute at hand;*

- *no issue not subject to arbitration was determined;* [5]

- *the members of the arbitral tribunal were not disqualified; and*

---

[5]     The Sole Arbitrator considers that a better translation of the Danish text here is as follows: "The arbitral tribunal has not determined questions that cannot be determined by arbitration".

24

# THE DANISH
## INSTITUTE OF ARBITRATION

- *the award is not contrary to 'public policy'.*

*In its award, the arbitral tribunal must explain how the arbitral tribunal ensured that the bullet points listed above were complied with so that the arbitral tribunal's handling of the proceedings cannot prompt any criticism potentially entailing invalidity, etc.*

*In addition to ensuring that all formal requirements have been met, the arbitral tribunal must also consider whether it may, in fact, allow the substantive part of the claim/defense made. In practice, this is accomplished by an actual oral hearing in the proceedings being scheduled and held in the usual manner. The party appearing submits the case, produces its evidence and examines its witnesses and, in that way, this party proves the justification of its claim/defense. At such an oral hearing, the demands made on the ability of the arbitral tribunal for substantive management of the proceedings are considerably greater than in ordinary arbitral proceedings, where it is usually to a greater extent up to the parties to present and argue the case. Consequently, in default proceedings, the arbitral tribunal itself must make reasonable efforts to identify the strengths and weaknesses of the case of the party who has appeared and, if necessary, ask clarifying questions of the party who has appeared, witnesses, etc. (...) Finally, in its award by default, the arbitral tribunal must determine the issues relating to costs."*

114.    Accordingly, the Sole Arbitrator will proceed to review each of the procedural issues listed in the article cited above.

Waiver of procedural objections

115.    First, it should be noted that Article 33(1) of the DIA Rules provides:

"*A party who has become aware that a provision of the Rules or a requirement under the arbitration agreement has not been complied with and yet proceeds with the case without stating an objection to such non-compliance without undue delay or, if a deadline is provided therefore, before that deadline, shall be deemed to have waived the right to object*".

116.    Section 3 of the Danish Arbitration Act is in similar terms:

25

# THE DANISH
# INSTITUTE OF ARBITRATION

Original Danish text: "*En part, som er bekendt med, at en bestemmelse i denne lov, som kan fraviges ved aftale, eller en bestemmelse i voldgiftsaftalen ikke er blevet overholdt, og som deltager i voldgiftssagen uden at gøre indsigelse uden ugrundet ophold eller, hvis der er fastsat en frist herfor, inden for denne frist, kan ikke senere gøre indsigelsen gældende.*"

English translation on the DIA's website: "*A party who knows that any provision of this Act from which the parties may derogate or any requirement under the arbitration agreement has not been complied with and yet proceeds with the arbitration without stating an objection to such non-compliance without undue delay or, if a time-limit is provided therefor, within such period of time, shall be deemed to have waived the right to object.*"

117.   As set out further below, since B&B participated in this arbitration without raising any such procedural issues, it is clear that B&B has to a significant extent waived its right to do so.

The parties do not lack legal capacity

118.   At no time has either party alleged that the other party lacks legal capacity. Having failed to raise this issue previously in the arbitration, B&B has waived its right to do so.

The arbitration agreement is valid and was adhered to

119.   B&B argued earlier in the arbitration that the arbitration provisions did not survive the expiration of the 2012 Agreements. However, in the Partial Award on Jurisdiction, the Sole Arbitrator ruled against B&B on this issue. Reference is made, in particular, to paragraphs 44-52 of the Partial Award on Jurisdiction.

120.   The Sole Arbitrator has also ruled that Pandora's claims fall within the scope of the arbitration provisions in the 2012 Agreements. Reference is made to paragraphs 42-43 of the Partial Award on Jurisdiction.

121.   For the record, the Sole Arbitrator also finds that Pandora's amended claims, as set out in Pandora's Revised Proposed Order for Requested Relief, dated November 30, 2017, fall within the scope of the arbitration provisions in the 2012 Agreements. These amended claims also arise out of the 2012 Agreements, or in any event they are claims made in connection with those Agreements.

26

# THE DANISH
# INSTITUTE OF ARBITRATION

<u>The party failing to appear was given proper notice of the appointment of the arbitral tribunal and of the arbitral proceedings</u>

122.    B&B participated in the appointment of the arbitral tribunal, and the DIA took account of B&B's views regarding the qualifications of the sole arbitrator.

123.    Until at least October 24, 2017, B&B also participated in the arbitral proceedings. Thereafter, B&B was given full notice of the main hearing and of the further steps taken in the proceedings thereafter.

124.    The Sole Arbitrator finds, therefore, that B&B has been given proper notice of the appointment of the arbitral tribunal and of the arbitral proceedings.

<u>All mandatory rules stipulated in the Arbitration Act were complied with, including that the party failing to appear was given ample opportunity to present its case</u>

125.    Having reviewed the provisions of the Danish Arbitration Act, the Sole Arbitrator is satisfied that all mandatory rules as stipulated in that Act have been complied with.

126.    In particular, the Sole Arbitrator has taken care to treat each party with equality, and has given B&B a full opportunity to present its case pursuant to Section 18 of the Danish Arbitration Act, including the opportunity to participate at the main hearing.

127.    Reference is made to the following provisions of the DIA Rules and of the Danish Arbitration Act, which permit the Sole Arbitrator to continue the proceedings in these circumstances:

- Article 18(8) of the DIA Rules provides: "*If, without showing good cause, a party fails to appear at a meeting, including an oral hearing, or to produce documentary evidence, the Arbitral Tribunal may continue the proceedings and make an arbitral award on the evidence before it.*"

- Section 25(3) of the Danish Arbitration Act provides:

    Original Danish text: "*Udebliver en part uden rimelig grund fra en mundtlig forhandling, eller undlader en part uden rimelig grund at fremlægge bevisdokumenter, kan voldgiftsretten fortsætte behandlingen af sagen og afsige voldgiftskendelse på det foreliggende grundlag.*"

27

# THE DANISH
# INSTITUTE OF ARBITRATION

English translation on the DIA's website: "*If, without showing sufficient cause, any party fails to appear at a hearing or to produce documentary evidence, the arbitral tribunal may continue the proceedings and make the award on the evidence before it.*"

128. The Sole Arbitrator has taken the following specific steps in order to provide B&B with a full opportunity to present its case:

(a) Subject to requesting a stay of proceedings (which was refused), B&B agreed to the timetable that was adopted in Procedural Order No. 4, dated July 18, 2017. At B&B's request, the dates in the timetable were pushed back 15 days in order to provide time for a possible hearing in the Florida court during August (Procedural Order No. 4, pages 5-6).

(b) At B&B's request, and with the consent of Pandora, the Sole Arbitrator postponed the date of the preliminary hearing in September 2017.

(c) At B&B's request, and with the consent of Pandora, the dates for submission of witness statements and supplementary witness statements were also postponed.

(d) The main hearing was held in the U.S.A. at the express request of B&B.

(e) The Sole Arbitrator reserved five dates for the main hearing, as requested by B&B (Procedural Order No. 4, page 6).

(f) In Procedural Order No. 9, dated November 7, 2017, the Sole Arbitrator stated that he had a duty to ensure that, despite B&B's indication that it might not participate in the main hearing, B&B continued to be given the opportunity to defend itself against the claims that had been made against it in the arbitration.

(g) Accordingly, the Sole Arbitrator postponed the date for the submission of case summaries, in order to allow further time for B&B to consider its position (Procedural Order No. 9, paragraph 6(2)).

(h) In addition, the Sole Arbitrator arranged for a further preparatory hearing to be held, if either party deemed it to be necessary (Procedural Order No. 9, paragraph 6(3)).

(i) The Sole Arbitrator gave formal notice of the dates and the place of the main hearing, and of the timetable for the main hearing, in Procedural Order No. 9.

28

# THE DANISH
## INSTITUTE OF ARBITRATION

(j)   In addition, in order to allow B&B the opportunity to participate, the Sole Arbitrator asked the parties to ensure that the hearing could continue up until 7.00 pm on each hearing day, if necessary (Procedural Order No. 9, paragraph 6(6)).

(k)   The Sole Arbitrator asked Pandora to arrange for an audio recording to be made of the hearing (Procedural Order No. 9, paragraph 6(7)), and Pandora did so by engaging a court reporter.

(l)   The Sole Arbitrator expressly stated that either party could apply to vary the terms of Procedural Order No. 9 (Procedural Order No. 9, paragraph 6(8)).

(m)   After B&B finally confirmed, by email dated November 24, 2017, that it would not appear at the main hearing, the Sole Arbitrator gave formal notice to both parties that the main hearing would proceed as planned (Procedural Order No. 10, dated November 27, 2017).

(n)   Following the main hearing, the Sole Arbitrator formally confirmed what had taken place at the main hearing and gave directions for the remaining steps in the arbitration (Procedural Order No. 11, dated November 29, 2017).

(o)   B&B was informed on November 29, 2017 that the main hearing had been recorded and transcribed by a court reporter (Procedural Order No. 11, paragraph 6). Thus, B&B had an opportunity to ask for a copy of the transcript of the main hearing.

(p)   As directed by the Sole Arbitrator, Pandora's new exhibit, Exhibit 30A, and its slightly-revised request for relief, were circulated to B&B by email (Procedural Order No. 11, paragraph 7(1)&(2); Pandora's email dated November 30, 2017).

(q)   B&B was given an opportunity to file a submission on costs (Procedural Order No. 11, paragraph 7(3)).

(r)   The Sole Arbitrator delayed the closing of the proceedings until December 7, 2017, in order to give time for B&B to make any additional submissions (Procedural Order No. 11, paragraph 7(4)); Procedural Order No. 12.

# THE DANISH
# INSTITUTE OF ARBITRATION

129.   Accordingly, the Sole Arbitrator is satisfied that all mandatory rules of the Danish Arbitration Act have been complied with and that B&B has been given ample opportunity to present its case.

The arbitral tribunal has jurisdiction to hear the dispute at hand

130.   The Sole Arbitrator has already found, in the Partial Award on Jurisdiction, that the DIA and the Sole Arbitrator have jurisdiction to hear and determine the claims made by Pandora A/S and Pandora Americas in this arbitration.

131.   Reference is made to the Sole Arbitrator's full analysis and reasoning at Section IV of the Partial Award on Jurisdiction.

132.   The Sole Arbitrator understands that B&B did not challenge the Partial Award on Jurisdiction in the Danish courts pursuant to section 16(3) of the Danish Arbitration Act.[6]   The Sole Arbitrator notes in this regard that B&B has instructed Danish counsel, who could have acted for B&B in such challenge proceedings.

133.   The Sole Arbitrator wishes to add that, since the Partial Award on Jurisdiction, B&B has actively participated in the arbitration until at least October 24, 2017.   The Sole Arbitrator notes the following points in particular:

    (a)   In its Statement of Defence, as well as arguing the question of jurisdiction, B&B also provided a defence on the merits.

    (b)   In his Affidavit, B&B's witness Rafael Bild argued the merits of the case, as well as questioning jurisdiction.

    (c)   B&B participated, at least in part, in the preparations for the main hearing.   In particular, B&B argued that it would be inappropriate for witnesses to give evidence without submitting witness summaries in advance of the main hearing.   In Procedural

---

[6]   Section 16(3) of the Danish Arbitration Act provides:

Original Danish text: "... *Træffes der særskilt afgørelse om, at voldgiftsretten har kompetence, kan hver af parterne inden 30 dage efter at have modtaget meddelelse om afgørelsen, anmode domstolene om at afgøre spørgsmålet....*".

English translation on the DIA's website: "... *If it is ruled as a preliminary question that the arbitral tribunal has jurisdiction, any party may request, within thirty days after having received notice of that ruling, the courts to decide the matter. ...*".

# THE DANISH
# INSTITUTE OF ARBITRATION

Order No. 6, dated October 4, 2017, the Sole Arbitrator ruled in favour of B&B that witnesses would need to provide witness summaries before the main hearing.

(d)     The timetable for the filing of witness summaries was also altered at the request of B&B.

134.    Thus, B&B's participation in arbitration has gone considerably beyond objecting to jurisdiction. B&B has presented its case on the merits, at least in part, and it has also participated in the proceedings on the merits following the issue of the Partial Award on Jurisdiction. In fact, up until at least October 24, 2017, B&B gave the impression that it was intending to participate in the main hearing.

135.    In these circumstances, the Sole Arbitrator finds that B&B has, in any event, waived its right to object to the jurisdiction of the DIA and the Sole Arbitrator by participating in the arbitration on the merits.

The arbitral tribunal has not determined questions that cannot be determined by arbitration

136.    The scope of this Final Award concerns the claims for relief that have been presented by Pandora in this arbitration. No other issue, outside the scope of Pandora' claims for relief, has been determined in this arbitration.

137.    Those claims for relief, and the issues related to them, are arbitrable, *i.e.* they can be determined by arbitration. In particular:

(a)     The Sole Arbitrator notes that Pandora's claims concern a legal relationship in respect of which the parties have an unrestricted right of disposition, pursuant to Section 6 of the Danish Arbitration Act — in other words, these are so-called "dispositive" claims that may theoretically be settled between the parties.

(b)     Moreover, Pandora's claims concern a defined legal relationship, pursuant to Section 7 of the Danish Arbitration Act.

The members of the arbitral tribunal were not disqualified

138.    Neither party has raised any issues regarding possible disqualification of the Sole Arbitrator.

31

# THE DANISH
## INSTITUTE OF ARBITRATION

139.   Moreover, to the extent that the parties have failed to challenge the Sole Arbitrator within the
time limit set out in Article 13 of the DIA Rules, the parties have lost the right to do so.

### The award is not contrary to 'public policy'

140.   B&B argued earlier in the arbitration that the arbitration was contrary to public policy and
contrary to the principle of comity. However, in the Partial Award on Jurisdiction, the Sole
Arbitrator ruled against B&B on this issue. Reference is made, in particular, to paragraphs 57-
63 of the Partial Award on Jurisdiction.

### (B)   Substantive issues

#### Introduction

141.   Turning to the substance, there is no doubt that the parties continued to do business after the
end of the Initial Term on July 31, 2015.

142.   B&B does not deny that the parties *"continued to operate"*. However, B&B's position is that
the parties *"continued to operate under a new oral contract"* and *"operated under an oral
agreement and understandings, which they sought to memorialize in a new written agreement"*
(B&B's First Pleading on the Issue of Jurisdiction, page 2; Statement of Defence, page 4).

143.   Accordingly, the principal question to be determined is on what basis, and pursuant to what
contractual arrangement, the parties continued to do business.

### The basis on which the parties continued to do business

*The parties' respective positions*

144.   Both parties accept that the 2012 Agreements contain a contractual provision that states:
*"Agreements on extensions of this agreement, including any amendments or alterations
hereto, shall be made in writing"* (MDA, clause 18.2; MFA, clause 22.2). In addition, the
2012 Agreements also provide: *"The terms and conditions of this agreement may be amended,
novated or varied only in writing signed by the Parties"* (MDA, clause 27.3; MFA, clause
31.3).

145.   Both parties also accept that no such written agreement, amendment or alteration was entered
into.

32

# THE DANISH
# INSTITUTE OF ARBITRATION

146.   However, Pandora argues that the parties continued to do business under the terms of the 2012 Agreements, and that those Agreements were extended by course of performance.

147.   B&B argues, on the other hand, that the 2012 Agreements could not be extended by course of performance since there was a contractual requirement that the 2012 Agreements could only be extended by means of an agreement, amendment or alteration in writing.  Since there was no such written agreement, amendment or alteration in writing, B&B argues that the 2012 Agreements expired pursuant to their own terms on July 31, 2015.  As noted above, B&B argues further that the parties continued to do business under the terms of another, verbal, agreement.

*The applicable substantive law*

148.   As noted above, both the 2012 Agreements state that they are *"governed in all respects in accordance with Danish law"* (MDA, clause 28.1; MFA, clause 32.1).

149.   Pandora maintains that all issues concerning the interpretation of the 2012 Agreements, including the question of whether they could be extended by course of performance, are to be determined pursuant to Danish law.

150.   B&B does not dispute that Danish law governed the 2012 Agreements themselves, but B&B argues that the choice of law clause also expired with the rest of the provisions which did not expressly survive or survive by their nature.  Thus, B&B argues that Danish law does not apply to the disputes that arose after the Agreements expired.

151.   Having considered this issue carefully, the Sole Arbitrator finds that, by virtue of the parties' express choice of law as set out above, Danish law is the applicable substantive law, both in respect of the interpretation of the 2012 Agreements generally, and also in respect of the question of whether they could be extended by course of performance.

152.   The Sole Arbitrator notes the following points in this respect:

   (a)   The Rome Convention on the Law Applicable to Contractual Obligations (80/934/EEC), dated 19 June 1980, applies in Denmark pursuant to the Danish Consolidation Act no. 139 of February 17, 2014.

33

# THE DANISH
# INSTITUTE OF ARBITRATION

(b) B&B argues that the Rome Convention is not applicable since B&B is an American company and the U.S.A. is not a signatory to the Rome Convention. However, the nationality or domicile is not relevant in determining the applicability of the Rome Convention. The Rome Convention has been made a part of Danish law pursuant to the Danish Consolidation Act no. 139 of February 17, 2014. Article 1(1) of the Rome Convention provides: *"The rules of this Convention shall apply to contractual obligations in any situation involving a choice between the laws of different countries"*.

(c) Article 3(1) of the Rome Convention provides: *"A contract shall be governed by the law chosen by the parties. The choice must be expressed or demonstrated with reasonable certainty by the terms of the contract or the circumstances of the case. By their choice the parties can select the law applicable to the whole or a part only of the contract."*.

(d) The *"Report on the Convention on the law applicable to contractual obligations"* by Professor Mario Giuliano and Professor Paul Lagarde (Official Journal of the European Communities No C 28211 of October 30, 1980), page 77, states as follows regarding Article 3 of the Rome Convention:

> *"The choice of law by the parties will often be express but the Convention recognizes the possibility that the Court may, in the light of all the facts, find that the parties have made a real choice of law although this is not expressly stated in the contract. (...) In other cases a previous course of dealing between the parties under contracts containing an express choice of law may leave the court in no doubt that the contract in question is to be governed by the law previously chosen where the choice of law clause has been omitted in circumstances which do not indicate a deliberate change of policy by the parties."*

(e) Pursuant to Article 8(1) of the Rome Convention: *"The existence and validity of a contract, or of any term of a contract, shall be determined by the law which would govern it under this Convention if the contract or term were valid."*.

(f) Thus, pursuant to Article 3 of the Rome Convention, it is sufficient that the choice must be expressed or demonstrated with reasonable certainty by the circumstances of

34

## THE DANISH
## INSTITUTE OF ARBITRATION

the case. Furthermore, pursuant to Article 8 of the Rome Convention, even if the contract in question is said to be invalid, its existence and validity is determined by the law which would govern it if the contract were valid.

(g)     The Sole Arbitrator finds that the parties' continued choice of Danish law is demonstrated with reasonable certainty by the circumstances of the case, where the original written contracts are expressly governed by Danish law and the parties continued to do business after the end of the Initial Term of the contracts. Moreover, if the additional term of the contract is said to be invalid by reason of a failure to observe the requirement of writing, the existence and validity of the additional term of the contract is determined by the law which would govern it if the additional term of the contract were valid, *i.e.* by Danish law.

153.    The Sole Arbitrator also notes the following comments by legal scholars in this respect:

•       Excerpt from a judgment delivered by the Danish Maritime and Commercial High Court, U.1987.9455:

Danish text: "... *Denn omstændighet, at en kontrakts materielretlige bestemmelser må anses for at være ugyldige, findes hverken efter schweizisk eller dansk ret i sig selv at bevirke, at kontraktens bestemmelser om lovvalg og voldgift er ugyldige. Tværtimod må det som udgangspunkt antages, at parterne – uanset kontraktens gyldighed i øvrigt – har næret ønske om at fastholde disse bestemmelsers gyldighed. ...*"

Certified translation: "... *It is not found either under Swiss law or under Danish law that, if the substantive law provisions of a contract must be deemed invalid, this means per se that the contract's provisions concerning choice of law and arbitration are invalid. On the contrary, as a general rule, it must be presumed that the parties wished to maintain the validity of these provisions, regardless of the validity of the contract in all other respects. ...*"

•       Born, *International Commercial Arbitration*, Second Edition, 2014, Volume III, page 3464: "*A choice-of-law agreement is effective to select the law governing the arbitration agreement even if one party denies the validity or existence of those agreements. That is consistent with general choice-of-law principles, and is the*

35

# THE DANISH
## INSTITUTE OF ARBITRATION

> approach applicable to the choice of law under Article II [of the New York Convention]. *Contrary analyses by a few authorities are mistaken.*"

154.  In addition, the Sole Arbitrator refers to paragraphs 44-48 of the Partial Award on Jurisdiction, in which the Sole Arbitrator found that the arbitration provisions by their nature survived any expiration of the written Agreements. The same reasoning applies with respect to the choice of law provision.

155.  Accordingly, the Sole Arbitrator finds that the applicable substantive law is Danish law.

*Could the 2012 Agreements, in theory, be extended by course of performance?*

156.  The Sole Arbitrator has already answered this question in the Partial Award on Jurisdiction, paragraphs 55 and 56:

> "*55. The Sole Arbitrator is persuaded that this is an issue that may be viewed rather differently by common law and civil law lawyers. Whereas common law lawyers tend to give primacy to the terms of the written agreement, civil law lawyers tend to look for the common intention of the parties in light of all relevant facts and circumstances, including the terms of the written agreement.*
>
> *56. Thus, the Sole Arbitrator is satisfied that, as a matter of Danish law, it would in theory be possible for parties to extend an agreement by means of their conduct or performance, even if the agreement states that an extension must be made in writing. See, e.g., Professor Mads Bryde Andersen's textbook on the law of contract (2015), page 192. However, in order to determine whether such an extension may have been made in any particular case, it would be necessary to evaluate all relevant facts and circumstances.*"

157.  It may be helpful in this context to quote the extract – provided by Pandora – from Professor Mads Bryce Andersen's textbook on the law of contract ("*Praktisk aftaleret: Aftaleretten II*" (Eng. "*Contract Law in Practice – Contract Law II*"), 4th edition, 2015), p. 192:

> Danish text: "*En aftale vil ofte pålægge parterne at udfærdige efterfølgende aftaler, der korrigerer eller reviderer den indgåede aftalen* [illegible]. *Hvis ikke et sådant vilkår udtrykkeligt sanktionera overtrædelser, må det antages, at det blot skal opfattes som en* [illegible], *hvis overtrædelse ikke har karakter av* [illegible] *misligholdelse, men*

36

# THE DANISH
## INSTITUTE OF ARBITRATION

> *derimod blot – ud fra en kontret* [illegible] *– kan tænkes at få bevismæssig betydning, jf. Kaasen (2006), s. 868 ff., om den bestemmelsem der i dag finders i NTK 07 art. 36.1.".*

> Certified translation: "*An agreement will often require the parties to draw up in writing any subsequent agreement to adjust or amend the contract concluded. If such term does not expressly impose any sanction for breach, it must be assumed that it is to be perceived as a mere non-mandatory procedural requirement, the breach of which does not constitute any separate breach, but is likely, however – based on a specific assessment – to be important only in terms of evidence, see Kaasen (2006), pp. 868 ff., on the current provision set out in article 36.1 of the NTK 07.".*

158. The Sole Arbitrator notes that the relevant sentences in the 2012 Agreements — (MDA, clauses 18.2 and 27.3; MFA, clause 22.2 and 31.3) — do not expressly impose any sanctions for breach of the requirement for amendments or alterations to be recorded in writing.

159. The Sole Arbitrator now turns to consider the evidence.

*Were the 2012 Agreements amended by the course of performance prior to July 31, 2015?*

160. It is common ground between the parties that, prior to July 31, 2015, the parties amended the 2012 Agreements by adding to the Territory, from the defined Territory of Columbia and Venezuela to Peru and Bolivia, and also to Ecuador.

161. There is no evidence that this was done by way of a formal amendment "*signed by the Parties*" (MDA, clause 27.3; MFA, clause 31.3).

162. B&B nevertheless argues that "*[t]he emails in which Pandora represents that B&B is in charge of the new territories satisfy the requirement that the amendment be "in writing." [Appendix 1]*" (B&B's Second Pleading on the Issue of Jurisdiction, dated May 15, 2017, page 2).

163. In fact, however, the evidence shows that B&B extended its operations beyond the original Territory of Colombia and Venezuela into Peru and Bolivia *long before* the emails to which B&B makes reference.

164. B&B refers, in Appendix 1 to its Second Pleading on the Issue of Jurisdiction, to Pandora's emails dated January 24, 2014 and April 8, 2015, written by Mr. Scott and Mr. Saragossi

37

## THE DANISH
## INSTITUTE OF ARBITRATION

respectively. However, the evidence shows that B&B extended its operations into Peru and Bolivia before October 21, 2013 – see B&B's email of that date, sent by Mr. Barral of B&B to Mr. Lamb of Pandora. There is no evidence that this amendment prior to October 21, 2013, was *"made in writing"* (MDA, clause 18.2; MFA, clause 22.2), still less that it was *"signed by the Parties"* (MDA, clause 27.3; MFA, clause 31.3).

165.    The email dated October 21, 2013, is clearly written sometime after the extension into Peru and Bolivia took place. In fact, this is confirmed by other evidence. In particular, on July 8, 2013, B&B entered into two Master Purchase Authorization agreements with Eurochronos S.R.L. of Bolivia.

166.    B&B changed its argument when the time came for it to submit its Statement of Defence. B&B then argued that *"expansion of territory is a mere modification of the agreement for which the 2012 Agreements do not require formal written amendments"* and that *"writings that expand the territories, do not by their nature extend the* term *of the 2012 Agreements"* (Statement of Defence, page 4). However, the wording of the 2012 Agreements does not make a distinction between mere modifications and formal written amendments. Moreover, B&B refers only to clause 18.2 of the MDA and clause 22.2 of the MFA, and apparently ignores the wide wording of clause 27.3 of the MDA and clause 31.3 of the MFA.

167.    In any event, in the Statement of Defence, B&B seems to be admitting that the modification by way of expansion of the territory did not comply with the formal requirements of the contract.

168.    It is also relevant to note the Sub Franchise Agreement dated April 16, 2014, entered into between B&B as Franchisee and LC Internacional SAC as Sub Franchisee. Schedule 2.1(d) of that Sub Franchise Agreement states formally that the Territory of the master franchise agreement – *i.e.* the Territory of the MFA – includes Peru. Yet there is no evidence of a formal amendment of the MFA in this respect.

169.    In summary, therefore, the evidence strongly suggests that the extension of the Territory into Peru and Bolivia was done by course of performance, without the parties entering into any formal or informal written agreement.

170.    It is also relevant to address B&B's further argument, as set out in the Statement of Defence, that *"Pandora's "course of performance" argument fails because "course of performance"*

38

# THE DANISH
## INSTITUTE OF ARBITRATION

*can only modify ambiguous terms of an agreement and cannot contradict the express, clear and unambiguous terms*" (Statement of Defence, page 5). B&B provides no legal authority for this argument in the Statement of Defence. Given B&B's position that the choice of law clauses did not survive the expiration of the 2012 Agreement, it appears that B&B is making reference to a U.S. law argument.[7] However, as set out above, the Sole Arbitrator has found that Danish law applies to the issue of whether the 2012 Agreements can be extended by course of performance.

171.   Unlike U.S. laws, Danish law does not make formal distinctions between admissible and inadmissible evidence for the purpose of determining the common intention of the parties. All relevant evidence is admissible, including "extrinsic" evidence of a course of dealing, usage or custom between the parties.

172.   As the Sole Arbitrator noted at paragraph 55 of the Partial Award on Jurisdiction, civil law lawyers tend to look for the common intention of the parties in light of all the relevant facts and circumstances.

173.   There is no evidence that the common intention of the parties was to make a distinction between ambiguous and unambiguous terms in this respect. On the contrary, the parties extended and amended the definition of the Territory by course of performance, even though the original definition of the Territory was clear and unambiguous.

*Were the 2012 Agreements extended by the course of performance after July 31, 2015?*

174.   In respect of the period after July 31, 2015, Pandora's witnesses made it clear during their testimony at the main hearing that nothing changed. Notwithstanding the absence of a written agreement on extension, the parties continued to perform in accordance with the provisions of the 2012 Agreements and in the same manner as they had done prior to that date.

175.   In particular, following July 31, 2015:

---

[7]   In its First Pleading on the Issue of Jurisdiction, page 10, B&B refers to two U.S. law cases on this point, as follows:

"*See e.g. Western Pet Wholesalers, Inc. v. Natura Pet Products. Inc.*, 2005 WL 1925858 (Cal. Ct. App. 2005), review denied (Nov. 16, 2005) (even if parties' course of dealing established a five-year term for the contract, that was not admissible to vary the unambiguous stated express term in the writing) [Appendix 16]; *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 598–99 (4th Cir. 2004)("under South Carolina and Ontario law, 'extrinsic evidence of a usage or custom is not admissible where the contract expresses the intent of the parties in clear and unambiguous language'") [Appendix 17]."

# THE DANISH
# INSTITUTE OF ARBITRATION

    (a)    B&B did not stop purchasing and distributing Pandora jewelry;

    (b)    B&B did not assign to Pandora or its designee B&B's pending orders and Sub Franchise Agreements, as required (MDA, clause 19.1; MFA, clause 23.1); and

    (c)    B&B did not stop using "*the Intellectual Property and confidential information in the PANDORA name, Products, brand, Trademarks and Systems*" as required (MDA clause 19.1(b); MFA clause 23.1(b)).

176.    The Sole Arbitrator finds it particularly relevant to note that B&B expressly continued to do business pursuant to the 2012 Agreements:

    (a)    On September 15, 2015, B&B entered into two Master Purchase Authorization agreements with Ripley's of Peru. These Master Purchase Authorization agreements were pursuant to Pandora's standard form dated December 2013.

    (b)    On March 20, 2017, B&B entered into a Sub Franchise Agreement with Plaza Vendome S.A. in relation to Ecuador. This Sub Franchise Agreement was expressly entered into "*[p]ursuant to a Master Franchise Agreement with PANDORA*" (clause 1.3) and referred to "*[t]he Territory of the master franchise agreement*" (Schedule 2.1(d)).

    (c)    On March 21, 2017, B&B entered into two Master Purchase Authorization agreements with Unity-Centro in relation to Ecuador. Again, these Master Purchase Authorization agreements were pursuant to Pandora's standard form dated December 2013.

177.    In light of the above, the Sole Arbitrator finds that the 2012 Agreements did not expire by their own terms on July 31, 2015. On the contrary, the Sole Arbitrator finds that the 2012 Agreements were extended by course of performance.

Did the parties enter into a verbal agreement after July 31, 2015?

178.    The Sole Arbitrator turns to consider B&B's argument that, after July 31, 2015, the parties entered into a verbal agreement.

179.    B&B describes the verbal agreement as follows:

40

# THE DANISH
# INSTITUTE OF ARBITRATION

- *"After the expiration of the Agreements, B&B Jewelry and Pandora Jewelry, LLC ("Pandora Americas") continued to operate under a new oral contract. While operating under verbal understandings, B&B Jewelry and Pandora Americas were negotiating the terms of a new written contract."* (First Pleading on the Issue of Jurisdiction, page 2).

- *"The parties' dispute arises out of verbal agreements and understandings which arose **after** the expiration of the initial Agreements."* … *"Those parties were negotiating a new agreement that did not contemplate arbitration in Denmark and were operating under verbal agreements."* (Second Pleading on the Issue of Jurisdiction, pages 5 and 11).

- *"Following the expiration of the 2012 Agreements between B&B and Pandora, B&B and Pandora Americas operated under an oral agreement and understandings, which they sought to memorialize in a new written agreement"* (Statement of Defence, page 4).

180.   Rather more colour is given in B&B's Complaint, dated December 12, 2016. In particular, the Complaint includes the following statements:

> *"17. Throughout 2013, 2014 and 2015, Pandora assured B&B that B&B's distributor relationship would continue over the long-term, for many years, just like nearly every other Pandora distributor worldwide, and that this relationship would be formalized in a written agreement."*

> …

> *"31. Pandora and B&B entered into a verbal agreement whereby B&B would continue over the long term, for many years, to operate as a Pandora distributor with the right to: (a) use Pandora's trademark and franchise system in connection with the establishment, management, and operation of Pandora retail stores in designated territories for the promotion and sale of Pandora products under Pandora's trademarks, (b) enter into distributor/sub-franchise agreements with retail store operators whereby sub-franchisees of B&B would operate their own Pandora retail stores in the South American territory with regard to the promotion and sale of Pandora products distributed to the sub-franchisees by B&B, and (c) establish new*

41

# THE DANISH
# INSTITUTE OF ARBITRATION

> *Pandora retail stores to be owned and operated by B&B and/or its principals, Bild*
> *and Barral, through Rafaman.*"

181.   B&B's pleadings are, of course, not evidence.  B&B's evidence is provided in the Affidavit of
its witness, Mr. Rafael Bild, dated 10 February, 2017, which states as follows in relation to the
alleged verbal agreement:

> "*8. Pandora U.S. [i.e.* Pandora Americas] *representatives (including Defendant*
> *Franck Saragossi), Manolo Barral (the co-principal of B&B) and I discussed and*
> *entered negotiations for a new written agreement between Pandora U.S. and B&B to*
> *govern our relationship for the years to come.  The new agreement was to be solely*
> *between Pandora U.S. and B&B.  Pandora Denmark never was, nor was it ever*
> *intended to be, a party to the new agreement.*
>
> *9. Upon expiration of the 2012 Agreements, Pandora U.S. and B&B continued to do*
> *business pursuant to a new verbal agreement and related understandings.  Pandora*
> *U.S. and B&B sought to incorporate the terms of our new agreement in a new, formal*
> *written agreement.*
>
> *10. Pandora U.S. and B&B endeavored to incorporate their new agreement and*
> *understandings in a new written agreement.  An unexecuted draft of the Master*
> *Franchise and Distribution Agreement from August 2015 (the "2015 Draft*
> *Agreement") is attached hereto as Exhibit A.  It was prepared by Pandora U.S. and*
> *the redline revisions throughout were requested by B&B.*
>
> *11. The new verbal agreement and understandings between Pandora U.S. and B&B*
> *differed substantially from the 2012 Agreements in several respects, including: (a)*
> *Denmark-based Pandora Holdings A/S was not a party; instead, Maryland-based*
> *Pandora U.S. was the party contracting with B&B; (b) Pandora U.S. and B&B agreed*
> *that the new agreement would be governed by U.S. law instead of Danish law; and (c)*
> *Pandora U.S. and B&B agreed that the venue for dispute resolution would be in the*
> *United States, rather than Denmark. (cf. ¶¶4–5).*
>
> *12. The new agreement and working relationship between Pandora U.S. differed*
> *substantially from the expired 2012 Agreements and B&B's prior working*
> *relationship with Pandora Denmark in other ways as well.  For example, under the*

42

# THE DANISH
# INSTITUTE OF ARBITRATION

*new agreement, B&B's exclusive franchise territories were expanded to include Peru, Ecuador, and Bolivia (Ex. A at § 1.1); and the new agreement gave Pandora U.S. new protections regarding internet and social media activities (Id. at § 30), data protection (Id. at § 33) and anti-bribery and money laundering compliance (Id. at § 35).*

*13. B&B never intended or understood that the expired 2012 Agreements – to which Pandora U.S. is not even a signatory – would continue in effect after they expired or that they would govern the relationship between Pandora U.S. and B&B after the 2012 Agreements expired.*

*14. B&B never intended or understood that Pandora U.S. would have the right to enforce arbitration in Denmark under Danish laws under the expired 2012 Agreements, particularly since both Pandora U.S. and B&B are U.S.-based companies. Indeed, in the 2015 Draft Agreement that Pandora U.S. prepared, Pandora U.S. included a provision that the agreement would be governed by U.S. law (rather than Denmark) and that disputes would be resolved in the U.S. (rather than Denmark). (Ex. A at § 40.3).*

*15. Throughout this period, Pandora U.S. and Franck Saragossi repeatedly urged B&B to continue operating under the new verbal agreement and understandings between Pandora U.S. and B&B, while the two companies continued our efforts to finalize and execute the 2015 Draft Agreement.*

*16. Pandora U.S. and Saragossi repeatedly assured me, time and time again, that the 2015 Draft Agreement would shortly be finalized.*

*17. B&B continued to hold up its end of the bargain until May, 2016, at which time Pandora U.S., unexpectedly and without cause, notified B&B that Pandora U.S. was terminating its relationship with B&B so that Pandora U.S. could "enter the markets directly" and that B&B was no longer authorized to open any new stores or renew existing stores."*

182. In considering allegations of a verbal agreement, the Sole Arbitrator finds it particularly relevant to seek to find evidence as to:

43

# THE DANISH
# INSTITUTE OF ARBITRATION

- when the verbal agreement was made,

- where the verbal agreement was made,

- between whom the verbal agreement was made, and

- most importantly, the content of the verbal agreement.

183.    However, virtually no such evidence has been provided by B&B:

    (a)    There is no evidence as to when the verbal agreement was made, except for the vague assertion that it was made sometime after July 31, 2015 and in connection with the negotiation of the MFDA in the summer and autumn of 2015.

    (b)    There is no evidence as to where the verbal agreement was made.

    (c)    There is insufficient evidence as to between whom the verbal agreement was made, except that B&B asserts that Mr. Saragossi was involved on the part of Pandora Americas and either Mr. Bild or Mr. Barral were involved on the part of B&B.

    (d)    There is very little evidence as to the specific content of the verbal agreement, except that Mr. Bild states that there was an agreement to choose U.S. law and U.S. arbitration instead of Danish law and Danish arbitration.

184.    Pandora's witnesses deny that any verbal agreement was made:

    (a)    Mr. Scott made it clear that he and his assistant Ms. Markwitz were responsible for the continued contractual relationship, and it is clear that they took instructions from Pandora A/S in this respect.

    (b)    Mr. Saragossi was adamant in his testimony that no verbal agreement was entered into.

    (c)    Mr. Saragossi made it clear that he did not have the mandate to enter into any verbal agreement.

    (d)    The Sole Arbitrator specifically asked Mr. Saragossi whether he had entered into a verbal agreement regarding choice of law and choice of disputes. His response was unequivocal, that there had been no verbal agreement at all.

44

# THE DANISH
# INSTITUTE OF ARBITRATION

     (e)    The Sole Arbitrator also asked Mr. Saragossi what "Rafaman" meant (as mentioned by B&B at paragraph 31 of the Complaint). In reply, Mr. Saragossi clearly did not understand the question, and when he was referred to paragraph 31 of the Complaint, he stated that he was not familiar with Rafaman.

185.    Crucially, the written correspondence and the sequence of events do not support B&B's description that the parties first agreed on a verbal agreement which they then sought to incorporate into the MFDA:

     (a)    Whereas the Initial Term of the 2012 Agreements expired on July 31, 2015, the draft MFDA was not sent to B&B until August 17, 2015. There is no evidence that B&B had any knowledge of the draft MFDA prior to that date.

     (b)    As Mr. Scott explained in his testimony, the MFDA was initially drafted by his assistant, Ms. Debra J. Markwitz. Indeed, this appears to be confirmed by Pandora's email to B&B dated August 17, 2015, since the files attached to that email were marked "*djm*", which are Ms. Markwitz's initials. When Pandora sent the draft of the MFDA to B&B on August 17, 2015, there was no mention of any verbal agreement.

     (c)    It is also notable that the draft MFDA was intended to take effect from the Effective Date, which is stated to be "*[the date of signing this Agreement]*" (clauses 1.1 and 20.1). It was not intended to take effect from July 31, 2015.

     (d)    B&B took a long time to revert to Pandora Americas with its comments on the draft MFDA. Mr. Saragossi chased B&B by email dated September 30, 2015.

     (e)    B&B replied first by email dated October 5, 2015, and B&B reverted to Pandora Americas with its redline version on October 7, 2015.

     (f)    When B&B finally provided its comments on the MFDA, by emails dated October 5, 2015 and October 7, 2015, there was also no mention of any verbal agreement. Had the parties first agreed on a verbal agreement which they then sought to incorporate into the MFDA, then it would be expected that at least one of them – or most likely, both of them – would refer back to that verbal agreement.

45

## THE DANISH
## INSTITUTE OF ARBITRATION

    (g)    B&B commented in its email dated October 5, 2015 that they had "*noticed several points which are out of the ordinary and need to be revised*". B&B did not say that the MFDA differed from a prior verbal agreement in relation to these points.

    (h)    Similarly, when B&B's counsel, Mr. Bandklayder, replied by email dated October 7, 2015, attaching a markup of the MFDA, he also made no mention of a prior verbal agreement.

    (i)    Further, when Mr. Barral of B&B wrote by email to Mr. Scott on November 19, 2015, yet again there was no mention of any prior verbal agreement.

    (j)    Mr. Bandklayder's email to Mr. Scott dated November 19, 2015, in which he asked for an update on the status of the MFDA, also did not mention any prior verbal agreement.

186.    In fact, it appears that the verbal agreement was first mentioned by B&B in its Complaint, which was filed by B&B over a year later, on December 16, 2016.

187.    It is also relevant to note that the draft MFDA Agreement itself does not mention any prior verbal agreement. Moreover, clause 41.2 of the draft MFDA includes the following express representation and warranty:

> "*DISTRIBUTOR* [B&B] *HAS NO KNOWLEDGE OF ANY REPRESENTATIONS BY SUPPLIER* [PANDORA AMERICAS] *OR ITS OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AGENTS, OR SERVANTS, ABOUT THE BUISNESS* [SIC] *CONTEMPLATED BY THIS AGREEMENT THAT ARE CONTRARY TO THE TERMS OF THIS AGREEMENT OR THE DOCUMENTS INCORPORATED HEREIN.*"

188.    In his markup of the draft MFDA on behalf of B&B, Mr. Bandklayder did not change or comment upon this clause. Yet, if there had been a far-reaching verbal agreement as B&B now claims, he would presumably have made reference to it.

189.    Taking account of all these facts and circumstances, the Sole Arbitrator finds that it is very unlikely that there was any verbal agreement between the parties as claimed by B&B. It is also not credible in these circumstances that the parties would agree to move from detailed

46

# THE DANISH
# INSTITUTE OF ARBITRATION

written agreements, signed by the parties' CEO and President respectively, to a vague verbal agreement.

190. In any event, the existence and the contents of any verbal agreement have not been proved by B&B in this arbitration.

191. Accordingly, the Sole Arbitrator finds that the parties did not enter into any verbal agreement on or after July 31, 2015.

For how long did the 2012 Agreements remain in force?

192. Having found that the 2012 Agreements were extended by course of conduct, and that the parties did not enter into a verbal agreement, the question remains for how long the extended 2012 Agreements remained in force.

193. The 2012 Agreements state that any extension shall be *"for an additional two (2) years"* (MDA, clause 18.2; MFA, clause 22.2). Thereafter, it is stated that *"the agreement will automatically terminate upon expiry of the initial term or the applicable subsequent agreed extension, i.e. at the end of year 3, 5, 7, 9, 11 and so on"* (MDA, clause 18.3; MFA, clause 22.3).

194. Accordingly, unless the parties agreed otherwise, the parties would have expected that the additional term would be for an additional two years, and would automatically terminate at the end of year 5, *i.e.* on July 31, 2017.

195. Pandora actually gave notice to B&B that it intended to end the relationship at the meeting between Pandora Americas and B&B dated May 19, 2016, as confirmed in Mr. Scott's email dated May 20, 2016. Accordingly, it was within Pandora's contractual rights to insist that the 2012 Agreements would terminate without cause on December 31, 2016, upon six months' written notice pursuant to clause 18.4 of the MDA and clause 22.4 of the MFA. Nevertheless, as confirmed in Mr. Scott's email dated November 17, 2016, Pandora agreed to continue the contractual relationship until the end of the additional two-year term, *i.e.* until July 31, 2017.

196. Accordingly, the Sole Arbitrator finds that the parties' contractual relationship came to an end on July 31, 2017.

47

# THE DANISH
# INSTITUTE OF ARBITRATION

The conditions following termination

197.  The conditions following termination are clearly set out in the 2012 Agreements (MDA, clause 19.1; MFA, clause 23.1):

   (a)  B&B is required to pay any and all amounts owing to Pandora under the Agreements, and all the rights granted to B&B as Distributor or Franchisee will automatically revert to Pandora (MDA clause 19.1(a); MFA clause 23.1(a));

   (b)  B&B is required to "*discontinue any use of the Intellectual Property and confidential information*" of Pandora (MDA clause 19.1(b); MFA clause 23.1(b));

   (c)  B&B is required to "*otherwise refrain from doing business under any name or in any manner that might give the impression that [B&B] is or was [a distributor under the MDA; a franchisee under the MFA] of PANDORA, or otherwise affiliated or associated with PANDORA.*" (MDA clause 19.1(c); MFA clause 23.1(d)); and

   (d)  In addition, under the MFA, "*all Sub Franchisee Agreements and pending orders shall be assigned directly to PANDORA or such third party as designated by PANDORA.*" (MFA clause 23.1(c)).

198.  B&B has not questioned that, following termination, these conditions apply in accordance with their terms.

199.  Accordingly, the Sole Arbitrator finds that Pandora is entitled to exercise its contractual rights as set out in clause 19.1 of the MDA and clause 23.1 of the MFA.

No assignment to Pandora Americas

200.  A further issue in this arbitration is whether Pandora A/S assigned its contractual rights under the 2012 Agreements to Pandora Americas.

201.  B&B has alleged that Pandora A/S is no longer a party to the Agreements, as the 'responsibility' for all distributor and franchise operation in North and South America was transferred to Pandora Americas in 2013.

202.  However, Pandora's witness, Mr. Scott, who is Vice-President, Legal and General Counsel of Pandora Americas, denied during his testimony that any such assignment had been carried out.

48

# THE DANISH
# INSTITUTE OF ARBITRATION

203.  The Sole Arbitrator would have expected to see a formal document between Pandora A/S and Pandora Americas, as well as a formal notice of assignment to B&B.

204.  Accordingly, and in the absence of any such evidence, the Sole Arbitrator finds that B&B has not proved its assertion that an assignment took place.

## IX.  Costs

Applicable rules

205.  Article 25 of the DIA Rules provides as follows regarding the decision as to costs:

> "*(1) The award shall state the costs of the arbitration and the proportion in which they shall be borne by the parties. The costs of the arbitration include the fees and any arbitration-related expenses of experts appointed by the Arbitral Tribunal, the fees and any arbitration-related expenses of each of the arbitrators, as well as the registration fee, administrative charge and arbitration-related expenses payable to DIA.*
>
> *(2) The Secretariat shall make the final computation of the costs of the arbitration. The costs stated in the award shall equal the amount decided by the Secretariat. Any excess amount of the financial deposit is reimbursed.*
>
> *(3) The award shall also state whether or not a party shall compensate the other party for reasonable costs, including legal costs, incurred by that other party in relation to the arbitration.*
>
> *(4) In its decision as to costs, the Arbitral Tribunal shall take into account the outcome of the case and other relevant circumstances, including any agreement between the parties and the extent to which each party has contributed to the arbitration in an efficient and cost-conscious manner.*"

206.  The Danish Arbitration Act provides:

> Original Danish text: "*Voldgiftsretten fordeler omkostningerne til voldgiftsretten mellem parterne. Stk. 2. Voldgiftsretten kan pålægge en part helt eller delvis at erstatte modparten de udgifter, voldgiftssagen har påført modparten.*"

49

# THE DANISH
## INSTITUTE OF ARBITRATION

Translation on the DIA website: *"Section 35. (1) The arbitral tribunal shall allocate the costs of the arbitral tribunal between the parties. (2) The arbitral tribunal may order a party to cover all or part of the costs of another party."*

The costs of the arbitration

207.  The Secretariat of the DIA has determined that the costs of the arbitration amount to a total of **DKK 699,700.00** and are specified as follows:

- the registration fee payable to the DIA: DKK 9,700.00,

- the administration fee payable to the DIA: DKK 123,200.00,

- the Arbitral Tribunal's costs for travel, accommodation and other reasonable expenses in relation to the arbitration: SEK 43,893.00 and USD 397.35 (corresponding to a total of DKK 35,135.00),

- the fee payable to the Arbitral Tribunal: DKK 531,615.00, and

- a related bank charge of DKK 50.00.

The costs claimed by the parties

208.  Pandora claims reimbursement of the following costs:

| | |
|---|---|
| Costs incurred by DLA Piper | DKK 2,026,660.49 |
| Costs incurred by Miles & Stockbridge | USD 188,881.00 |
| Travel costs incurred by Pandora | DKK 22,436.62 |

Total: **DKK 2,049,097.11** and **USD 188,881.00**

209.  In addition, Pandora paid the entirety of the security deposit to the DIA for the arbitration, as follows:

| | |
|---|---|
| Registration fee | DKK 9,700.00 |
| Security deposit for Pandora A/S | DKK 135,000.00 |

50

# THE DANISH
# INSTITUTE OF ARBITRATION

| | | |
|---|---|---|
| • | Security deposit for Pandora Jewelry, LLC | DKK 135,000.00 |
| • | Security deposit for Respondent | DKK 270,000.00 |
| • | Additional security deposit | DKK 150,000.00 |
| Total | | **DKK 699,700.00** |

210.    Although B&B made an initial, unspecified claim for costs, it did not present any costs submission.

The Sole Arbitrator's decision as to costs

211.    Pursuant to Article 25(4) of the DIA Rules, in making the decision as to costs the Sole Arbitrator shall take into account the outcome of the case and other relevant circumstances, including any agreement between the parties and the extent to which each party has contributed to the arbitration in an efficient and cost-conscious manner.

212.    Regarding the outcome of the case, there is no doubt that Pandora has won the arbitration, both on jurisdiction in the Partial Award on Jurisdiction, and on the merits in this Final Award.

213.    It would be usual in such circumstances for B&B, as the losing party, to bear the entire costs of the arbitration, and for B&B, as the losing party, to be required to compensate Pandora for its reasonable legal costs.

214.    The Sole Arbitrator notes the following extract from "*Praktisk voldgiftsret med fokus på Voldgiftsinstituttet*" (Eng. "*Practical Arbitration Law with focus on the Danish Institute of Arbitration*"), by Secretary General of the DIA, Steffen Pihlblad and others, Chapter 12.4, Distribution of costs between the Parties, p. 237-238:[8]

> "*The distribution of [costs] between the parties is determined with consideration to what the court of arbitration deems fair on the basis of the outcome and additional circumstances of the case. Depending on these circumstances, the court of arbitration may impose the full costs to the court of arbitration and the Danish Institute of Arbitration upon one of the parties. Often, the court of arbitration will decide with consideration to especially the outcome of the case, that the party, which has been*

---

[8]    The Sole Arbitrator was not provided with the original Danish text of this extract.

51

# THE DANISH
# INSTITUTE OF ARBITRATION

> *convicted in accordance with the opponent's claim, must bear the total costs to the court of arbitration and the Danish Institute of Arbitration. This starting point is derogated from if the party has only partially been convicted in accordance with the opponent's claim, just as the starting point – albeit more infrequently – is derogated from if the "winner" has delayed the case, e.g. because he unfairly has deviated from the agreed upon schedule or other agreements between the parties or generally has failed to comply with the instructions of the court of arbitration."*

215.   Regarding other relevant circumstances, the Sole Arbitrator is satisfied that Pandora has conducted the arbitration in an efficient and cost-conscious manner. On the other hand, B&B has deliberately sought to delay the arbitration on several occasions. What should have been a relatively quick and straight-forward case has been made considerably more complicated as a result of B&B's actions. Not only was it necessary to consider and resolve B&B's jurisdictional arguments, on which B&B was unsuccessful, but B&B also raised a number of additional procedural issues which gave rise to considerable additional expense.

216.   In these circumstances, the Sole Arbitrator finds that the costs and expenses claimed by Pandora are reasonable.

217.   Accordingly, taking into account the outcome of the case and other relevant circumstances, the Sole Arbitrator finds that the costs of the arbitration shall be borne by B&B, in full, as the losing party. Furthermore, the Sole Arbitrator finds that B&B, as the losing party, shall compensate Pandora for the full amount of its costs and expenses, as claimed.

# THE DANISH
# INSTITUTE OF ARBITRATION

**X.    Award**

218.    For the reasons set out in Sections VIII and IX above, the Sole Arbitrator hereby:

218.1    DECLARES that on July 31, 2017, the Master Distribution Agreement and the Master Franchise Agreement expired in accordance with Clause 18.3 of the Master Distribution Agreement and Clause 22.3 of the Master Franchise Agreement;

218.2    DECLARES that the contractual obligations upon termination as stated in Clause 19 of the Master Distribution Agreement and Clause 23 of the Master Franchise Agreement applied with effect from July 31, 2017, but have been temporarily suspended until a ruling by the Miami court on B&B Jewelry, Inc.'s motion for temporary injunction under the conditions set forth in the Stipulation marked as Exhibit 35 (Attached);

218.3    ORDERS that at the time permitted by the Stipulation (*i.e.*, upon a ruling by the Miami court on the referenced injunction motion) and unless otherwise ordered by the Miami court, B&B Jewelry, Inc. shall do the following:

218.3.1    B&B Jewelry, Inc. must discontinue any use of Pandora A/S's intellectual property and confidential information including without limitation the intellectual property and confidential information in the Pandora name, products, brand, trademarks, guide and system;

218.3.2    All Sub-Franchise Agreements and pending orders shall be assigned directly to Pandora A/S or such third party as designated by Pandora A/S;

218.3.3    B&B Jewelry, Inc. must refrain from doing business under any name or in any matter that might give the impression that B&B Jewelry Inc. is or was a franchisee or distributor of Pandora A/S or otherwise affiliated or associated with Pandora A/S;

218.4    DECLARES that Pandora A/S did not assign the Agreements to Pandora Jewelry, LLC and that Pandora A/S remains the contracting party under the Agreements;

53

THE DANISH
INSTITUTE OF ARBITRATION

218.5   ORDERS B&B Jewelry. Inc. to reimburse the legal fees and costs incurred by Pandora A/S in connection with or resulting from this dispute in the amount of **DKK 2,049,097.11 and USD 188,881.00**, with default interest in accordance with section 5 of the Danish Interest Act, cf. section 8a from the date of enforcement; and

214.6   ORDERS B&B Jewelry, Inc. to pay the fees and costs of the Arbitral Tribunal and any other costs of the arbitration, such as the registration fee and other expenses to the Danish Institute of Arbitration, in the amount of **DKK 699,700.00**, with default interest in accordance with the Danish Interest Act as applicable.

Seat of Arbitration: Copenhagen, Denmark

Date:        0 5 JAN 2018

Signed:

James Hope

The authenticity of this award is hereby confirmed

by Danish Institute of Arbitration

Copenhagen, Denmark

Secretary General Steffen Pihlblad

54

THE DANISH
INSTITUTE OF ARBITRATION

**ATTACHMENT**

Stipulation, dated July 25, 2017, marked as Exhibit 35.

EXHIBIT 35899

Filing # 59503794 E-Filed 07/25/2017 05:14:30 PM

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO: 2016-032176 CA 01

B&B JEWELRY, INC.,
a Florida corporation,

     Plaintiff,

vs.

PANDORA JEWELRY LLC d/b/a
PANDORA JEWELRY U.S.,
a foreign limited liability company; and
FRANCK SARAGOSSI, an individual,

     Defendants.

                            /

### STIPULATION REGARDING MOTION FOR TEMPORARY INJUNCTION

Plaintiff, B&B Jewelry, Inc. ("B&B") and Defendants Pandora Jewelry, LLC ("Pandora

Americas") and Franck Saragossi ("Mr. Saragossi") (collectively, "Defendants"), hereby stipulate

and agree as follows:

1.     The instant case arises out of B&B's role as a franchisee and distributor of

PANDORA® jewelry in certain South American countries: Columbia, Venezuela, Peru, Bolivia and

Ecuador (collectively the "Territory").

2.     The Defendants maintain that B&B's franchise and distribution rights arise out of

two written agreements dated August 1, 2012 ("the 2012 Agreements") with Pandora A/S – the

Danish parent of Defendant Pandora Americas. Pandora A/S, as well as the Defendants, further

maintain that the 2012 Agreements will expire on August 1, 2017, at which point B&B will no

longer be an authorized Pandora franchisee and distributor.

900

3.      B&B maintains that: (a) the 2012 Agreements expired in 2015; and (b) B&B's claims arise out of separate verbal agreements with Pandora Americas that do not expire August 1, 2017.

4.      On June 21, 2017, B&B moved for a temporary injunction seeking to enjoin Pandora Americas from terminating B&B's operations and maintain what B&B contends is the status quo until this Court decides this case on its merits. The Defendants will oppose that motion.

5.      In addition to B&B's pending Motion for Temporary Injunction, the parties have filed three (3) other substantive motions that remain pending:

- • Defendants' Motion to Compel Arbitration and to Dismiss Amended Complaint filed May 9, 2017;

- • Defendants' Motion to Dismiss for Failure to State a Claim filed May 9, 2017;

- • Plaintiff's Motion to Compel Defendant to Stay or Abate Arbitration filed on July 14, 2017.

6.      The parties have requested a consolidated hearing on these pending Motions in August of 2017.

7.      In anticipation of that hearing date, the parties have agreed upon the following briefing schedule:

- • Each party will file its respective Opposition Memoranda to the pending Motions on or before **July 29, 2017**; and

- • Each party will file its respective Reply Memoranda to the pending Motions on or before **August 4, 2017.**

8.      In light of the requested hearing date, the parties, with the consent of non-party Pandora A/S, have agreed that B&B may continue to operate as an authorized franchisee and distributor in the Territory until such time as the Court has ruled on the pending Motion for Temporary Injunction, subject to the following conditions:

2

901

- The agreement is without prejudice to any party's claims, defenses or position in this case or in the pending arbitration proceedings before the Danish Institute of Arbitration ("DIA"), including, but not limited to, Pandora's position that B&B's franchise and distribution rights contractually expire on August 1, 2017 and that B&B is not entitled to a preliminary injunction in this case;

- Defendants' participation in the injunction proceedings is without prejudice to their position as set forth in its pending Motion to Compel Arbitration;

- If the requested preliminary injunction is denied by this Court, B&B will not interfere with the smooth transition of its sub-franchise accounts to Pandora;

- In anticipation of a potential denial of the requested injunction and upon request by Pandora, B&B will promptly provide information necessary for the smooth transition of B&B's sub-franchise accounts to Pandora A/S or its designee should the Court deny B&B's injunction motion, including but not limited to pertinent ordering, shipping, importation and delivery information as identified in **Exhibit A** hereto; and

- Until a ruling by the Court on B&B's Motion for Temporary Injunction, Pandora Americas shall continue to: (i) supply PANDORA® jewelry to B&B; and (ii) permit B&B to operate as the exclusive Pandora franchisee and distributor in the Territory with respect to any currently open retail store and any unopened retail store that has been approved by Pandora as of August 1, 2017. While Pandora shall consider any new store applications submitted prior to August 1, 2017 in accordance with its usual practice, Pandora does not guarantee that it will have time to complete its review of any new store applications submitted after the date of this stipulation or that any such new store applications will be approved prior to August 1, 2017 and, thereafter, will not consider any unapproved application.

9.     The parties jointly and respectfully request that the Court issue a ruling on the

Motion for Temporary Injunction on or before September 30, 2017.


**IT IS SO STIPULATED AND AGREED.**

902

By: /s/ Daniel K. Bandklayder
Daniel K. Bandklayder, Esq.
Florida Bar No. 286265
danb@dkb-law.com


**Daniel K. Bandklayder, P.A.**
1130 North Kendall Drive – Suite 104
Miami, FL 33176
Telephone:  (305) 670-0242
Facsimile:  (305) 670-0211

/s/ Brandon J. Hechtman
Brandon J. Hechtman, Esq.
Florida Bar No. 88652
miacrtpleadings@wickersmith.com
Lindsey A. Hicks, Esq.

**Wicker Smith O'Hara McCoy & Ford, P.A.**
2800 Ponce de Leon Blvd., Suite 800
Coral Gables, FL 33134
Telephone:  (305) 448-3939
Facsimile:  (305) 441-1745


*Counsel for Plaintiffs*
*B&B Jewelry, Inc., a Florida corporation*

4825-0326-8171, v. 6


By: /s/ Manuel A. Garcia Linares
Manuel A. Garcia-Linares, Esq.
     Florida Bar No. 985252
mlinares@richmangreer.com
brodriguez@richmangreer.com
Georgia A. Thompson, Esq.
Florida Bar No. 100181
gthompson@richmangreer.com

**Richman Greer, P.A**
396 Alhambra Circle
North Tower – 14th Floor
Miami, FL 33134
Telephone: (305) 373-4000
Facsimile: (305) 373-4099

*and*
John E. McCann, Jr. (pending *pro hac vice*)
*jmccann@MilesStockbridge.com*
Michael Blumenfeld (pending *pro hac vice*)
*mblumenfeld@MilesStockbridge.com*
Alexandra P. Moylan (pending *pro hac vice*)
*amoylan@milesstockbridge.com*
**Miles & Stockbridge P.C.**
100 Light Street
Baltimore, Maryland 21202
Tel: 410.727.6464
Fax: 410.773.9101

*Counsel for Defendants*
*Pandora Jewelry LLC and Franck Saragossi*

4

## EXHIBIT A

1. How are the customer's ordering?
2. What is the order processing lead time?
3. What is the flow of the shipments after it departs the warehouse/freight forwarder in Miami?
4. Are the shipments being opened and repackaged for each store?
5. Are there additional sales between B&B and another party before the product gets to the store?
6. Who facilitates the transportation between Miami and the end destination?
   a. Is the end destination the store or a warehouse within the country?
7. Is B&B utilizing the Commercial Invoice given by Pandora or creating a new invoice?
8. Who is the Importer of Record for each country/customer?
   a. Is there a trading company being used?
9. Are any Free Trade Agreement/Special Trade Programs be utilized?
   a. If so, which programs?
10. Who is supplying the Tariff Code Classifications for each country?
    a. Is there a part database that has all classifications being utilized per country?
11. What Country of Origin are you declaring for jewelry products?

**Documents: Samples for each account of:**

1. Commercial Invoices for shipments
2. Bills of Ladings and/or Air-way Bills
3. Packing List
4. Import Entry Declarations (such as a Pedimento)
5. Country of Origin Declarations
6. Any additional Importation Documentation that is needed for a certain product

# EXHIBIT 2

Colombia & Venezuela

# DISTRIBUTION AGREEMENT

PANDORA HOLDING A/S
B&B Jewelry, Inc.

## CONTENTS

| | | |
|---|---|---|
| 1. | SCOPE OF THE AGREEMENT | 1 |
| 2. | DEFINITIONS | 1 |
| 3. | INTERPRETATION | 3 |
| 4. | APPOINTMENT | 4 |
| 5. | PRODUCTS | 4 |
| 6. | MINIMUM AGGREGATE PURCHASE OBLIGATION | |
| 7. | AUTHORIZATION OF MULTI-BRAND RETAILERS | 5 |
| 8. | GUIDELINES | 7 |
| 9. | TRAINING | 7 |
| 10. | DISTRIBUTOR'S PERSONNEL | 7 |
| 11. | SALES REPRESENTATIVES AND MERCHANDISERS VISITS | 8 |
| 12. | MARKETING AND PROMOTION | 8 |
| 13. | SURVEYS | 9 |
| 14. | REPORTING | 9 |
| 15. | NON-COMPETITION | 10 |
| 16. | INTELLECTUAL PROPERTY RIGHTS | 10 |
| 17. | CONFIDENTIALITY OBLIGATION | 11 |
| 18. | TERM AND TERMINATION | 12 |
| 19. | CONDITIONS FOLLOWING TERMINATION | 14 |
| 20. | ASSIGNABILITY | 16 |
| 21. | INSURANCE | 16 |

| | | |
|---|---|---|
| 22. | RELATIONSHIP BETWEEN THE PARTIES | 16 |
| 23. | FORCE MAJEURE | 16 |
| 24. | WAIVER | 17 |
| 25. | NOTICES | 17 |
| 26. | COMPLIANCE WITH LAW | 17 |
| 27. | MISCELLANEOUS PROVISIONS | 17 |
| 28. | GOVERNING LAW AND VENUE | 18 |
| 29. | WARRANTY | 18 |
| 30. | SIGNATURES | 19 |

## SCHEDULES

Schedule 2.1(a)    Commencement Date
Schedule 2.1(b)    Territory
Schedule 5.1       Assortment of Products
Schedule 5.2       Terms of Sale and Delivery
Schedule 5.6       POS Material
Schedule 6.1       Minimum Purchase Obligation
Schedule 6.4       Development Obligation
Schedule 11.3      Sales Representatives and Merchandisers Visits
Schedule 12.5      Advertising and Promotion Commitment
Schedule 15.1      Competing Products

iii

This agreement is made between

**PANDORA Holding A/S**
Reg No (CVR) 28505116
Egegaardsvej 59-61
2610 Roedovre
Denmark
("PANDORA")

AND

**B&B Jewelry, Inc.**
36 N.E. 1st Street, #213
Miami, Florida, 33132
USA
(the "Distributor")

In this agreement PANDORA and the Distributor shall from time to time be referred to indi-
vidually as a "Party" and together as the "Parties"

**1.      SCOPE OF THE AGREEMENT**

1.1      PANDORA has invested considerable resources in the development, distribution and branding of a unique collection of charm bracelets and matching jewellery under the "PANDORA" name and brand.

1.2      PANDORA wishes to appoint the Distributor as its exclusive distributor for the promotion and sale of PANDORA's Products to authorized Multi-brand Retailers within the Territory.

**2.      DEFINITIONS**

2.1      In this agreement, unless the context requires otherwise:

"Commencement Date"      means the date specified in Schedule 2.1(a).

"Contractual Year"      means every consecutive period of twelve (12) months following the Commencement Date.

"Force Majeure"      means any event or circumstance, or combination of events or circumstances, which is beyond the reasonable control of the Party affected and which causes or results in default or delay in the performance by that Party of any of its obligations under this agreement and which that Party could not reasonably have been expected to have prevented, or overcome. Force Majeure includes, without limitation the following events or circumstances:
(a) acts of God;
(b) wars, riots, fire, quarantine, insurrections, vandalism or sabotage; and
(c) strikes, lockouts, bans, limitations of work or other industrial disturbances.

"Goodwill"      means all goodwill, reputation, value and commercial advantage in connection with PANDORA, or the Trademarks and the Intellectual Property of PANDORA.

"Gross Profit"      means the Distributor's revenue from the sale of the Products less purchase costs of the Products.

1

| | |
|---|---|
| "Guidelines" | means the guidelines accessible to the Distributor's Multi-brand Retailers on PANDORA's website. |
| "Intellectual Property" | means all intellectual property rights, whether in law or in equity or under statute including without limitation: patents, copyright, registered designs, unregistered design rights, trade marks and the right to have confidential information kept confidential; and any application or right to apply for registration of any of those rights. |
| "Multi-brand Retailer" | means a retailer authorized by the Distributor in accordance with Clause 7 of this agreement. |
| "Net Sales" | means gross sales of the Products at the invoiced selling price less returns, deductions or discounts, and all applicable taxes. |
| "POS Material" | means PANDORA gift bags, gift boxes, gift-wrapping paper, sales displays, small mirrors, wood boxes, posters, brochures, catalogues and other marketing material used from time to time in connection with the resale of the Products. |
| "Products" | means the assortment of jewellery and accessories that are naturally related to the sale of the jewelry, including but not limited to jewelry cleaning fluids, jewelry cleaning cloths and jewelry boxes and chests, manufactured and/or supplied by PANDORA from time to time for sale in the Territory. |
| "Shop Fittings" | means counters, trays, exhibition towers, cabinets, panels, shelves, mirrors, signs, lighting, furniture, carpets and other items used for the presentation of the Products from time to time in accordance with the Guidelines. |
| "Territory" | means the area as defined in Schedule 2.1(b) with the exception of travel retail areas such as airports, airplanes and cruise ships, military establishments and other duty free areas. |

2

"Trademarks"          means the trademarks, logos, names, product des-
                      ignations, designs etc. owned or licensed by PAN-
                      DORA.

## 3.   INTERPRETATION

3.1     In the interpretation of this agreement unless the contrary intention appears or
        the context otherwise requires:

    (a)     the singular includes the plural and vice versa;

    (b)     a reference to a person includes a reference to a firm, corporation,
        other corporate body or legal entity;

    (c)     a reference to (i) a natural person includes the heirs' executors, admin-
        istrators and permitted assigns of that person and (ii) a corporate body
        includes the successors and permitted assigns of that corporate body;

    (d)     a reference to a person or corporate body includes that person or body
        acting in a trustee or other representative capacity;

    (e)     a reference to two (2) or more persons means those persons jointly
        and severally;

    (f)     where a word or expression is defined, other parts of speech and
        grammatical forms of that word or expression have corresponding
        meanings;

    (g)     headings are for ease of reference and do not affect the construction of
        this document;

    (h)     a reference to a statute includes (i) all amendments for the time being
        in force and any other replacement statute and all regulations and
        statutory instruments for the time being in force under that statute,
        and (ii) any notice demand order direction requirement or obligation
        pursuant to or under that statute or those regulations and statutory in-
        struments;

    (i)     a reference to a recital, clause, schedule, attachment or annexure is to
        recital, clause, schedule, attachment or annexure of or to this docu-
        ment and recital, schedule, attachment or annexure so referenced
        forms part of this document;

3

(j)     a reference to any agreement or document is to that agreement or document (and, where applicable, any of its provisions) as amended, novated, restated or replaced from time to time;

(k)     a reference to a consent, approval or discretion of a Party means the prior written consent or approval of that Party in its absolute and unfettered discretion or the exercise of the absolute and unfettered discretion of the Party which consent or approval may be granted on conditions;

(l)     a right includes a remedy, authority and power;

3.2    For the avoidance of doubt, the provisions of the Schedules attached hereto and referred to herein shall form part of this agreement and be binding on the Parties.

3.3    A provision of this document must not be construed against or to the disadvantage of a Party because that Party (or its advisers) was responsible for the preparation of the document (or a portion of the document).

4.    **APPOINTMENT**

4.1    PANDORA hereby appoints the Distributor as its exclusive distributor to distribute the Products in its own name and for its own account to Multi-brand Retailers authorized by the Distributor in the Territory.

5.    **PRODUCTS**

5.1    The Distributor shall purchase and distribute the assortment of Products as specified in **Schedule 5.1**. PANDORA determines the assortment of Products once a year taking into consideration relevant economic or market circumstances. The Distributor may propose other products and accessories which the Distributor considers relevant to include in the assortment of Products for the approval of PANDORA.

5.2    The Distributor shall buy the Products from PANDORA subject to the terms and conditions as specified in **Schedule 5.2** as may be amended from time to time by PANDORA's written notification to the Distributor.

5.3    The Distributor shall purchase all of its requirements for Products solely from PANDORA or suppliers designated or approved by PANDORA.

4

5.4     The Distributor shall only distribute the Products to authorized Multi-brand Re-
        tailers and shall not actively approach customers domiciled outside the Territory
        with a view to selling the Products.

5.5     The Distributor shall ensure that the Multi-brand Retailers do not sell the Prod-
        ucts to wholesalers. The Multi-brand Retailers shall not be entitled to sell Prod-
        ucts to retailers other than authorized PANDORA franchisees or authorized
        PANDORA Multi-brand Retailers.

5.6     PANDORA will supply the Distributor with POS Material to be used in connection
        with the resale of the Products as specified in Schedule 5.6. All freight charges
        shall be the responsibility of the Distributor. The Distributor shall ensure that
        no other POS Material is being used.

**6.     MINIMUM AGGREGATE PURCHASE AND DEVELOPMENT OBLIGATION**

6.1     During the term of this Agreement the Distributor undertakes to buy Products
        from PANDORA for a minimum aggregate purchase amount each year. The min-
        imum aggregate purchase amount for the first twelve (12) months following the
        Commencement Date is specified in Schedule 6.1.

6.2     The minimum aggregate purchase amount for subsequent years shall be negoti-
        ated in good faith between the Parties taking into consideration relevant eco-
        nomic or market circumstances. The minimum aggregate purchase amount
        must be agreed in writing by the Parties before the end of the previous Con-
        tractual Year.

6.3     In the event that no agreement is reached on the minimum aggregate purchase
        amount before the beginning of a contractual year, the minimum aggregate
        purchase amount for that Contractual Year shall be the higher amount of either
        (i) 110 % of the annual purchase obligation applied in the previous Contractual
        Year or (ii) the actual results (aggregate purchase amount) of the Distributor's
        purchases during the previous Contractual Year.

6.4     In addition to the minimum aggregate purchase obligation in Clause 6.1, the
        Distributor undertakes during the term of this agreement to distribute the Prod-
        ucts to the number of Multi-brand Retailers specified in Schedule 6.4.

**7.     AUTHORIZATION OF MULTI-BRAND RETAILERS**

7.1     The Distributor shall distribute the Products to Multi-brand Retailers authorized
        by the Distributor in accordance with the terms and conditions in this agree-
        ment.

5

7.2   A Multi-brand Retailer is a retailer who maintains a high profile within the retail Jewellery Industry. The Multi-brand Retailer must be specialised in the sale of jewellery of a high quality to consumers and the Multi-brand Retailer's sales and show room shall clearly project the image that the main turnover is based on quality products and shall at all times be managed and stand out in adherence with the prestige that encompass PANDORA's Products.

7.3   There are four different multi-brand retail formats. Each format is associated with a specific assortment of Products and requirements regarding shop location, dedicated in-store and window space and display of Shop Fittings. The level of support provided to the Multi-brand Retailers is different for each format.

7.4   The Distributor procures that the Multi-brand Retailers select one of the following retail formats whichever is the most appropriate:

7.4.1   PANDORA Shop-In-Shop

The Shop-In-Shop retailer is a Multi-brand Retailer with a clearly defined in-store space of minimum 8 square metres dedicated to the sale of the Products in either a multi-brand jewelry shop or in a department store without dedicated sales personnel. Dedicated window space proportional to the Shop-In-Shop space is required. Shop-In-Shops are located in main streets, shopping malls or similar. The Shop-In-Shop has PANDORA Shop Fittings, and carries a wide assortment in PANDORA's Products corresponding to 90% of the complete assortment in all PANDORA design lines.

7.4.2   Gold Partners

Gold Partners are Multi-brand Retailers with a strong PANDORA profile located as a minimum at best locations outside shopping malls and main streets, and who have dedicated in-store space to PANDORA's Products of minimum 4 square metres with PANDORA Shop Fittings. Dedicated window space proportional to the shop's space is required. Gold Partners carry a large assortment of Products corresponding to 85% of the complete assortment in all PANDORA design lines.

7.4.3   Silver Partners

Silver Partners are Multi-brand Retailers who have dedicated in-store space of minimum 4 square metres with PANDORA Shop Fittings. Dedicated window space proportional to the shop's space is required. There are no location requirements. Silver Partners carry a medium assortment of PANDORA's Products corresponding to 75% of the complete assortment in all PANDORA design lines.

7.4.4     White Partners

White Partners are those Multi-brand Retailers who do not contribute signifi-
cantly to profiling PANDORA in their shops but who carry a limited assortment
of PANDORA's Products corresponding to 50% of the complete assortment in all
design lines. There are no locations or in-store requirement to White Partners.
However, some dedicated window space proportional to the shop's space is re-
quired. White Partners are required to have basic PANDORA displays in the
shop.

7.5     The Distributor shall ensure that the Multi-brand Retailers within the Territory
at all times live up to the requirements regarding assortment of Products, shop
location, dedicated in-store and window space and display of Shop Fittings.

**8.     GUIDELINES**

8.1     The Distributor shall cause all its Multi-brand Retailers to conduct their business
activities in accordance with the Guidelines drafted by PANDORA, including in
particular PANDORA's guidelines for online sales as applied from time to time.

8.2     The Guidelines are accessible to the Multi-brand Retailers online on PANDORA's
website through a dealer area.

**9.     TRAINING**

9.1     Any key or contact persons of the Distributor shall as described in the Guide-
lines attend training programs as required and deemed necessary by PANDORA
from time to time and at the locations designated by PANDORA. The Distributor
shall bear any wage costs and travel and living expenses of its personnel in
connection with the training program.

9.2     The Distributors shall provide Multi-brand Retailers with training as required
and deemed necessary by PANDORA from time to time.

**10.     DISTRIBUTOR'S PERSONNEL**

10.1     The proper fulfilment of the Distributor's obligations under this agreement re-
quires that the Distributor and its personnel have the required qualifications
and skills as described in the Guidelines. The Distributor is obliged to employ a

7

sufficient number of suitably qualified personnel to ensure the proper fulfilment of its obligations under this agreement.

10.2    The Distributor shall upon request from PANDORA provide names of the key individuals employed by the Distributor to be responsible for the fulfilment of the obligations mentioned in the Guidelines and any changes to such information as it arises.

## 11.    SALES REPRESENTATIVES AND MERCHANDISERS VISITS

11.1    The Distributor shall carry out regular sales representative visits to help its Multi-brand Retailers optimize their sales processes and to ensure that assortment and stock levels are aligned with customer demands.

11.2    The Distributor shall further carry out merchandiser visits to help its Multi-brand retailers in trimming their business and to ensure that the Products are displayed according to PANDORA's guidelines.

11.3    The minimum number of yearly sales representative and merchandiser visits to be carried out by the Distributor is specified in Schedule 11.3.

## 12.    MARKETING AND PROMOTION

12.1    The Distributor shall participate in all promotion and marketing activities required by PANDORA in the Territory.

12.2    PANDORA shall provide the Distributor with marketing materials for use by the Distributor in all promotion and marketing activities. All freight charges in connection with the transportation of such marketing materials shall be the responsibility of the Distributor.

12.3    The Distributor shall ensure that the Multi-brand Retailers are supplied with POS Material and any other similar items provided by PANDORA for marketing as well as all activity materials related to new collections, Valentines Day, Christmas and any other activity set out in the activity plan provided by PANDORA once a year. The Distributor shall ensure that the Multi-brand Retailers are supplied with and use the materials and that no other materials than the latest updated materials provided by the Distributor are being used in connection with the resale of the Products to end users.

12.4    The Distributor shall submit samples of all advertising and promotional plans and materials to PANDORA for its approval, if such plans and materials have not been prepared or previously approved by PANDORA. If written notice of disapproval is not received by the Distributor from PANDORA within 10 days of the

date of receipt by PANDORA of such samples or materials, PANDORA shall be deemed to have approved them.

12.5    The Distributor shall spend, on a yearly basis, not less than the percentage of its yearly Net Sales on advertising and promotion as specified in Schedule 12.5.

12.6    Marketing and promotion as used herein shall mean all out-of-pocket expenses and costs (excluding salaries of Distributor's staff) incurred by the Distributor in accordance with its current business plan towards any marketing, promotional or advertising activities in support of the Products including but not limited to advertising through the use of print, radio, TV, the internet or other media, participation in fairs and other similar events, public relations activities and marketing contributions to Multi-brand Retailers.

12.7    Unless otherwise agreed with PANDORA, the Distributor shall not provide sponsorships or the like for purposes which are not directly connected with the sale of the Products. The amount of any permitted or approved sponsorships shall be taken into account when determining whether the yearly marketing and promotion commitment set out in Clause 12.5 has been met provided, however, that it shall not, for the purposes of the calculation exceed more than 10 % of the annual marketing and promotion commitment as set out in Clause 12.5.

12.8    The Distributors shall ensure that the same rules apply for sponsorships provided by any Multi-brand Retailer.

13.    SURVEYS

13.1    For the purpose of obtaining valuable information about the development and position of the brand relating to the products and the Distributor's position in the market, the Distributor shall upon request from PANDORA and according to PANDORA's instructions participate in retailer satisfaction surveys and customer satisfaction surveys initiated by PANDORA not more than once a year.

13.2    The Distributor will receive a report based on the data collected in connection with such surveys. PANDORA shall not guarantee the accuracy of such reports. The costs involved in participating in such surveys shall be divided and borne equally between PANDORA and the Distributor.

14.    REPORTING

14.1    The Distributor shall submit to PANDORA in the form prescribed by PANDORA, the following information:

9

GB

(a)    daily data concerning (i) the total current stock of the Products in number of units and value, (ii) the total current customer orders of the Products in number of units and value, and (iii) total current production order of Products in number and value in the preceding month;

(b)    yearly business plan, including a budget, in accordance with PANDORA's specifications from time to time. Submission of a yearly business plan also includes the obligation for the Distributor to take part in a yearly evaluation of the previous submitted business plan in accordance with PANDORA's Instructions;

(c)    annual accounts audited by a certified auditor (registered in the territory with the Independent Regulatory Board for Auditors) from the Distributor;

(d)    yearly opinion from the auditor referred to in 14.1(c) stating that the Distributor has spent the agreed level of expenditures on advertising and promotion activities as agreed in Clause 12.5.

## 15.    NON-COMPETITION

15.1    With the exception of products listed in Schedule 15.1 the Distributor shall not directly or indirectly in any capacity whatsoever (including without limitation either individually or as a trustee, principal, beneficiary, member, franchisor, Distributor, lender, joint venturer, agent, officer, or employee of any business), produce, purchase, promote, market or sell products which resemble or compete with the Products during the term of this agreement.

## 16.    INTELLECTUAL PROPERTY RIGHTS

16.1    PANDORA retains all Intellectual Property rights in and to the Products and the PANDORA name, brand and Trademarks.

16.2    Except for the Distributor's rights under this agreement, no right, title or interest in or to PANDORA's aforesaid Intellectual Property is granted or otherwise transferred by this agreement. The Distributor shall respect the Intellectual Property rights of PANDORA in accordance with all applicable laws and the provisions of this agreement. The Distributor's use of the Trademarks in connection with any advertising etc. shall be in accordance with PANDORA's instructions and specifications.

16.3    The Distributor may, solely for the purpose of conducting the business in relation to the sale and promotion of the Products and/or the appointment and management of Multi-brand Retailers in accordance with the terms of this

10

agreement, use PANDORA's name and Trademarks on its letterhead, envelopes, order sheets or any other stationery items used in connection with this agreement. The Distributor may not use or register the PANDORA name in or as part of the Distributor's business name, company name or domain name unless otherwise agreed by PANDORA in writing on such terms as PANDORA may stipulate in respect thereof.

16.4    The Distributor shall inform PANDORA as soon as reasonable possible of any known or threatened infringements of PANDORA's Intellectual Property or of any claim or allegation by a third party that its Intellectual Property has been infringed by the exercise of any of the rights granted by PANDORA to the Distributor under this agreement.

16.5    The Distributor shall itself refrain and shall take all reasonable steps to ensure that all PANDORA Multi-brand Retailers refrain from registering or applying for registration of any Intellectual Property attached to or subsisting in and/or relating to the Products, the PANDORA name or brand and Trademarks and/or any part or derivative thereof. In the event that any such rights have already been registered before the execution of this agreement, the Distributor shall ensure that any such rights are assigned to PANDORA without compensation.

## 17.    CONFIDENTIALITY OBLIGATION

17.1    The Distributor undertakes to keep strictly confidential all confidential information about PANDORA, its suppliers, customers and products. Any and all information of such nature shall be deemed business or operating secrets of PANDORA. The Distributor may use the information provided by PANDORA solely for the purpose of the fulfilment of its obligations under this agreement.

17.2    The Distributor undertakes not to disclose to third parties any confidential and business information pursuant to Clause 17.1 which the Distributor has received prior to or after the signing of this agreement.

17.3    To the extent permitted by law, the Distributor shall not disclose to anyone its realised or estimated sales figures or profits relating to the Products. If the Distributor's total sales are derived from the sale of PANDORA's Products and those of a third party and the total value of sales attributed to PANDORA Products is 60% or more of the Distributor's total sales, the Distributor shall obtain the prior written approval of PANDORA prior to disclosing such information.

17.4    This confidentiality obligation shall survive the termination of this agreement and remain in force as long as any of the information pursuant to Clause 17.1 is of confidential nature.

11

**18.    TERM AND TERMINATION**

18.1    The term of this agreement shall be for an initial term of three (3) years from the Commencement Date unless sooner terminated in accordance with the provisions herein.

18.2    After the initial term of three (3) years, this agreement shall be extended for an additional two (2) years provided that agreement on extension has been reached between the Parties before the end of the second Contractual Year. Where any subsequent extension is requested, the Parties must have agreed on such extension before the end of the first Contractual Year of the extension period, i.e. before the end of year 4, 6, 8, 10, 12 and so on. Agreements on extensions of this agreement, including any amendments or alterations hereto, shall be made in writing.

18.3    If agreement on extension of this agreement has not been reached in accordance with Clause 18.2 or if PANDORA decides not to extend the term, the agreement will automatically terminate upon expiry of the initial term or the applicable subsequent agreed extension, i.e. at the end of year 3, 5, 7, 9, 11 and so on.

18.4    Notwithstanding Clauses 18.1 and 18.2 PANDORA shall at all times be entitled to terminate this agreement before expiry by giving six (6) months' written notice thereof to the Distributor. In this case, the Distributor shall be entitled to receive compensation from PANDORA. The compensation shall amount to Distributor's Gross Profit on sales of the Products in the preceding twelve (12) months prior to the written notice. In the event that the cooperation between the Parties has not had a duration of effective twelve (12) months, the Distributor's Gross Profit shall be calculated by multiplying the average monthly Gross Profit in the effective period with twelve (12). Should PANDORA decide to terminate the agreement with six (6) months' notice the Parties agree in good faith to discuss a possible transfer to PANDORA of the employees of the Distributor who are dedicated to the fulfilment of this agreement. This discussion should also include the possibility of forming a joint venture between the Parties.

18.5    Notwithstanding Clauses 18.1 to 18.4 either Party may by written notification to the other Party with immediate effect terminate this agreement due to a material breach of this agreement by the other Party or for another important reason which renders it unacceptable for the terminating Party to continue complying with this agreement for reasons of public morals or good faith, if the breach has

12

not been remedied within 30 calendar days of receiving written notice of such breach from the notifying Party and of what is required to be done by the breaching Party to remedy the breach. Material breach and important reasons entitling a Party to terminate this agreement with immediate effect shall include, among other things, the following:

- the Distributor fails to meet its minimum aggregate purchase obligation in any given year as set out in Clause 6.1;
- The Distributor's fails to meet its marketing and promotion commitment as set out in Clause 12.5;
- The Distributor breaches the restrictions contained in Clause 15;
- The Distributor is in breach of the rules on the use of the Trademarks and other Intellectual Property as set out in Clause 16;
- The Distributor breaches the confidentiality provision as set out in Clause 17; and
- The Distributor in any way discredits PANDORA, its affiliates or the Trademarks.
- that for an extended period of time PANDORA is unable to supply the agreed assortment of Products to the Distributor, and that this is not because PANDORA or its suppliers are affected by Force Majeure.

18.6   In the event that the Distributor itself, the legal entity that the Distributor is a part of or the parent or subsidiary company of the Distributor has entered into an Master Franchise Agreement with PANDORA regarding the distribution of the Products to authorized sub franchisees in the Territory, material breach of the said Master Franchise Agreement shall constitute a material breach of this agreement as well.

18.7   PANDORA may terminate this agreement, effective immediately upon receipt by the Distributor of a termination notice from PANDORA to the Distributor, which termination notice PANDORA will be entitled to serve, upon the occurrence of any one or more of the following important reasons for of termination:

- the Distributor no longer holds a licence that the Distributor must hold to carry on its business under this agreement;
- the Distributor becomes bankrupt, insolvent under administration or an externally-administered body corporate;
- the Distributor or the director thereof is convicted of a serious offence;
- the Distributor or the director thereof operates its business in a way that in the opinion endangers public health or safety;
- the Distributor or the director thereof is fraudulent in connection with the operation of its business under this agreement; and

13

- the Distributor agrees to termination of this agreement.

18.8    Unless expressly provided for by this agreement or by mandatory provisions of
        the applicable law, termination or non-renewal of this agreement by PANDORA
        will not entitle the Distributor to any payment or compensation or a payment
        towards Goodwill.

19.     CONDITIONS FOLLOWING TERMINATION

19.1    Immediately upon the expiration or termination of this agreement:

        (a)     the Distributor will pay any and all amounts owing to PANDORA and its
                related bodies corporate pursuant to this agreement and all the rights
                under this agreement granted to the Distributor will automatically re-
                vert to PANDORA;

        (b)     the Distributor will discontinue any use of the Intellectual Property and
                confidential information of PANDORA including without limitation the
                Intellectual Property and confidential information in the PANDORA
                name, Products, brand, Trademarks and System;

        (c)     the Distributor will otherwise refrain from doing business under any
                name or in any manner that might give the impression that the Distrib-
                utor is or was a distributor of PANDORA, or otherwise affiliated or asso-
                ciated with PANDORA.

19.2    The Distributor acknowledges and agrees that:

        (a)     the Goodwill and any increase in value of the Goodwill vests absolutely
                in PANDORA and that the Distributor is not entitled to any payment or
                other compensation whatsoever from PANDORA for any increase in val-
                ue in the Goodwill that occurred during the term of this agreement un-
                less otherwise provided for by mandatory provisions of the law applica-
                ble;

        (b)     after the termination of this agreement, to the extent permitted by law,
                PANDORA may continue to use any information relating to customers or
                clients of the Distributor that was provided to PANDORA by the Distrib-
                utor during the term of this agreement in accordance with this agree-
                ment and the Distributor will not be entitled to any payment or com-
                pensation in relation to PANDORA's use of this information. To the ex-
                tent permitted by law the Distributor shall transfer to PANDORA any in-
                formation not already transferred to PANDORA during the term of this

14

BB

agreement relating to customers, including any databases, lists, regis-
ters, records, files or any similar lists, whether electronic or physical,
containing information regarding end customers. PANDORA may use
any such information after the termination of this agreement, and the
Distributor will not be entitled to any payment or compensation in rela-
tion to PANDORA's use of any such information;

(c)     unless otherwise provided for by mandatory provisions of the applicable
law, PANDORA shall have the right but not the obligation within 30
days after termination, to purchase from the Distributor any or all in-
ventory or *Shop Fittings* related to the *resale* of the *Products* at the
lowest of either the purchase price or book value thereof in the Distrib-
utor's account. PANDORA shall arrange for transportation and insurance
and any related costs. The Distributor may sell inventory of products to
its Multi-brand Retailers in relation to orders that the Distributor has
received and accepted from such Multi-brand Retailers before the date
of termination of this agreement, or for which PANDORA does not exer-
cise its right to repurchase;

(d)     the Distributor shall return to PANDORA any materials provided by
PANDORA (marketing, activity, advertising and promotional material) in
its possession or control.

19.3    PANDORA's termination of this agreement does not affect PANDORA's rights
(either pursuant to this agreement or otherwise at law) regarding any breaches
of this agreement by the Distributor which as at the date of termination have
not been remedied by the Distributor.

19.4    All obligations of the Parties which expressly or by their nature survive the ter-
mination or expiration of this agreement will continue in full force and effect
notwithstanding the termination or expiration of this agreement.

19.5    In the event that the terms of section 197 of the Labour Relations Act 66 of
1995 apply upon the expiration or termination of this agreement, without
prejudice to any of the rights of PANDORA at law, or in terms of any other
provision of this agreement, the Distributor hereby indemnifies PANDORA
against all actual or contingent losses, liabilities, damages, costs and expenses
of any nature whatsoever which PANDORA may suffer or incur as a result of or
in connection with any action or claim of any nature which may be brought
against PANDORA or any subsidiary of PANDORA by any employee or former
employee of the Distributor ("indemnified loss"). The Distributor shall be
obliged to pay PANDORA the amount of any indemnified loss suffered or
incurred by PANDORA as soon as PANDORA is obliged to pay the amount

thereof (in the case of any indemnified loss which involves a payment by PANDORA) or as soon as PANDORA suffers the indemnified loss (in the case of an indemnified loss which does not involve a payment by PANDORA).

**20.   ASSIGNABILITY**

20.1   PANDORA may assign or novate its rights or obligations fully or in part (including but not limited to PANDORA's handling and fulfilment of this agreement) to any company within the group of which PANDORA belongs and the Distributor will execute all necessary documents in a form PANDORA considers reasonably necessary to effect that assignment or novation. Furthermore, PANDORA shall be entitled to assign the agreement in connection with a possible assignment of all or the majority of PANDORA's assets and liabilities.

20.2   The Distributor may not assign or in any other way transfer its rights or obligations under this agreement without the prior written consent of PANDORA which consent will not be unreasonably withheld. The transfer of 50% or more of the share capital or voting power of the Distributor shall be deemed to be an assignment of this agreement.

**21.   INSURANCE**

21.1   The Distributor shall take out on its own account full insurance against all relevant risks, and ensure that PANDORA is fully insured within the Territory against product liability and all other relevant claims from any third parties. The Distributor shall upon request provide PANDORA with copies of all insurance policies in force.

**22.   RELATIONSHIP BETWEEN THE PARTIES**

22.1   This agreement does not create a fiduciary relationship between the Parties. The Distributor is an independent contractor, and nothing in this agreement is intended to constitute either Party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose.

**23.   FORCE MAJEURE**

23.1   Neither of the Parties to this agreement shall be responsible to any other Party for any delay in performance or non-performance due to Force Majeure, but the affected Party shall promptly upon the occurrence of any such causes inform the other Party in writing, stating that such cause has delayed or prevented its performance hereunder and thereafter such Party shall take all action within its

16

power to comply with the terms of this agreement as fully and promptly as possible.

23.2 Each Party shall be entitled to terminate the agreement by reasonable written notice to the other Party if performance of the agreement within a reasonable time becomes impossible on account of any circumstances due to Force Majeure.

## 24. WAIVER

24.1 The failure of any Party at any time to enforce any of the provisions of this agreement or to exercise any right under this agreement shall in no way effect that Party's rights after any failure or constitute a waiver of that right.

## 25. NOTICES

25.1 Any notice or consent required to be given to any Party in connection with this agreement shall be in writing and shall be sent by e-mail, fax, post or recorded delivery to the address of the Party set out in this agreement or to such changed address as shall for that purpose be notified to the other Party. Every such notice or consent shall be deemed to have been given at the time when in the course of ordinary transmission it should have been delivered at the address to which it was sent.

## 26. COMPLIANCE WITH LAW

26.1 The Distributor shall conduct its business in a lawful manner and shall faithfully comply with all applicable laws or regulations for the conduct of its business.

26.2 In connection with the Distributor's solicitation of Multi-brand Retailers to sell and promote Products in the Territory, and the execution and performance of all agreements entered into in connection therewith, the Distributor shall comply with, and conduct all promotion, advertising and other activities in accordance with any applicable law in the Territory and all of PANDORA's standards, rules, policies and procedures in effect from time to time.

## 27. MISCELLANEOUS PROVISIONS

27.1 The Distributor will duly execute and perform all such acts, deeds, matters and things (including the execution of documents) as may be reasonably required by PANDORA to enable PANDORA to obtain the full benefit and advantage of this agreement and the transactions contemplated by this agreement.

17

27.2    All the terms and provisions of this agreement are distinct and severable, and if any thereof are held unenforceable, illegal or void in whole or in part by any court, regulatory authority or other competent authority it shall to that extent be deemed not to form part of this agreement and the enforceability, legality and validity of the remainder of this agreement will not be affected.

27.3    The terms and conditions of this agreement may be amended, novated or varied only in writing signed by the Parties.

27.4    This agreement constitutes the entire agreement between the Parties as to its subject matter and supersedes all prior representations and agreement in connection with that subject matter. Either party shall be bound by any express or implied term, representation, warranty, promise or the like not recorded herein.

27.5    This agreement supersedes and replaces all previous contracts, arrangements or understandings (whether oral or written) between the Parties.

**28.    GOVERNING LAW AND VENUE**

28.1    This agreement is governed in all respects in accordance with Danish law and shall be construed and take effect as an agreement made in Denmark.

28.2    PANDORA shall have the right to enforce any dispute or claim arising out of or in connection with this agreement in accordance with the Rules of Arbitration Procedure of the Danish Institute of Arbitration. The venue of arbitration shall be in Copenhagen. The language of the proceeding shall be English.

28.3    Notwithstanding Clause 28.2 PANDORA shall not be prevented from bringing monetary claims against the Distributor before the ordinary courts at PANDO-RA's or the Distributor's venue or from resorting to immediate legal steps such as applications for interdicts in the Territory.

**29.    WARRANTY**

29.1    The Distributor warrants that it has complied (and will for the term of this agreement continue to comply) in all respects with all such South African Exchange Control Regulations and Rulings as may be applicable to it and which are necessary for the implementation of this agreement.

29.2    The warranty contained in clause 29.1 is given on the basis that notwithstanding that PANDORA is or should be aware that the warranty is or may be incorrect, this agreement is entered into by PANDORA relying on the warranty, which is deemed to be both a material representation inducing

PANDORA to enter into this agreement and an essential contractual undertaking by the Distributor to ensure that the warranty is true and correct.

**30.   SIGNATURES**

30.1    This agreement shall be signed in 2 original copies, one for each of the Parties.

On behalf of PANDORA:

Date:

Name: Bjorn Gulden
Title: CEO

On behalf of Distributor:

Date:

Name: Rafael Bild
Title: President

19

**Schedule 2.1(a)**

**Commencement Date**

The Commencement Date of this agreement is August 1st 2012.

**Schedule 2.1(b)**

**Territory:**

The Territory of this agreement is Colombia and Venezuela.

**Schedule 5.1**

**Assortment of Products**

The assortment of Products comprises the product lines specified in PANDORA's EUR3 price list from time to time, unless exemptions from this have been explicitly agreed.

Agreed exemptions in the assortment of Products:

**Schedule 5.2**

**Terms of Sale and Delivery**

| | |
|---|---|
| **Purchase** | The Distributor shall purchase the Products by placing orders with PANDO-RA by e-mail. |
| | Purchase orders shall be placed by the Distributor with PANDORA in accordance with PANDORA's instructions from time to time by using PANDO-RA's standard order form. Minimum order per product is stated in the order form. Certain items which have limited production capacity (e.g. glass items) may, if necessary, be rationalised by PANDORA. The Distributor shall specify sizes when ordering rings. |
| | Minimum order: EUR 5,000 per order. |
| | The Distributor shall at least once every 6 months submit order forecast for the forthcoming 6 months. If the Distributor wants to alter the forecast, this alteration will only be effective after 3 months. In addition, the alteration cannot exceed 100 %. |
| **Delivery** | Time of delivery is 6-8 weeks (subject to reservation for holidays and lack of spare parts) from the date of placement of order. The Products shall be delivered in the sequence produced, i.e. a delivery may contain Products from several orders. However, there is a maximum delivery of 10,000 units per week. This means that an order for 100,000 units will take up to 10 weeks. |
| | PANDORA shall inform the Distributor of the estimated delivery date of the Products upon receipt of the order and shall use all reasonable endeavours to meet the delivery date. |
| | Fluctuations in the number of units delivered may occur. For orders above 100 units, the number of units delivered may fluctuate +/- 15 % from the number ordered. For orders below 100 units fluctuations in the number of units delivered may be higher. |
| **Prices** | The base prices for the Products are the prices stipulated in PANDORA's wholesale price list ("EUR3 price list"). The base price list is adjusted at least once a year. On the day of invoicing the base prices will be adjusted according to the latest London Noon Fix for gold and silver. |
| | All prices are ex works and exclusive of freight and any applicable VAT. |
| **Payments** | Payment to PANDORA shall be made cash in advance the first 6 month. After the initial of 6 month, the Payment shall be made net cash 30 days from delivery to PANDORA's bank account unless otherwise agreed. Payment shall unless otherwise agreed be made in EUR, and all expenses of effecting payment shall be paid by the Distributor. |
| | Without prejudice to its other rights in respect thereof, PANDORA shall be entitled to withhold further supplies of Products while payment of any sums due from the Distributor remain outstanding and/or require advance payment, or other bank guaranteed method for further shipments. PANDORA is entitled to charge interest on such overdue payments at a rate of 2 % per month running from the due date and until payment is made. |
| **Retention of Title** | Ownership of Products in each delivery only passes to the Distributor when all Products in that delivery are paid for in full. |
| | Until then: |

RB

Ownership of Products in the relevant delivery remains with PANDORA;

(a) the Distributor holds Products as bailee for PANDORA; and
(b) the Distributor must store those Products and customer orders in a manner which enables them to be easily identified and distinguished from other goods and products.

If PANDORA terminates this agreement, then:

(a) immediately upon PANDORA's request the Distributor must return to PANDORA any Products nominated by PANDORA which are still owned by PANDORA; and
(b) PANDORA may resell those Products in its absolute and unfettered discretion.

**Risk and Insurance**

Risk of loss or damage to Products will pass to the Distributor at the time of delivery to the Distributor. The Distributor (at its sole cost), must insure such Products from the time risk passes to the Distributor.

**Warranty**

PANDORA warrants that 98 % (measured in value) of the Products are free from any defects caused by errors in production. If the Distributor can prove that in 1 year the error rate has exceeded 2 %, PANDORA shall be obliged to deliver Products equivalent to the value exceeding 2 % without charge. The Distributor shall not be entitled to make claims for errors within the 2 % range.

Not later than the 15 January every year, the Distributor shall inform PANDORA of the error rate in the past calendar year. If PANDORA is required to compensate the Distributor for errors of more than 2 % such a request must be submitted to PANDORA not later than 15 February of the same year. Defective Products for which compensation has been claimed shall be returned to PANDORA.

In the event that PANDORA is in breach of this warranty for whatever reason, the Distributor's remedy shall to the extent permitted by law be limited to replacement of the Products in question, or at PANDORA's discretion, repayment of the price where this has been paid.

**Liability**

Nothing in these Terms of Sale and Delivery shall exclude or limit the liability of Pandora in respect of fraudulent misrepresentation, nor in respect of death or personal injury caused by negligence of PANDORA. To the extent permitted by law, in no event shall PANDORA be liable to the Distributor for any loss of business, loss of opportunity or loss of profits or for any other indirect or consequential loss or damage whatsoever, whether occasioned by the negligence of PANDORA or its employees or agents or otherwise, arising out of or in connection with any act or omission of PANDORA in relation to the manufacture or supply of the Products, their resale by the Distributor or their use by any customer.

Unless expressly stated to the contrary, to the extent permitted by law PANDORA's liability to the Distributor for the breach of any condition or warranty in respect of the Products is limited at Pandora's option to any one of the supplying, replacing, repairing, or paying the cost of re-supplying, replacing, or repairing the Products in respect of which the breach occurred.

**Labelling**

The Distributor must comply with all labelling, marketing and other legal requirements in the Territory and obtain any necessary import licenses, certificates of origin or other requisite documents, and pay all applicable customs, duties and taxes in respect of the Products in respect of each order.

Schedule 5.6

**POS Material**

PANDORA supplies the Distributor with POS Material. Orders for POS Material placed by the Distributor cannot exceed an amount corresponding in value to 5 % of the Distributor's orders for Products in any given contractual year.

**Schedule 6.1**

**Minimum Aggregate Purchase Obligation**

The Distributor undertakes to buy Products from PANDORA for a minimum aggregate pur-
chase amount of 500.000 € excluding VAT for the first twelve (12) months, 750.000 € ex-
cluding VAT for the following twelve (12) months and 1.000.000 € for the last twelve (12)
months of the agreement from the Commencement Date and

**Schedule 6.4**

**Development Obligation**

The Distributor undertakes during the term of this agreement to distribute the Products to the following numbers of Multi-brand Retailers as defined in Clause 7:

| | Year 1 | Year 2 (additional) | Year 3 (additional) |
|---|---|---|---|
| Shop-in-Shop / Concept Stores | 4 | 6 | 6 |
| Gold | 3 | 3 | 3 |
| Silver | 3 | 3 | 3 |
| White | 5 | 5 | 5 |

**Schedule 11.3**

**Sales Representatives and Merchandiser Visits**

The Distributor shall carry out the following minimum number of visits a year to each Multi-brand Retailer:

|  | Shop-In-Shop | Gold | Silver | White |
|---|---|---|---|---|
| Sales Visits | 4 | 4 | 2 | 2 |
| Merchandisers Visits | 6 | 4 | 2 | 0 |

**Schedule 12.5**

**Marketing and Promotion Commitment**

The Distributor shall spend, on a yearly basis, not less than _8_ % of its yearly Net Sales on advertising and promotion of the Products and PANDORA's brand.

**Schedule 15.1**

**Competing Products**

The Distributor is entitled to produce, purchase, promote, market or sell the following products, which resemble or compete with the Products:

Coral & Stones United, Corp.'s collection

# EXHIBIT 3

Colombia & Venezuela

# MASTER FRANCHISE AGREEMENT

PANDORA HOLDING A/S
B&B Jewelry, Inc.

CONTENTS

| 1.  | SCOPE OF THE AGREEMENT | 1 |
|-----|------------------------|---|
| 2.  | DEFINITIONS | 1 |
| 3.  | INTERPRETATION | 4 |
| 4.  | GRANT OF FRANCHISE RIGHTS | 5 |
| 5.  | DEVELOPMENT OBLIGATION | 6 |
| 6.  | APPROVAL OF SUB FRANCHISEES AND STORE LOCATIONS | 6 |
| 7.  | PRODUCTS | 6 |
| 8.  | MINIMUM AGGREGATE PURCHASE OBLIGATION | 7 |
| 9.  | GUIDE | 7 |
| 10. | TRAINING | 8 |
| 11. | ASSISTANCE AND SERVICES | 8 |
| 12. | FRANCHISEE'S PERSONNEL | 9 |
| 13. | MARKETING AND PROMOTION | 9 |
| 14. | SURVEYS | 10 |
| 15. | FEES | 10 |
| 16. | REPORTING | 10 |
| 17. | PANDORA'S RIGHT OF INSPECTION | 11 |
| 18. | PANDORA'S RIGHT TO COMMUNICATE WITH SUB FRANCHISEES | 11 |
| 19. | NON-COMPETITION | 12 |
| 20. | INTELLECTUAL PROPERTY | 12 |
| 21. | CONFIDENTIALITY OBLIGATION | 13 |

ii

| 22. | TERM AND TERMINATION | 14 |
|---|---|---|
| 23. | CONDITIONS FOLLOWING TERMINATION | 16 |
| 24. | ASSIGNABILITY | 18 |
| 25. | INSURANCE | 18 |
| 26. | RELATIONSHIP BETWEEN THE PARTIES | 19 |
| 27. | FORCE MAJEURE | 19 |
| 28. | WAIVER | 19 |
| 29. | NOTICES | 19 |
| 30. | COMPLIANCE WITH LAW | 19 |
| 31. | MISCELLANEOUS PROVISIONS | 20 |
| 32. | GOVERNING LAW AND VENUE | 20 |
| 33. | WARRANTY | 21 |
| 34. | SIGNATURES | 21 |

iii

## SCHEDULES

| Schedule 2.1(a) | Commencement Date |
| Schedule 2.1(b) | Guide |
| Schedule 2.1(c) | Sub Franchise Agreement |
| Schedule 2.1(d) | Territory |
| Schedule 5.1 | Development Obligation |
| Schedule 7.1 | Assortment of Products |
| Schedule 7.6 | POS Material |
| Schedule 7.7 | Terms of Sale and Delivery |
| Schedule 8.1 | Minimum Aggregate Purchase Obligation |
| Schedule 11.3 | Sales Representatives and Merchandisers Visits |
| Schedule 13.5 | Marketing and Promotion Commitment |
| Schedule 15.1 | Foca |
| Schedule 19.1 | Competing Products |

iv

This agreement is made between

**PANDORA Holding A/S**
Reg No (CVR) 28505116
Egegaardsvej 59-61
2610 Roedovre
Danmark
("PANDORA")

AND

**B&B Jewelry, Inc.**
36 N.E. 1st Street, #213
Miami, Florida, 33132
USA
(the "Franchisee")

In this agreement PANDORA and the Franchisee shall from time to time be referred to individually as a "Party" and together as the "Parties".

## 1.   SCOPE OF THE AGREEMENT

1.1   PANDORA has invested considerable resources in the development, distribution and branding of a unique collection of charm bracelets and matching jewellery under the "PANDORA" name and brand as described in the Guide.

1.2   PANDORA has developed a System to be used in connection with the establishment, management and operation of Concept Stores in connection with the promotion and sale of Products under the Trademarks. The System, including instructions and directions, is described in the Guide.

1.3   PANDORA desires to grant the Franchisee the right within the Territory to use the Trademarks and the System in connection with the operation of Concept Stores and to grant sub franchise rights to Sub Franchisees by concluding Sub Franchise Agreements.

## 2.   DEFINITIONS

2.1   In this agreement, unless the context requires otherwise:

"Commencement Date"   means the date specified in Schedule 2.1(a).

"Concept Store"   means a stand-alone retail store or a stand-alone and clearly defined space in a department store, which is dedicated to the sale of the Products and which is owned and operated by the Franchisee or a Sub Franchisee in accordance with the Guide.

"Contractual Year"   means every consecutive period of twelve (12) months following the Commencement Date.

"Force Majeure"   means any event or circumstance, or combination of events or circumstances, which is beyond the reasonable control of the Party affected and which causes or results in default or delay in the performance by that Party of any of its obligations under this agreement and which that Party could not reasonably have been expected to have prevented, or overcome. Force Majeure includes, without limitation the following events or circumstances:
(a) acts of God;
(b) wars, riots, fire, quarantine, insurrections,

1

vandalism or sabotage; and

(c) strikes, lockouts, bans, limitations of work or other industrial disturbances.

"Goodwill"

means all goodwill, reputation, value and commercial advantage in connection with PANDORA, the Intellectual Property, and the System.

"Gross Profit"

means the Franchisee's revenue from the sale of the Products less purchase costs of the Products.

"Guide"

means the part of PANDORA's on-line retail management Guide accessible to the Franchisee and its Sub Franchisees describing the System, a current version of which is set out in Schedule 2.1(b), and as amended and updated continuously by PANDORA.

"Intellectual Property"

means all intellectual property rights of whatever nature, whether proprietary or otherwise and whether in law or in equity or under statute including without limitation, patents, copyright, registered designs, unregistered design rights, trade marks and the right to have confidential information kept confidential, and any application or right to apply for registration of any of those rights.

"Net Sales"

means gross sales of the Products at the invoiced selling price less returns, deductions or discounts, and all applicable taxes.

"POS Material"

means PANDORA gift bags, gift boxes, giftwrapping paper, sales displays, small mirrors, wood boxes, posters, brochures, catalogues and other marketing material used from time to time in connection with the resale of the Products.

"Products"

means the assortment of jewelry and accessories that are naturally related to the sale of the jewelry, including but not limited to jewelry cleaning fluids, jewelry cleaning cloths and jewelry boxes

and chests, manufactured and/or supplied by PANDORA from time to time for sale in the Territory.

"Shop Fittings"    means counters, trays, exhibition towers, cabinets, panels, shelves, mirrors, signs, lighting, furniture, carpets, cash register solutions and other items used for the presentation and/or sale of the Products from time to time in accordance with the Guide.

"Store Location"    means a location for a Concept Store which fulfils the standards and qualifications as set out in the Guide.

"Sub Franchisee"    means any person granted the right to open and operate a Concept Store according to a Sub Franchise Agreement.

"Sub Franchise Agreement"    means an agreement between the Franchisee and a Sub Franchisee granting the Sub Franchisee the right to use the Trademarks and the System in connection with the operation of a Concept Store. A draft model for such a Sub Franchise Agreement is set out in Schedule 2.1(c) or such other agreements as PANDORA from time to time authorises to be concluded between the Franchisee and Sub Franchisees. Amendments to the draft model are only permissible to the extent necessary to comply with existing legislation or trade customs in the Territory. Any amendments are subject to PANDORA's prior approval.

"System"    means the system developed by PANDORA for the establishment, management and operation of Concept Stores and distribution of Products. The System is described in the Guide and includes service systems, quality standards, Products, Trademarks, requirements for use of Trademarks, Shop Fittings, POS Material, management, training, stock control, guidelines, shop visuals, management support processes, reporting requirements and all other sup-

3

port processes, documentation, electronic guides, manuals, marketing material, and all their derivative works and improvements supplied by PANDORA from time to time.

"Territory"  means the area as defined in Schedule 2.1(d) with the exception of travel retail areas such as airports, airplanes and cruise ships, military establishments and other duty free areas.

"Trademarks"  means the trademarks, logos, names, product designations, designs etc. owned or licensed by PANDORA.

## 3.   INTERPRETATION

3.1  In the interpretation of this agreement unless the contrary intention appears or the context otherwise requires:

(a)  the singular includes the plural and vice versa;

(b)  a reference to a person includes a reference to a firm, corporation, other corporate body or legal entity;

(c)  a reference to (i) a natural person includes the heirs' executors, administrators and permitted assigns of that person and (ii) a corporate body includes the successors and permitted assigns of that corporate body;

(d)  a reference to a person or corporate body includes that person or body acting in a trustee or other representative capacity;

(e)  a reference to two (2) or more persons means those persons jointly and severally;

(f)  where a word or expression is defined, other parts of speech and grammatical forms of that word or expression have corresponding meanings;

(g)  headings are for ease of reference and do not affect the construction of this document;

(h)  a reference to a statute includes (i) all amendments for the time being in force and any other replacement statute and all regulations and

4

statutory instruments for the time being in force under that statute, and (ii) any notice demand order direction requirement or obligation pursuant to or under that statute or those regulations and statutory instruments;

(i)    a reference to a recital, clause, schedule, attachment or annexure is to recital, clause, schedule, attachment or annexure of or to this document and recital, schedule, attachment or annexure so referenced forms part of this document;

(j)    a reference to any agreement or document is to that agreement or document (and, where applicable, any of its provisions) as amended, novated, restated or replaced from time to time;

(k)    a reference to a consent, approval or discretion of a Party means the prior written consent or approval of that Party in its absolute and unfettered discretion or the exercise of the absolute and unfettered discretion of the Party which consent or approval may be granted on conditions;

(l)    a right includes a remedy, authority and power;

3.2    For the avoidance of doubt, the provisions of the Schedules attached hereto and referred to herein shall form part of this agreement and be binding on the Parties.

3.3    A provision of this document must not be construed against or to the disadvantage of a Party because that Party (or its advisers) was responsible for the preparation of the document (or a portion of the document).

## 4.    GRANT OF FRANCHISE RIGHTS

4.1    PANDORA grants to the Franchisee within the Territory,

(a)    the right for the Franchisee itself to use the Trademarks and the System in connection with the operation of Concept Stores; and

(b)    the right to grant sub franchise rights to use the Trademarks and the System in connection with the operation of Concept Stores to Sub Franchisees by concluding and entering into Sub Franchise Agreements with such Sub Franchisees.

4.2    The Franchisee shall operate Concept Stores according to Clause 4.1(a) through subsidiaries or affiliates provided that the Franchisee enters into a Sub Fran-

5

this Agreement with such subsidiaries or affiliates. Concept Stores operated through affiliates shall be organised with separate book keeping and accounts as if they were separate legal entities and the Franchisee shall receive payments from such affiliates as if they were operated as subsidiaries.

4.3     During the term of this agreement PANDORA shall not:

(a)     conclude any Sub Franchise Agreements;

(b)     grant any third party the right to use the System; or

(c)     itself use the System,

in the Territory.

**5.       DEVELOPMENT OBLIGATION**

5.1     The Franchisee shall itself open and continue to operate, and/or procure Sub Franchisees to open and operate the number of Concept Stores specified and within the time limits specified in Schedule 5.1.

**6.       APPROVAL OF SUB FRANCHISEES AND STORE LOCATIONS**

6.1     The Franchisee shall select and appoint prospective Sub Franchisees and Store Locations in accordance with the franchisee profile and location criteria in the Guide. The Franchisee undertakes to inform PANDORA of all ongoing approvals of Sub Franchisees and Store Locations.

6.2     If the Franchisee fails to meet its obligations under Clause 6.1, PANDORA has the right to introduce procedures for future appointments of prospective Sub Franchisees and Store Locations.

**7.       PRODUCTS**

7.1     The Franchisee is required to distribute to Sub Franchisees the assortment of Products as specified in Schedule 7.1. No other products or accessories than the Products shall be sold in Concept Stores operated by Sub Franchisees.

7.2     PANDORA determines the assortment of Products once a year taking into consideration relevant economic or market circumstances. The Franchisee may propose other products and accessories which the Franchisee considers relevant to include in the assortment of Products for the approval of PANDORA.

7.3     The Franchisee shall purchase the Products only from PANDORA or suppliers designated or approved by PANDORA. The Franchisee shall not purchase any products or accessories meant for the sale or use in a Concept Store from any other sources except with the prior approval of PANDORA.

7.4     The Franchisee shall not distribute Products to persons other than Sub Franchisees and the Franchisee shall ensure that sufficient order volumes and stocks are available at all times to meet the demand from Sub Franchisees.

7.5     The Franchisee shall not actively approach customers domiciled outside the Territory with a view to selling the Products.

7.6     PANDORA will supply the Franchisee with POS Material to be used by Sub Franchisees in Concept Stores as specified in Schedule 7.6. All freight charges shall be the responsibility of the Franchisee.

7.7     The Franchisee shall buy the Products from PANDORA subject to the terms and conditions as specified in Schedule 7.7 as may be amended from time to time by PANDORA's written notification to the Franchisee.

**8.     MINIMUM AGGREGATE PURCHASE OBLIGATION**

8.1     During the term of this agreement the Franchisee shall purchase Products from PANDORA for a minimum aggregate purchase amount each year. The minimum aggregate purchase amount for the first twelve (12) months following the Commencement Date is specified in Schedule 8.1.

8.2     The minimum aggregate purchase amount for subsequent years shall be negotiated in good faith between the Parties taking into consideration relevant economic and market circumstances. The minimum aggregate purchase amount for subsequent years must be agreed in writing by the Parties before the end of the previous Contractual Year.

8.3     In the event that no agreement is reached on the minimum aggregate purchase amount before the beginning of a Contractual Year, the minimum aggregate purchase amount for that Contractual Year shall be the higher amount of either (i) 110 % of the minimum aggregate purchase amount applied in the previous Contractual Year or (ii) the actual results (aggregate purchase amount) of the Franchisee's purchases during the previous Contractual Year.

**9.     GUIDE**

9.1     The Franchisee shall conduct all activities and shall cause all Sub Franchisees to conduct their business activities, in strict accordance with the Guide.

7

9.2     In case of inconsistency between the Guide and this agreement, this agreement shall prevail.

9.3     The Guide is the property of PANDORA and may not be copied, disclosed or disseminated in whole or in part in any manner except with PANDORA's express prior written consent.

## 10.     TRAINING

10.1    PANDORA shall provide the Franchisee's staff with training in accordance with the Guide. The training will take place at the locations designated by PANDORA. The Franchisee shall pay all wage costs and travelling, accommodation and other expenses for individuals participating in such training.

10.2    The Franchisee shall provide Sub Franchisees with training prior to and after opening of Concept Stores in accordance with the Guide and the terms of the Sub Franchise Agreements. The Franchisee shall not permit any Sub Franchisees to commence business in Concept Stores until the training required prior to the opening of a Concept Store has been completed.

## 11.     ASSISTANCE AND SERVICES

11.1    PANDORA shall provide Franchisee from time to time with reasonable assistance and services in connection with the management and operation of Concept Stores and/or the sale of Products. PANDORA will make available to the Franchisee the benefits of PANDORA's information, experience, advice, guidance, and know-how, and, upon the Franchisee's reasonable request, PANDORA shall counsel and assist the Franchisee with respect to the management and operations of Concept Stores and/or the sale of Products.

11.2    The Franchisee shall provide all Sub Franchisees with such assistance and services as PANDORA shall reasonably request and require in connection with the construction, equipping and opening of Concept Stores and in connection with the sourcing of equipment, fixtures, furnishings, inventory and supplies for Concept Stores, and the advertising and promotion of Concept Stores.

11.3    The Franchisee shall carry out regular sales representative visits to help its Sub Franchisees optimize their sales processes and to ensure that assortment and stock levels are aligned with customer demands. Furthermore, the Franchisee shall carry out regular merchandiser visits to help its Sub Franchisees in trimming their business and to ensure that the Products are displayed according to PANDORA's guidelines. The minimum number of yearly sales representative and

*merchandiser visits to be carried out by the Franchisee is specified in Schedule 11.3.*

## 12.    FRANCHISEE'S PERSONNEL

12.1    The proper fulfilment of the Franchisee's obligations under this agreement requires that the Franchisee and its personnel have the required qualifications and skills as described in the Guide. The Franchisee is obliged to employ a sufficient number of suitably qualified personnel to ensure the proper fulfilment of its obligations under this agreement.

12.2    The Franchisee shall upon request from PANDORA provide names of all key individuals employed by Franchisee to be responsible for the fulfilment of the obligations mentioned in the Guide and any changes to such information as it arises.

## 13.    MARKETING AND PROMOTION

13.1    The Franchisee shall participate in all promotion and marketing activities required by PANDORA in the Territory and such activities shall be carried out in accordance with the Guide.

13.2    PANDORA shall provide the Franchisee with marketing materials for use by the Franchisee in all promotion and marketing activities. All freight charges in connection with the transportation of such marketing materials to the Franchisee shall be the responsibility of the Franchisee.

13.3    PANDORA shall provide the Franchisee with all activity materials related to new collections, Valentines Day, Christmas and any other activity set out in the activity plan provided by PANDORA once a year. No other marketing or activity materials other than the latest updated materials provided by PANDORA are to be used by the Franchisee or Sub Franchisees without the prior consent of PANDORA.

13.4    The Franchisee shall submit samples of the Franchisee's advertising and promotional material to PANDORA for its approval, if such materials have not been prepared by or previously approved by PANDORA. If written notice of disapproval is not received by the Franchisee from PANDORA within 10 days of the date of receipt by PANDORA of such samples or materials, PANDORA shall be deemed to have approved them.

13.5    The Franchisee shall spend, on a yearly basis, not less than the percentage of its yearly Net Sales on marketing and promotion as specified in Schedule 13.5.

9

13.6    Marketing and promotion as used herein shall mean all out-of-pocket expenses and costs (excluding salaries of Franchisee's staff) incurred by the Franchisee in accordance with its current business plan towards any marketing, promotional or advertising activities in support of the Products including but not limited to advertising through the use of print, radio, TV, the Internet or other media, participation in fairs and other similar events, public relations activities and marketing contributions to Sub Franchisees.

13.7    Unless otherwise agreed with PANDORA, the Franchisee shall not provide sponsorships or the like for purposes which are not directly connected with the sale of the Products. The amount of any permitted or approved sponsorships shall be taken into account when determining whether the yearly marketing and promotion commitment set out in Clause 13.5 has been met provided, however, that it shall not, for the purposes of the calculation exceed more than 10 % of the annual marketing and promotion commitment as set out in Clause 13.5.

14.     SURVEYS

14.1    For the purpose of obtaining valuable information about the development and position of the brand relating to the Products and the Franchisee's position in the market, the Franchisee shall upon request from PANDORA and according to PANDORA's instructions participate in retailer satisfaction surveys and customer satisfaction surveys initiated by PANDORA not more than once a year.

14.2    The Franchisee will receive a report based on the data collected in connection with such surveys. PANDORA shall not guarantee the accuracy of such reports. The costs involved in participating in such surveys shall be divided and borne equally between PANDORA and the Franchisee.

15.     FEES

15.1    The Franchisee shall pay sign-on fees and management service fees as specified in Schedule 15.1.

16.     REPORTING

16.1    The Franchisee shall submit to PANDORA in the form prescribed by PANDORA, the following information:

        (a)     monthly statements reflecting the consolidated Net Sales in Concept Stores operated by Sub Franchisees;

10

(b)     monthly data concerning (i) the total current stock of the Products in number of units and value, (ii) the total current customer orders of the Products in number of units and value, and (iii) total current production order of Products in number and value in the preceding month;

(c)     shop data concerning Concept Stores operated by Sub franchisees as specified and requested by PANDORA from time to time;

(d)     yearly business plan, including a budget, in accordance with PANDO-RA's specifications from time to time. Submission of a yearly business plan also include the obligation on the Franchisee to take part in a yearly evaluation of the previous submitted business plan in accordance with PANDORA's instructions;

(e)     annual accounts audited by a certified auditor (registered in the Territory with the Independent Regulatory Board for Auditors) from the Franchisee and each Sub Franchisee;

(f)     yearly opinion from the auditor referred to in 16.1(e) stating that the Franchisee has spent the agreed level of expenditures on marketing and promotion activities as set out in Clause 13.5; and

(g)     such other forms, reports, records, information, and data as PANDORA may reasonably designate.

16.2     For the purpose of facilitating the gathering of shop data, as set out in Clause 16.1(c), PANDORA is entitled to introduce and require that software pro-grammes shall be acquired and used by the Franchisee and Sub Franchisees for such purpose.

## 17.     PANDORA'S RIGHT OF INSPECTION

17.1     If PANDORA wishes to review the validity of the data submitted by the Franchisee in accordance with Clause 16, PANDORA is entitled to carry out audits and reviews through an independent accountant at its own cost and the Franchisee will give that independent accountant and PANDORA full access to and copies of its records in that regard.

## 18.     PANDORA'S RIGHT TO COMMUNICATE WITH SUB FRANCHISEES

18.1     PANDORA reserves the right to communicate with any Sub Franchisee. This right includes the right to make inspections of Concept Stores operated by Sub Franchisees, to communicate with Sub Franchisees and the right to take legal action as agent for the Franchisee against any Sub Franchisee in the event of a

11

possible breach of a Sub Franchise Agreement and the Franchisee irrevocably authorises PANDORA to do so.

18.2     If a Sub Franchisee has breached a Sub Franchise Agreement, the Franchisee shall notify PANDORA of the same and if requested by PANDORA give notice of termination to such Sub Franchisee and terminate the Sub Franchise Agreement in accordance with its terms and law.

## 19.     NON-COMPETITION

19.1     With the exception of products listed in Schedule 19.1 the Franchisee shall not directly or indirectly in any capacity whatsoever (including without limitation either individually or as a trustee, principal, beneficiary, member, franchisor, franchisee, lender, joint venturer, agent, officer, or employee of any business), produce, purchase, promote, market or sell products which resemble or compete with the Products during the term of this agreement unless approved in writing by PANDORA.

## 20.     INTELLECTUAL PROPERTY

20.1     PANDORA retains all Intellectual Property in and to the Products and the PANDORA name, brand and Trademarks, the Guide and the System.

20.2     Except for the Franchisee's rights under this agreement, no right, title or interest in or to PANDORA's aforesaid Intellectual Property is granted or otherwise transferred by this agreement. Franchisee shall respect the Intellectual Property rights of PANDORA in accordance with all applicable laws and the provisions of this agreement and the Franchisee's use of the Trademarks in connection with any signs, decoration, advertising or marketing shall be in accordance with the instructions in the Guide.

20.3     The Franchisee may solely for the purpose of conducting the business in relation to the sale and promotion of the Products and/or the management and operation of Concept Stores pursuant to this agreement, use PANDORA's name and Trademarks on its letterhead, envelopes, order sheets or any other stationery items used in connection with this agreement. The Franchisee may not use nor register the PANDORA name in or as part of the Franchisee's business name, company name or domain name unless otherwise agreed by PANDORA in writing on such terms as PANDORA may stipulate in respect thereof.

20.4     The Franchisee shall inform PANDORA as soon as possible of any known or threatened infringement of PANDORA's Intellectual Property or of any claim or allegation by a third party that its Intellectual Property has been infringed by

12

the exercise of any of the rights granted by PANDORA to the Franchisee under this agreement.

20.5    The Franchisee shall itself refrain and shall take all reasonable steps to ensure that all Sub Franchisees refrain from registering or applying for registration of any Intellectual Property attached or subsisting in and/or relating to the Products and the PANDORA name or brand, the Trademarks, the Guide, the System and/or any part or derivative thereof. In the event that any such rights have already been registered before the execution of this agreement, the Franchisee shall ensure that any such rights are assigned to PANDORA without compensation.

## 21.    CONFIDENTIALITY OBLIGATION

21.1    The Franchisee undertakes to keep strictly confidential all confidential information about PANDORA, its suppliers, customers, products and the structure and development of the System; this shall apply in particular (but not limited) to all information contained in the Guide. Any and all information of such nature shall be deemed business or operating secrets of PANDORA. The Franchisee may use the information provided by PANDORA solely for the purpose of the fulfilment of its obligations under this agreement.

21.2    The Franchisee undertakes not to disclose to third parties any confidential and business information pursuant to Clause 21.1 which the Franchisee has received prior to or after the signing of this agreement.

21.3    The Franchisee may give access to the electronic Guide and other material dealing with the System to its employees for the use within its business. The Franchisee shall ensure that it has appropriate measures in place to prevent any employee from disclosing such documents or electronic information to any third party.

21.4    To the extent permitted by law, the Franchisee shall not disclose to anyone its realised or estimated sales figures or profits relating to the Products. If the Franchisee's total sales are derived from the sale of PANDORA Products and those of a third party and the total value of sales attributed to PANDORA Products is 60% or more of the Franchisee's total sales, the Franchisee shall obtain the prior written approval of PANDORA prior to disclosing such information.

21.5    This confidentiality obligation shall survive the termination of this agreement and remain in force as long as any of the information pursuant to Clause 21.1 is of confidential nature.

13

## 22.   TERM AND TERMINATION

22.1   The term of this agreement shall be for an initial term of three (3) years from the Commencement Date unless sooner terminated in accordance with the provisions herein.

22.2   After the initial term of three (3) years, this agreement shall be extended for an additional two (2) years provided that agreement on extension has been reached between the Parties before the end of the second Contractual Year. Where any subsequent extension is requested, the Parties must have agreed on such extension before the end of the first Contractual Year of the extension period, i.e. before the end of year 4, 6, 8, 10, 12 and so on. Agreements on extensions of this agreement, including any amendments or alterations hereto, shall be made in writing.

22.3   If agreement on extension of this agreement has not been reached in accordance with Clause 22.2 or if PANDORA decides not to extend the term, the Agreement will automatically terminate upon expiry of the initial term or the applicable subsequent agreed extension, i.e. at the end of year 3, 5, 7, 9, 11 and so on.

22.4   Notwithstanding Clauses 22.1 and 22.2 PANDORA shall at all times be entitled to terminate this agreement before expiry by giving six (6) months' written notice hereof to the Franchisee. In this case, the Franchisee shall be entitled to receive compensation from PANDORA. The compensation shall amount to Franchisee's Gross Profit on sales of the Products in the preceding twelve (12) months prior to the written notice. In the event that the cooperation between the Parties has not had a duration of effective twelve (12) months, the Franchisee's Gross Profit shall be calculated by multiplying the average monthly gross profit in the effective period with twelve (12). Should PANDORA decides to terminate the agreement with six (6) months' notice the Parties agree in good faith to discuss a possible transfer to PANDORA of the employees of the Franchisee who are dedicated to the fulfilment of this agreement. This discussion should also include the possibility of forming a joint venture between the Parties.

22.5   Notwithstanding Clauses 22.1 to 22.4 either Party may by written notification to the other Party with immediate effect terminate this agreement due to a material breach by the other Party or for another important reason which renders it unacceptable for the terminating Party to continue complying with this agreement for reasons of public morals or good faith, if the breach has not been remedied within 30 calendar days of receiving written notice of such breach from the notifying Party and of what is required to be done by the breaching

14

Party to remedy the breach. Material breach and important reasons entitling a Party to terminate this agreement with immediate effect shall include, among other things, the following:

- the Franchisee fails to meet its development obligation in any given year as set out in Clause 5.1;
- the Franchisee sells and distributes products and accessories other than those included in the assortment of Products as set out in Clause 7.1;
- the Franchisee fails to meet its minimum aggregate purchase obligation in any given year as set out in Clause 8.1;
- the Franchisee fails to comply with the Guide as set out in Clause 9;
- the Franchisee fails to meet its marketing and promotion commitment as set out in Clause 13.5;
- the Franchisee fails to pay the fees as set out in Clause 15.1, and other payment obligations in due time.;
- the Franchisee fails to submit correct or sufficient information as set out in Clause 16;
- the Franchisee fails to give access to information required by the obligation set out in Clause 17;
- the Franchisee breaches the restrictions contained in Clause 19;
- the Franchisee is in breach of the rules on the use of the Trademarks and other Intellectual Property as set out in Clause 20;
- the Franchisee breaches the confidentiality provisions set out in Clause 21;
- the Franchisee in any way discredits PANDORA, its affiliates, the Trademarks or the System;
- that for an extended period of time PANDORA is unable to supply the agreed assortment of Products to the Franchisee, and that this is not because PANDORA or its suppliers are affected by Force Majeure.

22.6   In the event that the Franchisee itself, the legal entity that the Franchisee is a part of or the parent or subsidiary company of the Franchisee has entered into an exclusive distribution agreement with PANDORA for the distribution of the Products to authorized multi-brand retailers in the Territory, material breach of the said distribution agreement shall constitute a material breach of this agreement as well.

22.7   PANDORA may terminate this agreement, effective immediately upon receipt by the Franchisee of a termination notice from PANDORA to the Franchisee, which termination notice PANDORA will be entitled to serve, upon the occurrence of any one or more of the following important reasons for termination:

15

- the Franchisee no longer holds a licence that the Franchisee must hold to carry on the franchised business under this agreement;
- the Franchisee becomes bankrupt, insolvent under administration or an externally-administered body corporate;
- the Franchisee or the director thereof is convicted of a serious offence;
- the Franchisee or the director thereof operates the franchised business in a way that in the opinion of PANDORA endangers public health or safety;
- the Franchisee or the director thereof is fraudulent in connection with the operation of the franchised business under this agreement; and
- the Franchisee agrees to termination of this agreement.

22.8    Unless expressly provided for by this agreement or by mandatory provisions of the law applicable, termination or non-renewal of this agreement by PANDORA will not entitle the Franchisee to any payment or compensation or a payment towards Goodwill.

## 23.    CONDITIONS FOLLOWING TERMINATION

23.1    Immediately upon the expiration or termination of this agreement:

(a)    the Franchisee will pay any and all amounts owing to PANDORA and its related bodies corporate pursuant to this agreement and all the rights under this agreement granted to the Franchisee will automatically revert to PANDORA;

(b)    the Franchisee will discontinue any use of the Intellectual Property and confidential information of PANDORA including without limitation the Intellectual Property and confidential information in the PANDORA name, Products, brand, Trademarks, Guide and System;

(c)    all Sub Franchisee Agreements and pending orders shall be assigned directly to PANDORA or such third party as designated by PANDORA; and

(d)    the Franchisee will otherwise refrain from doing business under any name or in any manner that might give the impression that the Franchisee is or was a franchisee of PANDORA, or otherwise affiliated or associated with PANDORA.

23.2    The Franchisee acknowledges and agrees that:

(a)    the Goodwill and any increase in value of the Goodwill vests absolutely in PANDORA and that the Franchisee is not entitled to any payment or other compensation whatsoever from PANDORA for any increase in value of the Goodwill that occurred during the term of this agreement un-

16

less otherwise provided for by mandatory provisions of the applicable law;

(b)     after the termination of this agreement, to the extent permitted by law, PANDORA may continue to use any information relating to customers or clients of the Franchisee that was provided to PANDORA by the Franchisee during the term of this agreement in accordance with this agreement and that the Franchisee will not be entitled to any payment or compensation in relation to PANDORA's use of this information. To the extent permitted by law the Franchisee shall transfer to PANDORA any information not already transferred to PANDORA during the term of this agreement relating to customers, including any databases, lists, registers, records, files or any similar lists, whether electronic or physical, containing information regarding end customers. PANDORA may use any such information after the termination of this agreement, and the Franchisee will not be entitled to any payment or compensation in relation to PANDORA's use of any such information;

(c)     unless otherwise provided for by mandatory provisions of the applicable law, PANDORA shall have the right but not the obligation within 30 days after termination, to purchase from the Franchisee any or all inventory and Shop Fittings related to the operation of Concept Stores at the lowest of either the purchase price or book value thereof in the Franchisee's account. PANDORA shall arrange for transportation and insurance and any related costs. The Franchisee may sell inventory to its Sub Franchisees in relation to orders that the Franchisee has received and accepted from such Sub Franchisees before the date of termination of this agreement; and

(d)     the Franchisee shall return to PANDORA any hard copies of the Guide and any other materials provided by PANDORA (marketing, activity, advertising and promotional material) in its possession or control.

23.3    PANDORA acknowledges and agrees that Clause 23.2(a) does not limit the Franchisee from selling the business it operates under this agreement and the goodwill in connection with the operation of that business and retain the proceeds of such a sale, provided that PANDORA has previously approved the sale (in writing) in accordance with Clause 24.2.

23.4    PANDORA's termination of this agreement does not affect PANDORA's rights (either pursuant to this agreement or otherwise at law) regarding any breaches of this agreement by the Franchisee which as at the date of termination have not been remedied by the Franchisee.

17                    RB

23.5    All obligations of the Parties which expressly or by their nature survive the termination or expiration of this agreement will continue in full force and effect notwithstanding the termination or expiration of this agreement.

23.6    In the event that the terms of section 197 of the Labour Relations Act 66 of 1995 apply upon the expiration or termination of this agreement, without prejudice to any of the rights of PANDORA at law, or in terms of any other provision of this agreement, the Franchisee hereby indemnifies PANDORA against all actual or contingent losses, liabilities, damages, costs and expenses of any nature whatsoever which PANDORA may suffer or incur as a result of or in connection with any action or claim of any nature which may be brought against PANDORA or any subsidiary of PANDORA by any employee or former employee of the Franchisee ("indemnified loss"). The Franchisee shall be obliged to pay PANDORA the amount of any indemnified loss suffered or incurred by PANDORA as soon as PANDORA is obliged to pay the amount thereof (in the case of any indemnified loss which involves a payment by PANDORA) or as soon as PANDORA suffers the indemnified loss (in the case of an indemnified loss which does not involve a payment by PANDORA).

24.    **ASSIGNABILITY**

24.1    PANDORA may assign or novate its rights or obligations fully or in part (including but not limited to PANDORA's handling and fulfilment of this agreement) to any company within the group of which PANDORA belongs and the Franchisee will execute all necessary documents in a form PANDORA considers reasonably necessary to effect that assignment or novation. Furthermore, PANDORA shall be entitled to assign the agreement in connection with a possible assignment of all or the majority of PANDORA's assets and liabilities.

24.2    The Franchisee may not assign or in any other way transfer its rights or obligations under this agreement without the prior written consent of PANDORA which consent will not be unreasonably withheld. The transfer of 50 % or more of the share capital or voting power in the Franchisee shall be deemed to be an assignment of this agreement.

25.    **INSURANCE**

25.1    The Franchisee shall take out on its own account full insurance against all relevant risks, and ensure that PANDORA is fully insured within the Territory against product liability and all other relevant claims from any third parties. The Franchisee shall upon request provide PANDORA with copies of all insurance policies in force.

**26.      RELATIONSHIP BETWEEN THE PARTIES**

26.1     This agreement does not create a fiduciary relationship between the Parties. The Franchisee is an independent contractor, and nothing in this agreement is intended to constitute either Party an agent, legal representative, subsidiary, joint venturer, partner, employer, or servant of the other for any purpose.

**27.      FORCE MAJEURE**

27.1     Neither of the Parties to this agreement shall be responsible to any other Party for any delay in performance or non-performance due to Force Majeure, but the affected Party shall promptly upon the occurrence of any such causes inform the other Party in writing, stating that such cause has delayed or prevented its performance hereunder and thereafter such Party shall take all action within its power to comply with the terms of this agreement as fully and promptly as possible.

27.2     Each party shall be entitled to terminate the agreement by reasonable written notice to the other Party if performance of the agreement within a reasonable time becomes impossible on account of any circumstances due to Force Majeure.

**28.      WAIVER**

28.1     The failure of any Party at any time to enforce any of the provisions of this agreement or to exercise any right under this agreement shall in no way affect that Party's rights after any failure or constitute a waiver of that right.

**29.      NOTICES**

29.1     Any notice or consent required to be given to any Party in connection with this agreement shall be in writing and shall be sent by e-mail, and recorded delivery to the address of the Party set out in this agreement or to such changed address as shall for that purpose be notified to the other Party. Every such notice or consent shall be deemed to have been given at the time when in the course of ordinary transmission it should have been delivered at the address to which it was sent.

**30.      COMPLIANCE WITH LAW**

30.1     The Franchisee shall conduct its business in a lawful manner and shall faithfully comply with all applicable laws or regulations for the conduct of its business.

30.2    In connection with the Franchisee's solicitation of Sub Franchisees to operate PANDORA Concept Stores in the Territory, and the execution and performance of all Sub Franchise Agreements entered into in connection therewith, the Franchisee shall comply with, and conduct all franchise promotion, advertising and other activities in accordance with any applicable law in the Territory and all of PANDORA's standards, rules, policies and procedures in effect from time to time.

**31.    MISCELLANEOUS PROVISIONS**

31.1    The Franchisee will duly execute and perform all such acts, deeds, matters and things (including the execution of documents) as may be reasonably required by PANDORA to enable PANDORA to obtain the full benefit and advantage of this agreement and the transactions contemplated by this agreement.

31.2    All the terms and provisions of this agreement are distinct and severable, and if any thereof are held unenforceable, illegal or void in whole or in part by any court, regulatory authority or other competent authority it shall to that extent be deemed not to form part of this agreement and the enforceability, legality and validity of the remainder of this agreement will not be affected.

31.3    The terms and conditions of this agreement may be amended, novated or varied only in writing signed by the Parties.

31.4    This agreement constitutes the entire agreement between the Parties as to its subject matter and supersedes all prior representations and agreement in connection with that subject matter. Either Party shall be bound by any express or implied term, representation, warranty, promise or the like not recorded herein.

31.5    This agreement supersedes and replaces all previous contracts, arrangements or understandings (whether oral or written) between the Parties.

**32.    GOVERNING LAW AND VENUE**

32.1    This agreement is governed in all respects in accordance with Danish law and shall be construed and take effect as an agreement made in Denmark.

32.2    PANDORA shall have the right to enforce any dispute or claim arising out of or in connection with this agreement in accordance with the Rules of Arbitration Procedure of the Danish Institute of Arbitration. The venue of arbitration shall be in Copenhagen. The language of the proceeding shall be English.

32.3    Notwithstanding Clause 32.2 PANDORA shall not be prevented from bringing monetary claims against the Franchisee before the ordinary courts at PANDO-

26

RA's or the Franchisor's venue or from resorting to immediate legal steps such as applications for interdicts in the Territory.

**33.     WARRANTY**

33.1     The Franchisee warrants that it has complied (and will for the term of this agreement continue to comply) in all respects with all such South African Exchange Control Regulations and Rulings as may be applicable to it and which are necessary for the implementation of this agreement.

33.2     The warranty contained in clause 33.1 is given on the basis that notwithstanding that PANDORA is or should be aware that the warranty is or may be incorrect, this agreement is entered into by PANDORA relying on the warranty, which is deemed to be both a material representation inducing PANDORA to enter into this agreement and an essential contractual undertaking by the Franchisee to ensure that the warranty is true and correct.

**34.     SIGNATURES**

34.1     This agreement shall be signed in 2 original copies, one for each of the Parties.


On behalf of PANDORA:                       On behalf of Franchisee:

Date:                                        Date:

Name: Bjorn Gulden                           Name: Rafael Bild
Title: CEO                                   Title: President


21                        RB

**Schedule 2.1(a)**

**Commencement Date**

The Commencement Date of this agreement is August 1st 2012.

**Schedule 2.1(b)**

See attached print-out of the current version of the Guide.

**Schedule 2.1(c)**

**Sub Franchise Agreement**

See attached print-out of the current version of the Sub Franchise Agreement.

RB

**Schedule 2.1(d)**

**Territory:**

The Territory of this agreement is the Colombia and Venezuela.

**Schedule S.1**

**Development Obligation**

The Franchisee shall itself open and operate, and/or procure Sub Franchisees to open and operate a number of Concept Stores throughout the Territory within the following agreed range and time limits:

Year 1: [ 1 ]
Year 2: [ 3 ]
Year 3: [ 3 ]

**Schedule 7.1**

**Assortment of Products**

The assortment of Products comprises the product lines specified in PANDORA's EUR3 price list from time to time, unless exemptions from this have been explicitly agreed.

Agreed exemptions in the assortment of Products:

**Schedule 7.6**

**POS Material**

PANDORA supplies the Franchisee with POS Material. Orders for POS Material placed by the Franchisee cannot exceed an amount corresponding in value to 5 % of the Franchisee's orders for Products in any given Contractual Year.

**Schedule 7.7**

**Terms of Sale and Delivery**

**Purchase**

The Franchisee shall purchase the Products by placing orders with PANDORA by e-mail.

Purchase orders shall be placed by the Franchisee with PANDORA in accordance with PANDORA's instructions from time to time by using PANDORA's standard order form. Minimum order per product is stated in the order form. Certain items which have limited production capacity (e.g. glass items) may, if necessary, be rationalised by PANDORA. The Franchisee shall specify sizes when ordering rings.

Minimum order: EUR 5,000 per order.

The Franchisee shall at least once every 6 months submit order forecast for the forthcoming 6 months. If the Franchisee wants to alter the forecast, this alteration will only be effective after 3 months. In addition, the alteration cannot exceed 100 %.

**Delivery**

Time of delivery is 6-8 weeks (subject to reservation for holidays and lack of spare parts) from the date of placement of order. The Products shall be delivered in the sequence produced, i.e. a delivery may contain Products from several orders. However, there is a maximum delivery of 10,000 units per week. This means that an order for 100,000 units will take up to 10 weeks.

PANDORA shall inform the Franchisee of the estimated delivery date of the Products upon receipt of the order and shall use all reasonable endeavours to meet the delivery date.

Fluctuations in the number of units delivered may occur. For orders above 100 units, the number of units delivered may fluctuate +/- 15 % from the number ordered. For orders below 100 units fluctuations in the number of units delivered may be higher.

**Prices**

The base prices for the Products are the prices stipulated in PANDORA's wholesale price list ("EUR3 price list"). The base pricelist is adjusted at least once a year. On the day of invoicing the base prices will be adjusted according to the latest London Noon Fix for gold and silver.

The Franchisee may order samples and customers' orders for products not included in the assortment of Products at the current list prices at the time of ordering less the following discounts:

All prices are ex works and exclusive of freight and any applicable VAT.

**Payments**

Payment to PANDORA shall be made cash in advance the first 6 month. After the initial of 6 month, the Payment shall be made net cash 30 days from delivery to PANDORA's bank account unless otherwise agreed. Payment shall unless otherwise agreed be made in EUR, and all expenses of effecting payment shall be paid by the Franchisee.

Without prejudice to its other rights in respect thereof, PANDORA shall be entitled to withhold further supplies of Products while payment of any sums due from the Franchisee remain outstanding and/or require advance payment, or other bank guaranteed method for further shipments. PANDORA is entitled to charge interest on such overdue payments at a rate of 2 % per month running from the due date until payment is made.

| | |
|---|---|
| **Retention of Title** | Ownership of Products in each delivery only passes to the Franchisee when all Products in that delivery are paid for in full. |
| | Until then: |
| | Ownership of Products in the relevant delivery remains with PANDORA; |
| | (a) the Franchisee holds Products as bailee for PANDORA; and |
| | (b) the Franchisee must store those Products and customer orders in a manner which enables them to be easily identified and distinguished from other goods and products. |
| | If PANDORA terminates this agreement, then: |
| | (a) immediately upon PANDORA's request the Franchisee must return to PANDORA any Products nominated by PANDORA which are still owned by PANDORA; and |
| | (b) PANDORA may resell those Products in its absolute and unfettered discretion. |
| **Risk and Insurance** | Risk of loss or damage to Products will pass to the Franchisee at the time of delivery to the Franchisee. The Franchisee (at its sole cost), must insure such Products from the time risk passes to the Franchisee. |
| **Warranty** | PANDORA warrants that 98 % (measured in value) of the Products are free from any defects caused by errors in production. If the Franchisee can prove that in 1 year the error rate has exceeded 2 %, PANDORA shall be obliged to deliver Products equivalent to the value exceeding 2 % without charge. The Franchisee shall not be entitled to make claim for errors within the 2 % range. |
| | Not later than the 15 January every year, the Franchisee shall inform PANDORA of the error rate in the past calendar year. If PANDORA is required to compensate the Franchisee for errors of more than 2 % such a request must be submitted to PANDORA not later than 15 February of the same year. Defective Products for which compensation has been claimed shall be returned to PANDORA. |
| | In the event that PANDORA is in breach of this warranty for whatever reason, the Franchisee's remedy shall to the extent permitted by law be limited to replacement or the Products in question, or at PANDORA's discretion, repayment of the price where this has been paid. |
| **Liability** | Nothing in these Terms of Sale and Delivery shall exclude or limit the liability of Pandora in respect of fraudulent misrepresentation, nor in respect of death or personal injury caused by negligence of PANDORA. To the extent permitted by law, in no event shall PANDORA be liable to the Franchisee for any loss of business, loss of opportunity or loss of profits or for any other indirect or consequential loss or damage whatsoever, whether occasioned by the negligence of PANDORA or its employees or agents or otherwise, arising out of or in connection with any act or omission of PANDORA in relation to the manufacture or supply of the Products, their resale by the Franchisee or their use by any customer. |
| | Unless expressly stated to the contrary, to the extent permitted by law PANDORA's liability to the Franchisee for the breach of any condition or warranty in respect of the Products is limited at Pandora's option to any one of the supplying, replacing, repairing, or paying the cost of re-supplying, replacing, or repairing the Products in respect of which the breach occurred. |
| **Labelling** | The Franchisee must comply with all labelling, marketing and other legal requirements in the Territory and obtain any necessary import licenses, certificates of origin or other requisite documents, and pay all applicable cus- |

toms, duties and taxes in respect of the Products in respect of each order.

**Schedule 8.1**

*Minimum Aggregate Purchase Obligation*

The Franchisee undertakes to buy Products from PANDORA for a minimum aggregate purchase amount of 200.000 € excluding VAT for the first twelve (12) months from the Commencement Date.

**Schedule 11.3**

**Sales Representatives and Merchandiser Visits**

**Sales Representatives Visits**

The Franchisee shall carry out minimum 8 sales representatives visits a year at its Sub Franchisees.

**Merchandiser Visits**

The Franchisee will carry out minimum 12 merchandiser visits a year at its Sub Franchisees.

**Schedule 13.5**

**Marketing and Promotion Commitment**

The Franchisee shall spend, on a yearly basis, not less than β % of its yearly Net Sales on marketing and promotion of the Products and PANDORA's brand.

**Schedule 15.1**

**Fees**

**Sign-on Fees**

The Franchisee shall pay 0.00 as sign-on fee for each Concept Store established, irrespective of whether such store unit is established by the Franchisee itself or by means of a Sub Franchise Agreement with a Sub Franchisee.

The amount shall be fully paid no later than at the opening of each store unit. No part of the amount may be subject to claim for repayment.

In the event that the Franchisee charges any Sub Franchisee sign-on fees that exceed the sign-on fees payable by the Franchisee to PANDORA in accordance with this Schedule 15.1, the Franchisee shall pay PANDORA 50 % of such sign-on fees additional to the amount paid to PANDORA.

**Management service fee**

The Franchisee shall pay an annual management service fee to PANDORA. The fee shall always amount to 2.5 % of the total Net Sales in store units operated by Sub Franchisees (including store units operated by the Franchisee). The Franchise fee payable by the Sub Franchisees to the Franchisee amounts to up to 5 % calculated on the basis of the Net Sales in each individual store unit. This means that the Franchisee may charge its Sub Franchisees a franchise fee in the range of 2.5-5 % of their Net Sales.

The management service fee shall be payable in EUR to PANDORA on a quarterly basis and no later than on the 15 January (for the period 1 October – 31 December), 15 April (for the period 1 January – 31 March), 15 July (for the period 1 April – 30 June) and 15 October (for the period 1 July – 31 September) in each calendar year. Each such payment shall be accompanied by an itemised statement of the Net Sales in the franchise units.

If payments from the Franchisee to PANDORA fall overdue, the Franchisee shall pay to PANDORA a late fee of 2 % per month on the overdue amount running from the due date and until payment is made.

**Schedule 19.1**

**Competing Products**

The Franchisee is entitled to produce, purchase, promote, market or sell the following products, which resemble or compete with the Products:

# EXHIBIT 4

# THE DANISH
# INSTITUTE OF ARBITRATION

### PARTIAL AWARD ON JURISDICTION

**In arbitration case number: E-2588**

| **PANDORA A/S** | & | **PANDORA JEWELRY, LLC** |
|---|---|---|
| Havneholmen 17-19 | | 250 W. Pratt Street |
| 1561 Copenhagen V | | Baltimore, MD, 21201 |
| Denmark | | USA |

"Claimants"

Represented by Attorney René Offersen, DLA Piper Denmark

v.

**B&B JEWELRY, INC.**

36 N.E. 1 St. #213

Miami, FL 33132

USA

"Respondent"

Represented by Attorney Daniel K. Bandklayder, Daniel K. Bandklayder, P. A

PLACE OF ARBITRATION: Copenhagen, DENMARK

Date: 23 July 2017

# THE DANISH
# INSTITUTE OF ARBITRATION

## I.    Introduction

1.    This is an arbitration between Pandora A/S, previously Pandora Holdings A/S, ("Pandora A/S") and Pandora Jewelry, LLC ("Pandora Americas") acting together as claimant (together, "Pandora"), and B&B Jewelry, Inc. ("B&B Jewelry") as respondent.

2.    This Partial Award concerns B&B Jewelry's contention that the Danish Institute of Arbitration (the "DIA") and the Sole Arbitrator lack jurisdiction to arbitrate the dispute that is the subject of this arbitration.

3.    Section II below sets out a summary of certain procedural matters that are relevant to this decision.  Section III sets out a summary of the parties' respective arguments as set out in their respective pleadings.  Section IV sets out the Sole Arbitrator's analysis.  Section V sets out certain details in respect of costs.  Section VI sets out the Sole Arbitrator's formal decision.

## II.    Procedural matters

4.    B&B Jewelry has consistently stated throughout this arbitration to date that it challenges the jurisdiction of the DIA, including *inter alia* as follows:

   (a)    By letter dated 1 February 2017, B&B Jewelry through its counsel informed the DIA of its position that the DIA had no jurisdiction;

   (b)    During the initial telephone conference in this arbitration, held on 12 March 2017, B&B Jewelry reiterated that it was challenging jurisdiction; and

   (c)    By email dated 27 March 2017, B&B Jewelry through its counsel repeated its jurisdictional objection and attached an Order issued by the United States District Court for the Southern District of Florida in proceedings between B&B Jewelry as plaintiff and Pandora Americas and Franck Saragossi as defendants (Case No. 1:17-cv-20198-UU), dated 23 March 2017 (the "U.S. District Court Order").

5.    Accordingly, by email dated 27 March 2017, the Sole Arbitrator invited each party to state its position briefly by email regarding how the U.S. District Court Order affected the arbitration.

6.    By email dated 2 April 2017, after receiving brief comments from both parties, the Sole Arbitrator noted that the parties had very different views regarding the question of the Arbitral

2

# THE DANISH
# INSTITUTE OF ARBITRATION

Tribunal's jurisdiction. Accordingly, the Sole Arbitrator suggested that he would need to make a ruling on this issue pursuant to Article 16 of the DIA Rules.

7.  By Procedural Order No. 2, dated 11 April 2017, following an exchange of emails between the parties and the Sole Arbitrator, the Sole Arbitrator fixed the following timetable for determination of the issue of jurisdiction:

    1.  B&B Jewelry's first pleading on the issue of jurisdiction (to the extent not already submitted): Friday 14 April 2017;

    2.  Pandora's first pleading on the issue of jurisdiction: Friday 28 April 2017;

    3.  B&B Jewelry's second pleading on the issue of jurisdiction: Friday 5 May 2017;

    4.  Pandora's second pleading on the issue of jurisdiction: Friday 12 May 2017;

    5.  Oral submissions by video conference, if requested by either party: Friday 19 May 2017 (or such other date to be agreed);

    6.  Order or Award by the Arbitral Tribunal on the issue of jurisdiction: by the end of May 2017 (or as soon as possible thereafter).

8.  Subsequently, by Procedural Order No. 3, dated 3 May 2017, and by agreement between the parties, the Sole Arbitrator varied the timetable set out in Procedural Order No. 2, as follows:

    1.  B&B Jewelry's first pleading on the issue of jurisdiction (to the extent not already submitted): Friday 14 April 2017;

    2.  Pandora's first pleading on the issue of jurisdiction: Friday 28 April 2017;

    3.  B&B Jewelry's second pleading on the issue of jurisdiction: ~~Friday 5 May 2017~~Monday 15 May 2017;

    4.  Pandora's second pleading on the issue of jurisdiction: ~~Friday 12 May 2017~~Thursday 1 June 2017;

    5.  Oral submissions by video conference, if requested by either party: ~~Friday 19 May 2017~~Thursday 8 June 2017 (or such other date to be agreed);

3

# THE DANISH
## INSTITUTE OF ARBITRATION

6.    Order or Award by the Arbitral Tribunal on the issue of jurisdiction: by the end of ~~May~~June 2017 (or as soon as possible thereafter).

9.    In accordance with the above timetable, the parties duly filed the following pleadings:

    (a)    B&B Jewelry's first pleading on the issue of jurisdiction, dated 14 April 2017;

    (b)    Pandora's first pleading on the issue of jurisdiction, dated 28 April 2017;

    (c)    B&B Jewelry's second pleading on the issue of jurisdiction, dated 15 May 2017; and

    (d)    Pandora's second pleading on the issue of jurisdiction, dated 1 June 2017.

10.    By emails dated 5 June 2017, both parties separately confirmed that they did not require a video conference to be held.

11.    The Sole Arbitrator will accordingly proceed to determine the issue of jurisdiction on the basis of the pleadings and other documents that have been submitted by the parties.

**III.    The parties' respective submissions on the issue of jurisdiction**

12.    The Sole Arbitrator will provide a short outline below of the main points pleaded by each party on the issue of jurisdiction. It should be noted, however, that the summary below only includes the most essential points, and the summary below is not intended to be an exhaustive recitation of every issue raised by the parties.

B&B Jewelry

13.    B&B Jewelry argues, in short, that the arbitration agreements have expired.

14.    B&B Jewelry argues that, although Pandora A/S and B&B Jewelry were previously parties to the Master Distribution Agreement (the "MDA") and the Master Franchise Agreement (the "MFA") both dated 1 August 2012 (together, the "Agreements"), the Agreements expired on 31 July 2015, since no written agreement or amendment to extend the Agreements was entered into.

15.    B&B Jewelry argues that the arbitration provisions in the Agreements did not survive the expiration of the Agreements.

# THE DANISH
# INSTITUTE OF ARBITRATION

16. According to B&B Jewelry, Pandora Americas and B&B Jewelry continued thereafter to operate under a new oral contract, but they were not operating and did not intend to continue operating under the expired Agreements.

17. Thus, B&B Jewelry claims that the parties did not agree to arbitrate this dispute which arose after the expiration of the Agreements.

18. Furthermore, B&B Jewelry points out that the United States District Court for the Southern District of Florida, in the U.S. District Court Order, has held that no agreement to arbitrate exists between Pandora Americas and B&B Jewelry. B&B Jewelry asks the Sole Arbitrator to respect the U.S. District Court Order pursuant to the doctrine of comity. B&B Jewelry also points out that Pandora Americas did not seek to appeal the U.S. District Court Order.

19. B&B Jewelry suggests that there is no delegation by the parties of a determination of arbitrability to the arbitrator.[1] Moreover, B&B Jewelry argues that Pandora Americas has waived any right it may have had to have the Sole Arbitrator determine the arbitrability of this dispute, by affirmatively submitting the question of arbitrability to the U.S. District Court, and to the Florida State Court, without raising the argument that arbitrability was outside the scope of those courts' jurisdiction. Accordingly, B&B Jewelry argues that the United States District Court properly made the decision of whether the dispute is arbitrable.

20. B&B Jewelry adds that, in the event that the Sole Arbitrator asserts jurisdiction over this matter and an award is issued in this arbitration, such award would be unenforceable under the express terms of the New York Convention.

Pandora

21. Pandora points out that the written Agreements between Pandora A/S and B&B Jewelry are governed in all respects by Danish law and contain arbitration provisions that allow any dispute or claim arising out of the agreements to be arbitrated before the DIA.

22. Pandora states that it follows from the competence-competence doctrine that the Sole Arbitrator must determine his own jurisdiction without regard to the U.S. District Court Order.

---

[1] The Sole Arbitrator understands the word "arbitrability" to be used by B&B Jewelry in the U.S. sense of whether a dispute should be decided by an arbitrator.

5

# THE DANISH
# INSTITUTE OF ARBITRATION

23.  Pandora seeks a declaration in these proceedings that the agreements did not expire in 2015, but were continued by course of performance and, unless earlier terminated, remain in effect until 31 July 2017.

24.  Pandora argues that, under Danish law, a written contract can be extended by course of performance. Any requirement for extensions to be in writing will not be considered decisive. In Danish case law, there are several examples of the Danish High Court ruling that an arbitration clause agreed by the parties as part of an agreement also applies to subsequent extensions of, or additions to, the parties' agreement.

25.  Accordingly, Pandora argues that, in accordance with Danish law, the MDA and the MFA were renewed by the parties by course of performance for two additional years, ending 31 July 2017. The parties continued to perform in accordance with the provisions of the agreements, despite not having made any written extension agreement. No verbal agreement was made regarding the terms and conditions after 31 July 2015.

26.  Although the Initial Term came to an end on 31 July 2015, the parties continued to perform in accordance with the provisions of the agreements and in the same manner as they had done prior to that date. In particular:

   -   B&B Jewelry did not stop purchasing and distributing Pandora jewelry,
   -   B&B Jewelry did not assign B&B Jewelry's pending orders and sub-franchise agreements to Pandora, and
   -   B&B Jewelry did not stop using Pandora's intellectual property.

27.  In the period up to and on the date of expiry of the Initial Term, both parties knew that the commercial relationship would continue despite the absence of written agreement on extension.

28.  Pandora adds that the U.S. District Court Order was merely procedural; the order is not conclusive of the issue of jurisdiction and is not even binding on the Florida State Court to which the case has been remanded, much less on the Sole Arbitrator. Moreover, the U.S. District Court Order is based on a limited record and a narrow procedural context. Furthermore, U.S. law does not prevent, and should not dissuade, the Sole Arbitrator from deciding the threshold issue of jurisdiction over this dispute.

6

# THE DANISH
# INSTITUTE OF ARBITRATION

**IV.    Analysis**

The applicable legal framework

29.    This arbitration has been commenced pursuant to the arbitration provisions in the written Agreements, section 32.2 of the MFA and section 28.2 of the MDA respectively, which provide as follows:

> "*[Pandora A/S] shall have the right to enforce any dispute or claim arising out of or in connection with this agreement in accordance with the Rules of Arbitration Procedure of the Danish Institute of Arbitration. The venue of arbitration shall be in Copenhagen. The language of the proceeding shall be English.*".

30.    Both the MFA and the MDA, including their respective arbitration provisions, are governed by, and are to be interpreted in accordance with, Danish substantive law (section 32.1 of the MFA and section 28.1 of the MDA).

31.    Pursuant to these arbitration provisions, Pandora A/S and B&B Jewelry have agreed to arbitrate in accordance with the Arbitration Rules of the DIA. In addition, since they have agreed to arbitrate in Copenhagen, the Danish Arbitration Act (Act no. 553 of 24 June 2005 on Arbitration) applies. Section 1(1) of that Act states: "*This Act applies to arbitration, including international arbitration, if the place of arbitration is in this country*".

Whether the Sole Arbitrator is entitled to rule on his own jurisdiction

32.    The competence-competence doctrine is incorporated into the Arbitration Rules of the DIA and also into the Danish Arbitration Act, which provide as follows:

- Article 16(1) of the DIA Rules: "*The Arbitral Tribunal shall rule on its own jurisdiction, also in relation to any objections as to the existence or validity of the arbitration agreement.*"

- Section 16(1) of the Danish Arbitration Act: "*The arbitral tribunal may rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement. For that purpose, an arbitration clause which forms part of a contract shall be treated as an agreement independent of the other terms of the*"

7

# THE DANISH
# INSTITUTE OF ARBITRATION

*contract. A decision by the arbitral tribunal that the contract is null and void shall not entail ipso jure the invalidity of the arbitration clause.*"

33.  By incorporating the DIA Rules and by choosing Copenhagen as the seat of arbitration, the parties delegated to the Sole Arbitrator the right to rule on his own jurisdiction, including the existence of the arbitration agreements. Accordingly, the Sole Arbitrator is *prima facie* expressly entitled to rule on the issue of jurisdiction.

34.  B&B Jewelry argues that Pandora Americas has waived the right to have the Sole Arbitrator rule on jurisdiction. However, Pandora disputes this assertion and states that "*the U.S. Defendants have consistently maintained that the issue of whether the Agreements were extended by course of performance is for the Sole Arbitrator to decide under Danish law*" (Pandora's Second Pleading on Jurisdiction, dated 1 June 2017, para. 62.3).

35.  Pandora A/S is, in any event, not a party to the legal proceedings in the U.S.A. It therefore cannot be suggested that Pandora A/S has waived its right for the Sole Arbitrator to rule on jurisdiction in respect of claims made by Pandora A/S.

36.  As regards Pandora Americas, the Sole Arbitrator considers that it is important to note that there are material differences between the U.S. legal proceedings and this arbitration.

   (a)  Most notably, the parties are different:

   •  The parties to the U.S. legal proceedings are B&B Jewelry as plaintiff and Pandora Americas and Franck Saragossi as defendants;

   •  The parties to this arbitration are Pandora A/S and Pandora Americas as claimants, and B&B Jewelry as respondent.

   (b)  Moreover, whereas B&B Jewelry's claims "*are based upon and arise from entirely separate verbal agreements*" (see page 3 of the U.S. District Court Order), the claims made by Pandora A/S and Pandora Americas in this arbitration are expressly based upon and arise from the written Agreements (see the Statement of Claim in this arbitration). In this regard, it is relevant to note that Pandora denies that any verbal agreements have been entered into.

8

# THE DANISH
# INSTITUTE OF ARBITRATION

37.    It follows that the issue of jurisdiction in the U.S. legal proceedings is different from the issue of jurisdiction in this arbitration.   Whereas the issue of jurisdiction in the U.S. legal proceedings is whether B&B Jewelry's claims based on verbal agreements can be pursued in U.S. courts against Pandora Americas and Franck Saragossi, the issue of jurisdiction in this arbitration is whether the claims by Pandora A/S and Pandora Americas against B&B Jewelry based on the written Agreements can be pursued by way of arbitration.

38.    By its actions in the U.S. legal proceedings, Pandora Americas has not waived its right to ask the Sole Arbitrator to rule on jurisdiction in relation to the claims based on the written Agreements made by Pandora A/S and Pandora Americas in this arbitration.

39.    The Sole Arbitrator accordingly finds that he is entitled to proceed to determine his own jurisdiction pursuant to Article 16(1) of the DIA Rules and Section 16(1) of the Danish Arbitration Act.

The jurisdictional issue in this arbitration

40.    The issue to be determined is whether the Sole Arbitrator has jurisdiction to hear and determine the claims based on the written Agreements made by Pandora A/S and Pandora Americas in this arbitration.

41.    Such claims, as set out in paragraphs 7 and 8 of the Statement of Claim, can be summarised as follows:

      (a)    Pandora A/S seeks (i) a declaration that the written Agreements will expire on 31 July 2017, and that certain conditions following termination will apply from 31 July 2017, and (ii) a declaration that Pandora A/S did not assign the written Agreements to Pandora Americas and that Pandora A/S remains the contracting party under the written Agreements.

      (b)    Alternatively, Pandora Americas seeks essentially the same declaration as summarised in item (a)(i) above.

9

# THE DANISH
# INSTITUTE OF ARBITRATION

Whether the claims made in this arbitration fall within the scope of the arbitration provisions in the
written Agreements

42.    It does not appear to be disputed that the claims made by Pandora A/S and Pandora Americas
       in this arbitration fall within the scope of the arbitration provisions in the written Agreements.
       Those arbitration provisions refer to "*any dispute or claim arising out of or in connection
       with*" the written Agreements (see paragraph 29 above). The claims made by Pandora A/S and
       Pandora Americas in this arbitration arise out of the written Agreements. In any event, these
       claims are claims in connection with the written Agreements.

43.    Accordingly, but for the question of whether or not the arbitration provisions in the written
       Agreements survive, the Sole Arbitrator finds that the claims made by Pandora A/S and
       Pandora Americas in this arbitration fall within the scope of the arbitration provisions in the
       written Agreements.

Do the arbitration provisions in the written Agreements survive?

44.    The central issue between the parties for present purposes is whether there is still any
       arbitration agreement between these parties; in other words, whether the arbitration provisions
       in the written Agreements survive.

45.    B&B Jewelry contends that the written Agreements themselves have expired, and that the
       arbitration provisions did not survive such expiration since there is no provision that expressly
       provides for the survival of the arbitration provisions. Section 19.4 of the MDA and section
       23.5 of the MFA provide: "*All obligations of the Parties which expressly or by their nature
       survive the termination or expiration of this agreement will continue in full force and effect
       notwithstanding the termination or expiration of this agreement*". However, B&B Jewelry
       contends that the arbitration provisions are not "*obligations*".

46.    However, at least under Danish law which is the *lex arbitri*, arbitration provisions by their
       nature generally survive the expiration of the agreements in which they are included. It is not
       necessary for parties to include an express statement in the agreement that the arbitration
       provisions will survive expiration or termination of the agreement. See, *e.g.*, Professor Mads
       Bryde Andersen's textbook on contract law in practice (2015), pp. 359-360, and Niels
       Schiersing's textbook with annotations to the Danish Arbitration Act (2016), pp. 265-266.

10

# THE DANISH
# INSTITUTE OF ARBITRATION

47.   In the absence of an express statement that the arbitration provisions do not survive the
      expiration of the agreements, which would be most unusual, the Sole Arbitrator finds that
      arbitration provisions in an agreement governed by and construed in accordance with Danish
      law would generally be expected to survive expiration of that agreement.

48.   Section 19.4 of the MDA and section 23.5 of the MFA do not exclude the survival of the
      arbitration provisions.  These sections do not give an exclusive list of those provisions that
      survive termination or expiration of the agreements; for example, these sections do not suggest
      that only such obligations that are expressly referred to are intended to survive.  In fact, these
      sections are worded in inclusive language.

49.   B&B Jewelry draws a distinction between the word "*obligations*" in section 19.4 of the MDA
      and section 23.5 of the MFA and the reference to Pandora being given "*the right to enforce
      any dispute or claim*" by arbitration under the arbitration provisions.  However, the Sole
      Arbitrator is not satisfied that such a distinction may validly be drawn.  In particular, the
      arbitration provisions give rise to both rights and obligations.  Accordingly, pursuant to
      section 19.4 of the MDA and section 23.5 of the MFA, the obligation of the parties to resolve
      disputes by way of arbitration, pursuant to the arbitration agreement that has been created by
      virtue of the arbitration provisions, by its nature survives the termination or expiration of the
      Agreements.

50.   Accordingly, the Sole Arbitrator finds that the arbitration provisions have survived any
      expiration of the written Agreements.

Whether the Agreements themselves remain in force

51.   The central substantive issue in the arbitration is whether the written Agreements themselves
      remain in force.

52.   However, for the purposes of this Partial Award on Jurisdiction, it is sufficient for the Sole
      Arbitrator to have found that the arbitration provisions have survived any expiration of the
      written Agreements.  Even if it were later to be found that the written Agreements have
      themselves already expired, the arbitration provisions have survived such expiration.  Thus,
      whether or not the Agreements themselves remain in force, the Sole Arbitrator has jurisdiction
      to hear and determine claims or disputes arising out of or in relation to those written
      Agreements.

11

# THE DANISH
# INSTITUTE OF ARBITRATION

53. The issue of whether the written Agreements themselves have expired turns on an evaluation of all relevant facts and circumstances, but given the limited evidence before the Sole Arbitrator at this stage in the case, it would be wrong for the Sole Arbitrator to take any view on this evidential issue at this stage.

54. Nevertheless, the Sole Arbitrator will express an initial view on the issue of Danish law as to whether an agreement that provides for written extension can be extended by conduct, since this discrete issue of law has been addressed at some length in the parties' respective pleadings.

55. The Sole Arbitrator is persuaded that this is an issue that may be viewed rather differently by common law and civil law lawyers. Whereas common law lawyers tend to give primacy to the terms of the written agreement, civil law lawyers tend to look for the common intention of the parties in light of all relevant facts and circumstances, including the terms of the written agreement.

56. Thus, the Sole Arbitrator is satisfied that, as a matter of Danish law, it would in theory be possible for parties to extend an agreement by means of their conduct or performance, even if the agreement states that an extension must be made in writing. See, *e.g.*, Professor Mads Bryde Andersen's textbook on the law of contract (2015), page 192. However, in order to determine whether such an extension may have been made in any particular case, it would be necessary to evaluate all relevant facts and circumstances.

## The principle of comity

57. B&B Jewelry has argued that the U.S. District Court Order should nevertheless be respected pursuant to the principle of comity.

58. The principle of comity is of great importance in circumstances where it applies. However, the Sole Arbitrator does not consider that the principle of comity can be applicable in the present circumstances.

59. First, the issue of the Sole Arbitrator's jurisdiction is an issue to be determined pursuant to the *lex arbitri* which is Danish law. Pursuant to Danish arbitration law, it is for the Sole Arbitrator to determine his own jurisdiction, subject to the supervisory jurisdiction of the Danish courts. Neither the Sole Arbitrator nor the Danish courts should give deference to the U.S. District Court Order in making such determinations.

# THE DANISH
# INSTITUTE OF ARBITRATION

60.   Second, to the extent that the issues in question turn on the interpretation of provisions of the
      written Agreements, these agreements are expressly governed by and must be construed in
      accordance with Danish substantive law pursuant to section 32.1 of the MFA and section 28.1
      of the MDA. The U.S. District Court Order did not make any reference to Danish substantive
      law.

61.   Third, as has already been noted, the issue of jurisdiction before the U.S. District Court was
      different from the issue of jurisdiction that arises in this arbitration. In particular, the U.S.
      District Court based its decision on the plaintiff's Affidavit of Rafael Bild, who attested "*that
      upon the expiration of the 2012 Agreements, Plaintiff and Defendant, Pandora Americas,
      continued to do business pursuant to a new verbal agreement and related understandings*"
      (U.S. District Court Order, page 6). Conversely, the claims made by Pandora A/S and
      Pandora Americas in this arbitration are expressly based upon the written Agreements and are
      not founded upon any verbal agreement or related understandings.

62.   Fourth, the U.S. District Court based its decision upon the failure by Pandora Americas to
      meet its burden of proof: "*'In evaluating a motion to remand, the removing party bears the
      burden of demonstrating federal jurisdiction.' ... However, in removing this case to federal
      court and in responding to Plaintiff's Motion to Remand, Defendants failed to attach any
      evidence or affidavit. On the other hand, Plaintiff attached the Affidavit of Rafael Bild to its
      Motion to Demand. ... Based on the affidavit submitted and the allegations in this case,
      Defendants have failed to meet their burden in establishing this Court has subject-matter
      jurisdiction.*" (U.S. District Court Order, page 6).

63.   Fifth, the Sole Arbitrator notes that the U.S. District Court Order is a procedural decision, not
      a final and decision on substantive matters.

64.   For these reasons, the Sole Arbitrator declines to follow the U.S. District Court Order.

V.    **Costs**

65.   Neither party has asked for any ruling on costs, and it is normal for costs to be dealt with at the
      end of the arbitration. Accordingly, the Sole Arbitrator defers the question of costs until the
      end of the arbitration.

# THE DANISH
# INSTITUTE OF ARBITRATION

**VI.    Order**

66.    For the reasons set out above, the Sole Arbitrator hereby FINDS that the Danish Institute of
Arbitration and the Sole Arbitrator have jurisdiction to hear and determine the claims made by
Pandora A/S and Pandora Americas in this arbitration.


Seat of Arbitration: Copenhagen, Denmark

Date:        **23. JUNI 2017**

Signed:

James Hope

The authenticity of this award is hereby confirmed

by Danish Institute of Arbitration

Copenhagen, Denmark
Secretary General Steffen Pihlblad

14

# EXHIBIT 5



DLA Piper Denmark Law Firm P/S
Raadhuspladsen 4
DK-1550 Copenhagen V
Denmark

Tel    +45 33 34 00 00
Fax   +45 33 34 00 01
CVR 35 20 93 52
denmark@dlapiper.com
www.dlapiper.com

Daniel K. Bandklayder, P.A.
Attn: Daniel K. Bandklayder
11130 N. Kendall Drive, Suite 104
Miami, Florida 33176
USA

And

Mazanti-Andersen Korsø Jensen Advokatpartnerselskab
Attn: Jens Folker Bruun and Lars Lüthjohan Jensen
Amaliegade 10
1256 Copenhagen C
Denmark

21 December 2017

Our ref.: 310804-LGR

### Request for payment of costs

In arbitration case number E-2588 at the Danish Institute of Arbitration the Sole
Arbitrator has issued the final award containing an order of costs. The award was
issued on 18 December 2017.

René Offersen

Lawyer

Direct tel. +45 33 34 02 23

E-mail rene.offersen@dlapiper.com

Lene Grønne

Secretary

Direct tel. +45 33 34 02 16

Pursuant to the Danish Arbitration Act section 34, sub-section 1, the award on
costs is due for payment 30 days after the termination of the arbitral proceedings.
The arbitral proceedings were terminated with the sole arbitrator's issuance of
the final award, cf. the Danish Arbitration Act section 32, sub-section 1.

The amount awarded is thus due for payment on 17 January 2018.

The final award orders BB Jewelry, Inc to pay costs in paragraph 218.5 and 218.6.

The final award orders payment of **DKK 2,049,097.11** and **USD 188,881** with
default interests in accordance with section 5 of the Danish Interest act, cf. section
8a, from the date of enforcement.

The provisions in the Danish Interest act stipulate, that interests accrue from the
date of enforcement and that the interest in this regard is the Danish National
Bank's official lending rate, as regulated in January or July of the year in question
(at this moment 0,05%[1]) with an additional 8%. The accruing interest applicable
for overdue payment of the cost award thus constitute 8,05% p.a. from the time
of enforcement on 17 January 2018.

DLA Piper Denmark Law Firm P/S
is a limited partnership company
registered in Denmark (Danish
Business ID number 35 20 93 52)
which is part of DLA Piper, a global
law firm operating through various
separate and distinct legal entities.
Its places of business are at
Raadhuspladsen 4, DK-1550
Copenhagen V and DOKK1, Hack
Kampmanns Plads 2, Level 3, DK-
8000 Aarhus C, Denmark.

A list of offices and regulatory
information can be found at
www.dlapiper.com.

Denmark Switchboard
+45 33 34 00 00

---

[1] http://www.nationalbanken.dk/en/marketinfo/official_interestrates/Pages/default.aspx



The final award also orders payment of **DKK 699,700.00** with interests in accordance with the Danish Interest act, for fees and costs of the Arbitral Tribunal and other administrative fees to the Danish Institute of Arbitration. The fees have during the proceedings been paid by Pandora A/S, and are owed to Pandora A/S. Interest of 8,05% p.a. will also accrue for this due amount from the date of enforcement on 17 January 2018.

The total amount due for payment 17 January 2018 constitutes **DKK 2,748,797.11 (USD 435,549.61)** and **USD 188,881** and shall be transferred to the following bank account:

Nordea Bank
Account number: 2191 0493 108 484
IBAN: DK 13 2000 0493 108 484
SWIFT-code: NDEADKKK
Please include reference: ref. 310804

Please be advised, that Pandora has instructed me to take all necessary steps to enforce the award if payment is not received by the date of payment. The award can be enforced in 157 national states, including the United States, in accordance with the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958.

Yours sincerely

René Offersen

# EXHIBIT B

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION
CASE NO: 16-032176 CA-01

B&B Jewelry, Inc.

Plaintiff(s),

vs.

Pandora, et al

Defendant(s),

ORDER
~~GRANTING~~/DENYING
PLAINTIFF'S/~~DEFENDANTS~~
~~Motion For Temporary~~
~~Injunction~~

THIS CAUSE having come on to be heard on ___December 19, 2017___
on Plaintiff's/~~Defendant's~~ Motion

For Temporary Injunction

and the Court having heard arguments of counsel, and being otherwise advised in the premises, it is hereupon

ORDERED AND ADJUDGED that said Motion be, and the same is hereby

Denied as the court after having a full evidentiary hearing finds that Plaintiffs have failed to establish the necessary criteria for the extraordinary remedy they request.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida this ___19th___

day of ___December___, ___2017___

CIRCUIT COURT JUDGE

MONICA GORDO
CIRCUIT COURT JUDGE

Copies furnished to: Counsel of Record

117_01-554   3/11